UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE TELIK, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-cv-04819 (CM) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED SETTLEMENT AND CERTIFICATION OF THE CLASS**

Stanley D. Bernstein
Mel E. Lifshitz
Timothy J. MacFall
Joseph R. Seidman, Jr.
**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
10 E. 40th St
New York, New York 10016
(212) 779-1414

*Counsel for Lead Plaintiff and the Class*

14920v1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

OVERVIEW OF FACTUAL ALLEGATIONS IN
THE AMENDED COMPLAINT ........................................................................................... 3

REASONS FOR THE SETTLEMENT .............................................................................. 5

THE PROPOSED SETTLEMENT ...................................................................................... 7

     A.    Settlement Consideration ................................................................................... 7

     B.    Plan of Allocation of the Net Settlement Fund ....................................... 7

     C.    Release of Class Members' Claims ........................................................ 9

ARGUMENT ....................................................................................................................... 10

I.      STANDARDS FOR GRANTING PRELIMINARY APPROVAL .................................. 10

II.     THE COURT SHOULD PRELIMINARILY
APPROVE THE SETTLEMENT ...................................................................................... 11

     A.    The Proposed Settlement Is the Result of
Good Faith, Arm's-Length Negotiations Among Experienced
Counsel Mediated By a Retired Judge .................................................. 11

     B.    The Proposed Settlement Must Be Viewed In Light of
The Profound Risks of Continued Litigation Learned By
Lead Counsel During Settlement Negotiations and Mediation ............ 13

     C.    The Proposed Settlement Falls Within a Range of
Reasonableness and Warrants Notice and a
Hearing on Final Approval .................................................................... 16

     D.    The Settlement Has No Obvious Deficiencies ...................................... 18

III.    THE COURT SHOULD APPROVE THE FORM OF
THE NOTICE AND PLAN FOR PROVIDING
NOTICE TO THE CLASS ................................................................................................. 19

IV.    THE PROPOSED CLASS SATISFIES
THE REQUIREMENTS OF RULE 23 ............................................................................. 20

     A.    The Numerosity Requirement is Satisfied ........................................... 21

B.   Plaintiffs and the Proposed Class
     Common Questions of Law And Fact .................................................................... 21

C.   Lead Plaintiff And Its Counsel Will
     Adequately Represent the Proposed Class............................................................. 22

D.   The Proposed Class Satisfies the
     Requirements of Rule 23(b)(3) ............................................................................ 23

E.   Common Questions of Law and Fact Predominate ............................................. 23

F.   A Class Action is Superior to Multiple Individual Actions................................. 24

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES:**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)..................................................................22, 23

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
  222 F.3d 52 (2d Cir. 2000)...............................................................22

*Cromer Fin. Ltd. v. Berger,*
  205 F.R.D. 113 (S.D.N.Y. 2001) ................................................. passim

*Hicks v. Morgan Stanley,*
  No. 01 CIV. 0071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................................17

*In re AMF Bowling Sec. Litig.,*
  334 F. Supp. 2d 462 (S.D.N.Y. 2004)......................................................12

*In re Blech Sec. Litig.,*
  187 F.R.D. 97 (S.D.N.Y. 1999) .................................................21, 24, 25

*In re Excess Value Ins. Coverage Litig.,*
  No. M-21-84 (RMB), 2004 WL 1724980 (S.D.N.Y. July 30, 2004),
  *aff'd sub nom. D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001)..............................................................11

*In re Gilat Satellite Networks, Ltd.,*
  No. CV-02-1510 CPS, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...................................14

*In re Global Crossing Sec. & ERISA Litig.,*
  225 F.R.D. 436 (S.D.N.Y. 2004) .........................................................18

*In re Ikon Office Solutions, Inc. Sec. Litig.,*
  194 F.R.D. 166 (E.D. Pa. 2000)..........................................................20

*In re Indep. Energy Holdings PLC Sec. Litig.,*
  302 F. Supp. 2d 180 (S.D.N.Y. 2003).....................................................19

*In re Interpublic Sec. Litig.,*
  No. 02 Civ. 6527 (DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)...............................10

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
  No. 02 MDL 1484JFK, 2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007)......................13, 17, 18

*In re Nasdaq Market-Makers Antitrust Litig.,*
   176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................10, 11, 18

*In re PaineWebber Ltd. P'ships Litig.,*
   147 F.3d 132 (2d Cir. 1998)................................................................................10

*In re PaineWebber Ltd. P'ships Litig.,*
   171 F.R.D. 104 (S.D.N.Y.), *aff'd,*
   117 F.3d 721 (2d Cir. 1997)................................................................................11

*In re Prudential Sec. Inc. P'ships Litig.,*
   163 F.R.D. 200 (S.D.N.Y. 1995) ................................................................ passim

*In re Prudential Ins. Co. of Am. Sales Practice Litig.,*
   148 F.3d 283 (3d Cir. 1998)................................................................................21

*In re Sumitomo Copper Litig.,*
   189 F.R.D. 274 (S.D.N.Y. 1999) ..................................................................22, 25

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir.), *cert. denied,*
   546 U.S. 935 (2005)............................................................................................13

*Marisol A. v. Giuliani,*
   126 F.3d 372 (2d Cir. 1997)...............................................................................21

*Maywalt v. Parker & Parsley Petroleum Co.,*
   147 F.R.D. 51 (S.D.N.Y. 1993) .........................................................................21

*McManus v. Fleetwood Enters.,*
   320 F.3d 545 (5th Cir. 2003) .............................................................................21

*Peters v. Nat'l R.R. Passenger Corp.,*
   966 F.2d 1483 (D.C. Cir. 1992) ........................................................................20

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
   No. 94 CIV. 5587 (PKL) (RL), 2003 WL 21136726 (S.D.N.Y. 2003) ...................14

*Robidoux v. Celani,*
   987 F.2d 931 (2d Cir. 1993)...............................................................................22

*Robinson v. Metro-North Commuter R.R. Co.,*
   267 F.3d 147 (2d Cir. 2001)...............................................................................21

*Taft v. Ackermans,*
   No. 02 CIV. 7951 (PKL), 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) .................14

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01 Civ. 11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ...............................11

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)...........................................................................................10, 21

**STATUTES:**

15 U.S.C. § 78u-4 ......................................................................................................13, 19

**OTHER AUTHORITIES:**

*Manual for Complex Litigation (Fourth)* § 13.14 (2004) .............................................10

Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act
Common stock Settlements: Updated Through December 2004* ....................................18

Keith L. Johnson & Richard H. Koppes:  *Cellstar and Cal Micro
Cases Provide New Model for Common stock Fraud Litigation*,
SE39 ALI-ABA 537 (1999) ............................................................................................18

Denise N. Martin, *et al.*, *National Economic Research
Associates,* What Explains Filings and Settlements in
Shareholder Class Actions? (1996) ...............................................................................18

Mukesh Bajaj, *et al.*, *"Common stock Class Action
Settlements,"* (Nov. 16, 2000) .......................................................................................18

## PRELIMINARY STATEMENT

Lead Plaintiff Policemen's Annuity and Benefit Fund for the City of Chicago ("Lead Plaintiff") and additional named Plaintiff Ramesh K. Mehan, RML Limited, Ramesh K. Mehan Irrevocable Children's Trust, Joel K. Mehan Irrevocable Trust, Sheila G. Mehan Irrevocable Trust, Renee Mehan Family Trust, Neal D. Mehan Irrevocable Trust, Rahul D. Mehan and Ramesh K. Mehan Family Trust (collectively, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion, pursuant to Rules 23(a), (b)(3), and (e) of the Federal Rules of Civil Procedure, for preliminary approval of the proposed settlement of this class action (the "Settlement"). The Settlement, as set forth in the Stipulation and Agreement of Compromise, Settlement and Release dated April 16, 2008 (the "Stipulation"), and filed contemporaneously herewith, provides for the gross payment of five million dollars ($5,000,000.00) in cash for the benefit of the Class.[1] Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Class in a very challenging case and should be approved by the Court.

This action asserts claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, against Telik, Inc. ("Telik" or the "Company"), Telik officers Michael M. Wick and Cynthia M. Butitta (the "Individual Defendants") (Telik and the Individual Defendants are referred to as the "Telik Defendants"), and UBS Securities LLC, Lehman Brothers Inc., and J.P. Morgan Securities Inc. (the "Underwriter Defendants"), who underwrote an offering of Telik common stock in January of 2005 (the "Offering").

Plaintiffs respectfully request that this Court enter the proposed Order Preliminarily Approving Settlement, Providing for Notice and Scheduling Settlement Hearing (the "Preliminary

---

[1] Otherwise undefined terms have the definitions given in the Stipulation.

Order") annexed to the Stipulation and submitted separately herewith as Exhibit A for the Court's convenience. The Preliminary Order, among other things: (i) preliminarily approves the Settlement as within a range of reasonableness; (ii) schedules a hearing (the "Settlement Hearing") to consider the fairness, reasonableness and adequacy of the proposed Settlement, the Plan of Allocation of the Net Settlement Fund ("Plan of Allocation" or "Plan"), and Lead Counsel's application for an award of attorneys' fees and expenses on behalf of Plaintiffs' Counsel; (iii) approves the forms and methods of disseminating notice to the Class; (iv) approves the appointment of the claims administrator recommended by Lead Counsel to help implement the terms of the Settlement; (v) establishes procedures by which persons may request to be excluded from the Class; and (vi) establishes procedures for Class Members to object to the terms of the Settlement, Plan of Allocation, or applications for fees and expenses.

   If the Court grants preliminary approval to the Settlement, Plaintiffs respectfully propose the following schedule for the various Settlement events:

- Mailing of individual Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Expenses, and Settlement Hearing ("Notice") and Proof of Claim form to all Class Members who can be identified through reasonable effort: *30 days after entry of the Preliminary Order.*

- Publication of Summary Notice of Pendency of Class Action, Proposed Settlement and Settlement Hearing ("Summary Notice") in the national edition of *The Wall Street Journal*: *10 days after the date the Notice is mailed.*

- Deadline for submission of requests for exclusion from the Class or objections to the Settlement, Plan of Allocation, or motions for fees and expenses: *60 days after the date the Notice is mailed.*

- Settlement Hearing: *At the Court's convenience, but no less than 70 days after the date the Notice is mailed.*

- Deadline for submission of Proofs of Claim: *20 days after the Settlement Hearing*

15733v1                                    2

## OVERVIEW OF FACTUAL ALLEGATIONS IN THE AMENDED COMPLAINT

Telik is a biopharmaceutical company that works to develop innovative small molecule drugs to treat diseases. The Company's most advanced drug development candidate is TELCYTA, a tumor-activated small molecule designed to be activated in cancer cells. ¶3.[2] Throughout the Class Period, the Company conducted multiple clinical trials to evaluate the effectiveness of TELCYTA. ¶30.[3]

Telik initiated Phase 2 clinical trials of TELCYTA in ovarian and non-small cell lung cancers in the first half of 2001, and continued these trials throughout the Class Period. In March 2003, Telik initiated Phase 3 trials in connection with those same diseases. ¶5.[4]

Lead Plaintiff alleged that, throughout the Class Period, the Telik Defendants stated that they received interim data concerning both the Phase 2 and Phase 3 clinical trials. *See* ¶¶35-36, 47-49. Indeed, at various oncological conferences, in press releases, and in analysts' conference calls throughout the Class Period, the Telik Defendants repeatedly touted the interim findings of the Phase

---

[2] "¶___," refers to paragraphs of the Complaint.

[3] Before a new drug can be marketed in the United States, it must be approved by the Food and Drug Administration ("FDA") after a lengthy period of clinical trials which are divided into several phases. ¶4. Phase 2 trials include about 100-300 participants and test for safety and efficacy. Phase 3 trials test the drug, which utilizes a larger number of participants than Phase 2, further tests the product's effectiveness, monitors side effects, and, in some cases, compares the product's effects to a standard treatment, if one is already available. *Id.*

[4] The Phase 3 trials consisted of three separate testing arms called ASSIST (ASsessment of Survival In Solid Tumors) 1, 2, and 3. ASSIST-1 was a 440 patient multinational, randomized study designed to evaluate TELCYTA as compared to the active control agents liposomal doxorubicin or topotecan in the third-line therapy of platinum resistant ovarian cancer. ASSIST-2 was a 520 patient multinational, randomized study designed to evaluate TELCYTA as compared to gefitinib in the third-line therapy of advanced non-small cell lung cancer. ASSIST-3 was a 244 patient randomized trial conducted in the U.S. designed to demonstrate a statistically significant improvement in overall tumor response to the combination of TELCYTA plus carboplatin compared to liposomal doxorubicin in the second-line treatment of platinum resistant ovarian cancer. The primary "endpoint," or goal, of ASSIST-1 and 2, was survivability. The primary endpoint of ASSIST-3 was "objective response" to TELCYTA, *i.e.*, reduction in tumor size, with a secondary endpoint of survivability. ¶6.

2 trials, stating that TELCYTA demonstrated significant anti-tumor activity and had a favorable impact on survival. *Id.* As a consequence of these glowing reports, Telik common stock reached a Class Period high of $29.04 per share. ¶7. In addition, in January 2005, Telik engaged in an offering of 8,050,000 shares of common stock, underwritten by the Underwriter Defendants, that was completed in February 2005. Net proceeds to Telik were about $140 million. *Id.*

Even as they were issuing highly positive statements about the interim results of the Phase 2 clinical trials, however, Lead Plaintiff alleged that the Telik Defendants received, but failed to disclose, interim data from the ASSIST-1 and 2 Phase 3 clinical trials which showed that TELCYTA not only failed to improve survival rates, but that patients treated with TELCYTA actually died sooner than the control groups who did not receive the drug. ¶¶45-46, 50-51, 55-56, 65. Lead Plaintiff also alleged that the Telik Defendants failed to disclose that they had received interim reports that the ASSIST-3 Phase 3 clinical trial had been compromised by the premature withdrawal of 25% of the participants, rendering it useless for submission to the FDA. ¶¶57-58, 60-61, 63-65.

Lead Plaintiff alleged that the truth was partially disclosed on December 26, 2006 when the Telik Defendants announced that TELCYTA had failed to reach the primary endpoint – "a statistically significant improvement in overall survival" – in two of its Phase 3 clinical trials. ¶65. Additionally, the Company disclosed that in the third Phase 3 clinical trial, ASSIST-3, approximately 25% of the patients were prematurely discontinued from the assigned study treatment, invalidating that trial. *Id.* After these partial disclosures, Telik common stock fell $11.49 per share, or over 70%, to close on December 26, 2006 at $4.77 per share, on very heavy trading volume. ¶66.

Although the Telik Defendants had disclosed that TELCYTA failed all three Phase 3 clinical trials in December 2006, Lead Plaintiff alleged that they failed to disclose that TELCYTA had performed substantially worse than the competitors' drugs that were used in the control arms of

15733v1                                    4

ASSIST-1 and ASSIST-2. ¶¶67-68. From December 2006 until June 2007, the Telik Defendants continued to make positive statements about the purported efficacy of TELCYTA based on various studies and interim data from the Phase 2 clinical trials. ¶72.

Lead Plaintiff alleged that it was not until June 3, 2007 that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil® or Hycamtin® (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months for the control group that was treated with Iressa® (gefitinib). ¶¶73-74.

The following day, June 4, 2007, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which stopped new patient enrollment in TELCYTA clinical trials, and prevented the Company from administering additional doses of the drug to those patients already enrolled in the trials. ¶76. Following the Company's disclosure and the FDA announcement, shares of the Company's stock declined an additional 41% to close on June 5, 2007 at $3.42 per share, on unusually heavy trading volume. ¶77.

## REASONS FOR THE SETTLEMENT

Lead Plaintiff and Lead Counsel believe that the Settlement is an outstanding result for the Class. As discussed more fully below, during settlement negotiations, the mediation, and in materials produced, as well as depositions conducted during confirmatory discovery, the Telik Defendants demonstrated that they were "blinded" to all substantive data concerning the ASSIST-1, ASSIST-2, and ASSIST-3 Phase 3 clinical trials of TELCYTA until the conclusion of those studies in December 2006. Indeed, the "interim looks" cited by the Telik Defendants were, in fact, summary status reports from independent Data Monitoring Committees ("DMCs") that stated only

15733v1                               5

whether the trials should be terminated, continued, modified, or whether Telik should seek accelerated approval from the FDA. While the DMCs reviewed the underlying data from the trials on an on-going basis, their Charters expressly precluded them from disclosing any detailed data, such as drug efficacy, to the Company. Lead Plaintiff has uncovered no evidence to suggest that the DMCs breached these provisions of their Charters.

In addition, while the Complaint alleged that Defendants failed to disclose that the patients receiving TELCYTA died more quickly than those in the control groups, the evidence adduced during confirmatory discovery shows that the survival rates for the patients in the control group in the ASSIST-1 trial were aberrationally higher than historical norms, and there was no statistical significance to the survival rate differential between the control group and the TELCYTA-treated group in ASSIST-2. Finally, Lead Counsel learned that the five month time period between the December 26, 2006 disclosure that all three Phase 3 tests had failed, and the June 4, 2007 disclosure that TELCYTA performed worse than the control drug, was necessary to fully analyze and confirm the accuracy of all data, since Telik received only a "top-line," or summary, analysis, in December .

Despite the foregoing, Lead Plaintiff believes that it could have sought leave to amend the Complaint to allege that the Telik Defendants' statements that the Phase 3 trials were designed to provide for "interim looks" were materially misleading because the Telik Defendants did not, in fact, receive such interim data. Lead Plaintiff also recognized, however, that there were substantial hurdles to establishing liability under this theory. For example, some (but not all) of the analysts following Telik understood the "interim looks" to refer only to the periodic data reported to the DMCs, and not to the Telik Defendants.

Even assuming that Lead Plaintiff successfully alleged that the Telik Defendants' statements concerning interim looks were found to be actionable, Lead Plaintiff recognized that it would face

significant hurdles in establishing the falsity of the statements, as well as scienter and loss causation in connection with these statements.

In sum, Lead Counsel and Lead Plaintiff believe these profound uncertainties, compared to a concrete benefit for the Class now, make this Settlement a very attractive one for the Class.

## THE PROPOSED SETTLEMENT

### A.    Settlement Consideration

The Settlement provides that Defendants' insurers will pay $5,000,000 in cash into an interest-bearing escrow account for the benefit of the Class. This Settlement consideration and interest, after the deduction of attorneys' fees and expenses awarded by the Court, notice and administration expenses, and taxes and related expenses (the "Net Settlement Fund"), will be distributed among all Class Members who submit timely and valid Proofs of Claim ("Authorized Claimants"), in accordance with the Plan of Allocation described below.

### B.    Plan of Allocation of the Net Settlement Fund

Under the Plan of Allocation, an independent settlement and claims administrator, Garden City Group, Inc., recommended by Lead Counsel, will calculate each Authorized Claimant's "Recognized Claim" based on the information supplied in each person's Proof of Claim. Recognized Claims will be used to allocate the Net Settlement Fund proportionately among all Authorized Claimants.

The structure of the Plan, which is set forth in full in the Notice, is similar to plans of allocation which have been used in numerous federal securities class actions. The Plan allocates the settlement money based on Lead Plaintiff's estimate of the amounts by which the market price of Telik common stock was artificially inflated at various points during the Class Period, and takes into consideration when an Authorized Claimant purchased Telik common stock, and if the claimant sold the stock, when it was sold. Plaintiffs submit that the Plan is fair and equitable and should be

15733v1                                7

approved together with the Settlement at the Settlement Hearing. In any event, the Plan is not a part

of or a condition of approval of the Settlement. Under the Stipulation, the Net Settlement Fund may

be distributed in accordance with the following Plan or such other plan the Court may approve:

1.    For shares of common stock purchased between February 19, 2004 and December 22, 2006:

    A.    For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $11.49 per share; or
        (2) the difference between the purchase price per share and $3.17.[5]

    B.    For shares sold between February 19, 2004 and December 22, 2006, the Recognized Loss shall be zero.

    C.    For shares sold between December 26, 2006 and June 1, 2007, the Recognized Loss shall be the lesser of:

        (1) $9.39 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

    D.    For shares sold on June 4, 2007, the Recognized Loss shall be the lesser of:

        (1) $10.32 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

    E.    For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:
        (1) $11.49 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

---

[5] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." The mean (average) daily closing trading price of Telik, Inc. common stock during the 90-day period beginning on June 5, 2007 and ending on August 31, 2007 was $3.17.

15733v1                                    8

2.      For shares of common stock purchased between December 26, 2006 and June 1, 2007:

    A.      For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $2.10 per share; or
        (2) the difference between the purchase price per share and $3.17.

    B.      For shares sold between December 26, 2006 and June 1, 2007, the Recognized Loss shall be zero.

    C.      For shares sold on June 4, 2007, the Recognized Loss shall be the lesser of:

        (1) $0.93 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

    D.      For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $2.10 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

3.      For shares of common stock purchased on June 4, 2007:

    A.      For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $1.17 per share; or
        (2) the difference between the purchase price per share and $3.17.

    B.      For shares sold on June 4, the Recognized Loss shall be zero.

    C.      For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $1.17 per share; or
        (2) the difference between the purchase price per share and the sales price per share for each share sold.

**C.      Release of Class Members' Claims**

    In exchange for the Settlement consideration, Defendants will receive a release of all "Settled Claims" that Class Members may have against Defendants and certain other "Released Parties," as

15733v1                                   9

defined in the Stipulation and disclosed in the Notice. Settled Claims are any and all claims concerning the purchase or sale of Telik common stock during the Class Period and which were or could have been asserted in this action.

## ARGUMENT

## I.    STANDARDS FOR GRANTING PRELIMINARY APPROVAL

It is well-established that there is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998); *see In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *7 (S.D.N.Y. Oct. 26, 2004) ("[P]ublic policy favors settlement, especially in the case of class actions") (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)); *In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995).

Approval of a class action settlement under Rule 23(e) involves a two-step process: first, a "preliminary approval" order; and second, a "final approval" order, after notice of the proposed settlement has been provided to the class and a hearing has been held to consider the fairness and adequacy of the proposed settlement. *See Manual for Complex Litigation (Fourth)* § 13.14, at 173 (2004) ("*Manual*"). As explained by Judge Sweet:

> In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice. Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted. Once preliminary approval is bestowed, the second step of the process ensues: notice is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval.

*In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). (Citation omitted).

15733v1                                10

On a motion for preliminary approval, therefore, the Court should consider the extent of informed arm's-length negotiations between the parties and whether the resulting settlement is within the *range* of what might be found fair, reasonable and adequate, so as to justify the dissemination of notice to the class and scheduling of a hearing to consider final approval of the settlement. Determination of whether the settlement falls within the "range of possible approval" depends upon whether there is a conceivable basis for presuming that the more rigorous standard applied for final approval will be satisfied. In essence, it is a determination that the settlement is "at least sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard." *Nasdaq*, 176 F.R.D. at 102. (citation omitted); *cf. Prudential*, 163 F.R.D. at 209.

## II.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT

### A.    The Proposed Settlement Is the Result of Good Faith, Arm's-Length Negotiations Among Experienced Counsel Mediated By a Retired Judge

A proposed class action settlement "will enjoy a presumption of fairness" where the settlement "is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation". *In re Excess Value Ins. Coverage Litig.*, Nos. M-21-84 (RMB), MDL-1339, 2004 WL 1724980, at *10 (S.D.N.Y. July 30, 2004) (citation omitted), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); *see In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("Great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation") (internal quotation marks omitted); *see also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at *1 (S.D.N.Y. May 14, 2004).

The proposed Settlement is the product of extensive, arm's-length negotiations that occurred during an extensive, in-person mediation session before the Honorable Daniel Weinstein (Ret.), a retired Judge in the Superior Court of California. Lead Plaintiff filed its Complaint on October 23,

15733v1                                11

2007. The Parties first met soon thereafter on October 27, 2007 to discuss the possibility of settlement. After numerous telephone conferences, the Parties, as well as representatives of Defendants' insurers, then met with Judge Weinstein and his assistant, Jed Melnick, Esq., to mediate the case on November 27, 2007. The Parties negotiated well into the night without success. However, over the next six weeks, the parties engaged in numerous telephone conferences and extensive negotiations, with substantial concessions made by both sides. The Parties finally reached an agreement-in principle to settle this action, signing a Memorandum of Understanding on January 15, 2008. Judge Weinstein's role in the settlement negotiations strongly supports a finding that they were conducted at arm's-length and without collusion. *See In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004) ("The participation of Judge Sweet and retired Judge Politan in the settlement process gives me confidence that they were conducted in an arms-length, non-collusive manner.").

After mediation, Lead Counsel reviewed and analyzed thousands of pages of documents produced by the Telik Defendants. Lead Counsel has also conducted confirmatory depositions of Defendant and Telik CFO Cynthia Buttita, as well as Telik's Chief Medical Officer, Dr. Gail Brown. The testimony elicited during these depositions is not only consistent with the information contained in the documents produced by the Telik Defendants, but supports the fairness and adequacy of the proposed Settlement. Further, counsel for all Parties have extensive experience in securities litigation and are thoroughly familiar with the factual and legal issues in this action and the strengths and weaknesses of the parties' claims and defenses.

In sum, the Settlement is the product of serious, informed and non-collusive negotiations among experienced counsel, is supported by confirmatory discovery (as discussed below), and is deserving of preliminary approval.

**B.    The Proposed Settlement Must Be Viewed In Light
Of The Profound Risks of Continued Litigation Learned
By Lead Counsel During Settlement Negotiations and Mediation**

In considering whether to enter into the Settlement, Lead Plaintiff, represented by counsel

experienced in securities litigation, took into account the serious risks inherent in establishing

Defendants' liability. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.), *cert. denied*,

546 U.S. 935 (2005) (proof that material misstatements caused plaintiffs' losses is a required

element of a Rule 10b-5 claim) (citing 15 U.S.C. § 78u-4(b)(4)), *petition for cert. filed*, 74 U.S.L.W.

3026 (U.S. June 29, 2005).

Indeed, this Court recently discussed the relevance of the risks of establishing liability when

weighing the reasonableness of a settlement:

> The high risk of going forward with this case and attempting to prove liability and
> establish damages weighs most heavily in favor of approving the Settlement. At
> the time the parties executed the Stipulation, the Second Circuit had affirmed
> Judge Pollack's dismissal-with-prejudice of the Test Cases on loss causation
> grounds. In addition, as counsel point out, the Second Circuit also affirmed
> dismissals of the complaints in two similar securities class actions against
> brokerage firms on the ground of the statute of limitations, in *Citigroup,* and on
> the ground of failure to adequately plead scienter, in *Morgan Stanley.* Counsel
> contend that the grounds for dismissal asserted in *Citigroup* and *Morgan Stanley*
> arguably also would have prevailed in this case. *Thus, given the Circuit's rulings
> in Lentell, Citigroup, and Morgan Stanley, the alternative to settlement in this
> action was almost certain non-recovery by the class members.*
>
> Similarly, the reasonableness of the settlement, in light of the risk faced by the
> plaintiffs in going forward, militates in favor of approval. Here, the Settlement
> Fund will amount to $15 million, plus interest, representing a certain cash
> recovery for the class. *The alternative, as noted above, was the very high risk of
> complete non-recovery.*

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484JFK, 2007 WL

4526593, at **10-11 (S.D.N.Y. Dec. 20, 2007). (Emphasis added). Here, likewise, for reasons

mentioned above and discussed at length below, there was a "very high risk of complete non-

recovery." *Id.* at *11. *See also In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 CPS, 2007

WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) (high uncertainty of demonstrating elements of

federal securities claims militated in favor of settlement); *Taft v. Ackermans*, No. 02 CIV. 7951

(PKL), 2007 WL 414493, at *7 (S.D.N.Y. Jan. 31, 2007) (same); *RMED Int'l, Inc. v. Sloan's*

*Supermarkets, Inc.*, No. 94 CIV. 5587 (PKL) (RL), 2003 WL 21136726, at *1 (S.D.N.Y. May

15, 2003) (same).

The stature of Lead Plaintiff's case – and the risks of continued litigation – changed

dramatically during settlement negotiations and mediation.  The core allegation in the Complaint is

that the Telik Defendants received data about the Phase 3 tests on a "rolling basis" from the "interim

looks" that Defendants Wick and Buttita stated were built into the study.  Lead Plaintiff alleged that,

based on their receipt of negative interim data concerning the TELCYTA Phase 3 trials, the Telik

Defendants knew that their positive statements concerning the Phase 2 and 3 trial results were

materially false and misleading.  In addition, Lead Plaintiff alleged the Telik Defendants knew that

25% of the participants in the lung cancer arm of the tests were prematurely withdrawn from the

study, compromising the data and rendering it unusable for FDA purposes.

However, Lead Counsel learned during the settlement discussions and mediation, and later

confirmed through discovery, that the Telik Defendants were actually blinded to all substantive data

during the conduct of the Phase 3 trials.  The "interim looks" referenced by Defendants Wick and

Buttita were, in fact, periodic reports to the independent DMCs – not Telik.  Moreover, under their

respective Charters, the DMCs were precluded from disclosing any of this data, including the

withdrawal rate for the TELCYTA-treated patients, to Telik until the Phase 3 trials were complete.

Instead, the DMCs' communications with Telik were limited to recommending whether the trials

should be continued, modified, or terminated (whether for safety reasons or to seek accelerated FDA

approval) based on that data.  Accordingly, the Telik Defendants were aware neither of TELCYTA's

performance compared to the control arms, nor that 25% of the patients in the ASSIST-3 trial had been prematurely withdrawn until December 2006. This was confirmed through documentary evidence and by Dr. Brown, Telik's Chief Medical Officer and primary liaison with the DMCs.[6]

In addition, while Lead Plaintiff alleged that the Telik Defendants delayed disclosing that certain patients treated with TELCYTA failed to survive as long as those in the control groups, Lead Counsel has learned that the additional time was necessary to allow Telik to analyze the actual data underlying the top-line analysis un-blinded in December 2006. Moreover, Lead Counsel has confirmed that the reason for the disparity in survival rates for the patients in the ASSIST-1 control group (specifically those treated with Doxil) was that these patients had aberrationally long survival times as compared to historical norms. In fact, TELCYTA had actually performed as well as the Company had anticipated in the ASSIST-1 trial. With respect to ASSIST-2, the difference in the survival rates for the TELCYTA-treated patients and the control group (4.6 months and 6.1 months, respectively) was not statistically significant. Once again, TELCYTA performed as had been expected, but the control group survived slightly longer than anticipated based on prior studies. Indeed, post-Class Period events corroborate this. On June 4, 2007, the FDA issued a clinical hold suspending all trials involving TELCYTA based on the fact that TELCYTA-treated patients died earlier than those in the ASSIST-1 and 2 control groups. However, after reviewing the data from the Phase 3 trials, the FDA completely lifted that hold on October 15, 2007.

As noted above, Lead Plaintiff believes that it could have sought leave to amend the Complaint to allege that the Telik Defendants' statements about the "interim looks" were actionable absent the Telik Defendants' actual receipt of such interim data. Lead Plaintiff believes that these statements were materially false and misleading because they lead the market to believe that the

---

[6] The truth about the nature of the "interim looks" affects both Lead Plaintiff's Section 11 claims under the Securities Act, as well as its Section 10(b) claims under the Exchange Act.

Company received data on an on-going basis and, in the absence of the disclosure of any adverse information, that the trials were favorable. Lead Plaintiff believes it would face significant obstacles under this theory, however, because many analysts understood that "interim looks" referred to periodic reports to the DMCs, and that Telik received only limited information as to whether to continue, modify, or stop the trials. While other analysts did appear to construe these statements as meaning that the Company received substantive data about the trials on a rolling basis, Lead Plaintiff would need to show that enough analysts were misled so as to artificially inflate the price of Telik's common stock during the Class Period. In addition, Lead Plaintiff would have to further establish that the Telik Defendants made these statements with the intent to defraud, or with severe recklessness. While Lead Plaintiff believes that it could have satisfied its burden of establishing the foregoing, it also recognizes that overcoming these obstacles was far from certain.[7]

In light of the strong defenses to the allegations of the Complaint presented by the Telik Defendants, as well as the substantial hurdles to recovery on any alternative theory of liability, the risks of continued litigation militate strongly in favor of preliminarily approving this Settlement.

## C. The Proposed Settlement Falls Within a Range of Reasonableness and Warrants Notice and a Hearing on Final Approval

The Settlement also warrants preliminary approval based on the recovery achieved. Plaintiffs' damage expert estimated the aggregate loss of market value following the disclosures that TELCYTA failed to reach the primary endpoint in its Phase 3 clinical trials, and that the survival rates for the control groups were higher than the TELCYTA-treated groups, at $449 million. After consulting with its damages expert, however, Lead Plaintiff believes that the overwhelming majority of this loss is attributable to market forces and not fraud (*i.e.*, the fact that Telik's primary new drug

---

[7] Further, because of the language in the prospectus disseminated in connection with the Offering, Lead Plaintiff would face substantial hurdles in amending the complaint to allege a Section 11 claim.

candidate failed all three Phase 3 clinical trials). For example, 10 similarly situated biotech companies with primary drug candidates that failed FDA testing – where *no* allegations of fraud were made, and *no* securities fraud litigation was filed, in connection with such testing failure – lost between 40% and 87.83% of their market value, for an average loss of 67.21% of market value upon disclosure of the adverse test results.[8] Here, Telik lost 71.77% of its market value on the two corrective disclosures on December 26, 2006 and June 4, 2007.[9] Thus, even assuming that it could establish liability, Lead Plaintiff anticipates that it could only establish that approximately $20.47 million, representing 4.56% Telik's loss in market value, are the maximum recoverable damages in this litigation. Accordingly, the $5 million cash recovery provided by the proposed Settlement represents approximately 25% of the maximum recoverable damages that Lead Plaintiff believes it could establish at trial.

This is well within the range of reasonable securities class action settlements. As this Court held in *Merrill Lynch*:

> Counsel state that, according to Lead Counsel's damages expert, the estimated recovery of $0.545 per share provided by the settlement represents between 2.15% and 4.07% of estimated damages. The estimated recovery falls within the range of reasonableness for settlements of securities class actions. *See* (*Hicks v. Morgan Stanley*, No. 01 CIV. 0071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005)) (finding a settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness). In sum, after considering the relevant *Grinnell* factors, the Court finds that the Settlement is substantively fair and reasonable.

---

[8] *See* Ex. B hereto (chart listing ten biotechnology companies and the percentages, and amounts, of drop in stock value after disclosing that their primary new drug candidates had failed in Phase III trials). These companies, all part of the NASDAQ Biotechnology Index, were selected based on the fact that their primary lead drug candidate failed Phase 3 FDA trials within the last two years.

[9] The price of Telik common stock fell from a close of $16.26 per share on December 22, 2006 (the last trading day before alleged partial disclosure of December 26, 2006), to a close of $4.77 per share on December 26, 2006. The stock fell from a close of $5.81 to a close of $4.59 per share on June 4, 2007.

2007 WL 4526593, at *11.[10]

The proposed Settlement is, therefore, well within the range of reasonable class action settlements – particularly in light of the nature of the risks of continued litigation here – and warrants preliminary approval by this Court.

### D. The Settlement Has No Obvious Deficiencies

The Settlement also "has no obvious deficiencies [and] does not improperly grant preferential treatment to class representatives or segments of the class[]". *Nasdaq*, 176 F.R.D. at 102. As discussed above, the $5 million recovery constitutes a significant and certain benefit for Class members. Lead Plaintiff will receive distributions from the Net Settlement Fund in accordance with the Plan of Allocation in the same manner as distributions to all other Class members. Subject to the approval of the Court, Lead Counsel will seek a reasonable attorney's fee of no more than 30% of the Settlement Fund and reimbursement of litigation expenses of up to $125,000.

Nothing in the course of the settlement negotiations or the terms of the Settlement itself suggest grounds to doubt its fairness. Rather, the substantial recovery to the Class, the arm's-length nature of the negotiations – with the assistance of a mediator – and the participation of sophisticated counsel throughout the litigation supports a finding that the proposed Settlement is sufficiently fair,

---

[10] *See* Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act Common stock Settlements: Updated Through December 2004*, at 5 (Cornerstone Research 2005) (post-PSLRA common stock class action settlement overall through 2003 recovered 4.0% of plaintiffs' estimated damages); Keith L. Johnson & Richard H. Koppes: *Cellstar and Cal Micro Cases Provide New Model for Common stock Fraud Litigation*, SE39 ALI-ABA 537, 539 (1999) (citing Denise N. Martin, *et al.*, *National Economic Research Associates,* What Explains Filings and Settlements in Shareholder Class Actions?, at 10, 133 (1996)); Mukesh Bajaj, *et al.*, *"Common stock Class Action Settlements,"* (Nov. 16, 2000) (*available at* http://common stock.stanford.edu/research/ studies/20001116_SSRN_Bajaj.html) reporting that the median recovery in common stock class actions between 1991 and 1999 ranged from 1.98% to 6.30% of market losses); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."). (Citation omitted).

reasonable and adequate to justify notice to the Class and a hearing on final approval. Lead Plaintiff respectfully urges preliminary approval of the Settlement.

## III.    THE COURT SHOULD APPROVE THE FORM OF THE NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS

The Court should approve the form and content of the proposed Notice and Summary Notice. *See* Stipulation Exs. A-1 & A-3. The Notice is written in clear, straightforward language, and features a "Q & A" format that clearly sets out the relevant information and answers most questions Class members will have. Consistent with Rules 23(c)(2)(B) and 23(e)(B), the Notice objectively and neutrally apprises Class members of the nature of the action, the definition of the Class, the Class claims and issues, that a Class member may enter an appearance through counsel if desired, that the Court will exclude from the Class any Class member who requests exclusion (and sets forth the procedures and deadline for doing so), and the binding effect of a class judgment on Class members under Rule 23(c)(3).

The Notice also satisfies the separate disclosure requirements imposed by the PSLRA. The Notice states: the amount of the settlement proposed to be distributed to the parties, determined in the aggregate and on an average per share basis; provides a statement from each party concerning the issues about which the parties disagree; states the amount of attorneys' fees and expenses (both on an aggregate and average per share basis) that Lead Counsel will seek, with a brief explanation supporting such fees and expenses; provides the names, addresses, and toll-free telephone numbers of Lead Counsel, who will be available to answer questions from Class members; provides a brief statement explaining the reasons why the parties are proposing the Settlement; and includes a cover page summarizing all of this information. *See* 15 U.S.C. § 78u-4(a)(7); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 184-85 (S.D.N.Y. 2003). Additionally, the Notice discloses the date, time and location of the Settlement Hearing and the procedures and deadlines for

15733v1                                19

the submission of Proof of Claim forms and objections to any aspect of the Settlement, Plan of Allocation, or attorneys' fees and expenses to be sought by counsel. These disclosures warrant approval. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000).

Rule 23(c)(2)(B) and (e)(B) require a certified class to receive "the best notice practicable under the circumstances, including individual notice to [those] who can be identified through reasonable effort" and require the court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, . . . . " The notice plan meets these standards. Lead Plaintiff, through an experienced claims administrator, will cause the Notice to be sent by first class mail to every Class member who can be identified through reasonable effort. This will be accomplished by using record holder data to be produced by the transfer agent for Telik, and by reaching out to broker-dealers for the last-known names and addresses of potential Class members. The Summary Notice will be published once in the national edition of *The Wall Street Journal*.

This notice program satisfies the requirements of Rule 23 and due process and should be approved by the Court. *See Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) ("It is beyond dispute that notice by first class mail ordinarily satisfies rule 23(c)(2)'s requirement that class members receive 'the best notice practicable under the circumstances'") (citation omitted); *Prudential*, 163 F.R.D. at 210-11.

## IV.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23

Pursuant to the Stipulation, Lead Plaintiff seeks certification of the Class for settlement purposes pursuant to Rule 23(a) and (b)(3).[11] Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *Prudential*, 163 F.R.D. at 205. Further, the

---

[11] As noted above, the Class is defined for settlement purposes as all persons who acquired Telik, Inc. common stock between February 19, 2004 and June 4, 2007, inclusive.

Second Circuit has recognized that "[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes." *Weinberger*, 698 F.2d at 72 . The proposed Class should be certified as it satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a)(1)-(4) and the predominance and superiority requirements of Rule 23(b)(3).

### A.    The Numerosity Requirement is Satisfied

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993). Here, throughout the Class Period, there were millions of Telik shares outstanding. Beneficial holders of the shares are believed to number in the thousands and are geographically located throughout the United States, making joinder impracticable. Thus, Rule 23(a)(1) is satisfied.

### B.    Plaintiffs and the Proposed Class Common Questions of Law And Fact

The commonality requirement of Rule 23(a) (2) and typicality requirement of Rule 23 (a)(3) are discussed herein together because courts treat them as closely linked and evaluate them on much the same basis. *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 311 (3d Cir. 1998) ("The concepts of commonality and typicality are broadly defined and tend to merge."). The threshold for satisfying these two requirements is not high. *McManus v. Fleetwood Enters.*, 320 F.3d 545, 548 n.2 (5th Cir. 2003). The commonality inquiry "asks if the named plaintiffs' 'grievances share a common question of law or of fact' with those of the proposed class . . . ." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). Typicality is satisfied if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) (plaintiff

alleging a common course of conduct arising out of a single set of operative facts satisfies the commonality requirement). *Cf. Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

The Complaint asserts the same claims on behalf of all Class Members. All Class Members, as purchasers of Telik common stock during the Class Period, sustained injury due to the artificial inflation of the price of those securities that was caused by Defendants' alleged material misrepresentations throughout the Class Period. In addition, all Class Members make the same legal claims under the federal securities laws. Lead Plaintiff has alleged common issues of fact and law that affect all Class Members, satisfying the commonality requirement of Rule 23(a)(2). *See, e.g., In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 279 (S.D.N.Y. 1999) (commonality satisfied "[b]ecause a single, continuous conspiratorial artifice is alleged, the relevant proof will not vary among class members, and the case presents a fundamental [important] question...to all class members").

### C. Plaintiffs And Lead Counsel Will Adequately Represent the Proposed Class

The adequacy requirement of Rule 23(a)(4) involves the inquiry as to whether: (1) plaintiff's interests are antagonistic to the interests of the other members of the Class; and (2) plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both elements are present in this case.

No conflicts exist between Plaintiffs and the members of the Class. Plaintiffs' interests are aligned with those of the Class as the factual and legal claims of Plaintiffs and the Class arise from the same nexus of operative facts and course of conduct by Defendants. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). (Citation omitted). Plaintiffs, like all Class Members, purchased Telik common stock at artificially inflated prices

during the Class Period as a result of Defendants' alleged materially false and misleading statements and was damaged thereby.

Lead Plaintiff has retained counsel who have successfully prosecuted numerous securities and other complex class actions in courts throughout the United States. *See* Bernstein Liebhard resume attached hereto as Exhibit C. Indeed, Lead Counsel has vigorously prosecuted the Action.

Thus, Plaintiffs are adequate representatives of the Class, and Lead Counsel is qualified, experienced, and capable of prosecuting the Action, in satisfaction of Rule 23(a)(4).

### D.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

In addition to the four requirements of Rule 23(a), a class must also satisfy one of the three subparts of Rule 23(b). Plaintiffs seek class certification under Rule 23(b), which requires that:

> the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

### E.    Common Questions of Law and Fact Predominate

The Rule 23(b)(3) inquiry normally focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Cromer*, 205 F.R.D. at 127 (quoting *Amchem*, 521 U.S. at 623). (Alteration in original). Predominance "is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem*, 521 U.S. at 625.

Because the issue of liability in this case is common to all members of the Class, the predominance requirement of Rule 23(b)(3) is satisfied. Plaintiffs allege that Defendants engaged in a common course of fraudulent conduct to artificially inflate the price of Telik common stock. Proof of that common course of conduct relates to Defendants' liability as to all Class Members. Because the central and predominant focus of the Action is Defendants' alleged fraudulent conduct, each Class Member is similarly situated and common questions predominate over individual questions. *See Cromer*, 205 F.R.D. at 127 (finding predominance because "[t]he proof for the claims of misrepresentation or omission, materiality, and . . . scienter are all based on a common nucleus of facts and a common course of conduct."); *Blech*, 187 F.R.D. at 107 ("as a result of the allegations relating to the common course of conduct alleged in this action, certain common questions of law and fact relating to liability exist as to all members of the Class and predominate over any questions affecting solely individual members.").

In this case, common questions predominate over individual questions. The common questions include: (1) whether the federal securities laws were violated by Defendants' acts and omissions; (2) whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about the business and operations of Telik; (3) whether the market price of Telik common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions; and (4) to what extent the members of the Class have sustained damages and the proper measure of damages.

## F.    A Class Action is Superior to Multiple Individual Actions

Rule 23(b)(3) also requires that the class action be "superior to other available methods for fair and efficient adjudication of the litigation." Fed. R. Civ. P. 23(b)(3). Courts have found that the superiority requirement is satisfied where:

> The potential class members are both significant in number and geographically dispersed. The interest of the class as a whole in litigating the many common questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions.

*Cromer*, 205 F.R.D. at 133.

Here, the utility of presenting the claims asserted through the class action method is substantial since the Class Members who have been injured number in the thousands, but most have not been damaged to a degree that would induce them to institute litigation on their own behalf. *See Blech*, 187 F.R.D. at 107 ("violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible"); *see also Sumitomo Copper Litig.*, 189 F.R.D. at 279.

Further, certification of the Class is the superior method to facilitate the resolution of Plaintiffs' claims. Without the settlement class device, Defendants could not obtain a Class-wide release, and therefore would have had little, if any, incentive to enter into the Settlement. Moreover, certification of a Class for settlement purposes will enable Lead Counsel to handle the administration of the Settlement in an organized and efficient manner. Resolution of Plaintiffs' claims against Defendants through the proposed Class is superior to any other available method of resolution.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant preliminary approval to the proposed Settlement, approve the forms and methods of notice, and issue the proposed Preliminary Order submitted herewith.

15733v1                                    25

Dated: New York, New York          Respectfully submitted,
      April 16, 2008

                        **BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

                        /s/

By: _____

                      Stanley D. Bernstein (SB-1644)
                      Mel E. Lifshitz (ML-2616)
                      Timothy J. MacFall (TM-8639)
                      Joseph R. Seidman, Jr. (JS-9260)
                      10 East 40th Street
                      New York, New York  10016
                      (212) 779-1414
                      (212) 779-3218 (fax)

                      *Attorneys for Lead Plaintiff and Proposed*
                      *Settlement Class*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the attached was served upon the following counsel of record in the actions filed this Court, First Class Mail prepaid, this 16th day of April, 2008:

*Attorneys for Defendants:*

David W. Haller                        Jamie Levitt
Linda C. Goldstein                     **Morrison & Foerster LLP**
**Covington & Burling LLP**            755 Page Mill Road
620 Eighth Avenue                      Palo Alto, CA  94304
New York, NY  10018


*Attorneys for Plaintiff Mehan Group*:

David A.P. Brower
**Brower Piven, P.C.**
488 Madison Avenue
Eighth Floor
New York, New York  10022


                                       /s/
                                       _____
                                       JOSEPH R. SEIDMAN, JR.

15733v1                                27