UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

)
IN RE TELIK, INC.                            )        Civil Action No. 07-cv-04819 (CM)
SECURITIES LITIGATION                    )
                                                      )
                                                      )
                                                      )
                                                      )
                                                      )

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF THE
PROPOSED SETTLEMENT, PLAN OF ALLOCATION, AND
FINAL CERTIFICATION OF CLASS FOR SETTLEMENT PURPOSES**

Stanley D. Bernstein
Mel E. Lifshitz
Timothy J. MacFall
Joseph R. Seidman, Jr.
**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
10 E. 40th St
New York, New York 10016
(212) 779-1414

*Counsel for Lead Plaintiff and the Class*

18319v2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 5

I.    STANDARDS FOR APPROVAL OF CLASS
ACTION SETTLEMENTS ..................................................................... 5

II.    THE PROPOSED SETTLEMENT IS PROCEDURALLY AND
SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE ...................... 7

    A.    The Settlement Is Entitled to a Strong Presumption of Fairness
Because It Is the Product of Arm's-Length Negotiations Among
Experienced Counsel ............................................................................ 7

    B.    The Settlement Is Substantively Fair, Adequate and Reasonable
Under *Grinnell* ................................................................................... 9

        1.    Continued Litigation Would Be Complex and Consume
Substantial Judicial and Private Resources.................................. 9

        2.    The Reaction of the Class has Been Overwhelmingly
Positive With Only Two Objections Filed Against the
Settlement ................................................................................ 10

        3.    When the Parties Agreed to Settle, Plaintiffs' Case Had
Changed Considerably .............................................................. 12

        4.    Establishing Liability Involves Significant Risks......................... 12

        5.    The Settlement Amount Is Reasonable in View of the
Best Possible Recovery and the Myriad Risks of Litigation ........ 14

        6.    Defendants' Ability to Withstand a Greater Judgment................. 15

III.    THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND IS
FAIR AND REASONABLE .................................................................. 16

IV.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF
RULE 23 ............................................................................................. 18

    A.    The Numerosity Requirement is Satisfied .............................................. 18

B.    Plaintiffs and the Proposed Class Share Common Questions of
Law And Fact............................................................................................. 19

C.    Plaintiffs And Lead Counsel Will
Adequately Represent the Proposed Class................................................. 20

D.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)............ 20

E.    Common Questions of Law and Fact Predominate .................................. 21

F.    A Class Action is Superior to Multiple Individual Actions...................... 22

CONCLUSION.......................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)..............................................................................20, 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
   222 F.3d 52 (2d Cir. 2000)..........................................................................20

*Carson v. Am. Brands, Inc.,*
   450 U.S. 79 (1981).......................................................................................12

*City of Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974).................................................................6, 7, 15

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) .......................................................................5

*Cromer Fin. Ltd. v. Berger,*
   205 F.R.D. 113 (S.D.N.Y. 2001) ......................................................19, 21, 22

*D'Amato v. Deutsche Bank,*
   236 F.3d 78 (2d Cir. 2001)........................................................................6, 12

*Denney v. Jenkens & Gilchrist,*
   230 F.R.D. 317 (S.D.N.Y. 2005) ..............................................................12, 13

*Dura Pharm., Inc. v. Broudo.,*
   544 U.S. 336 (2005)..................................................................................14, 18

*Goldberger v. Integrated Res., Inc.,*
   209 F.3d 43 (2d Cir. 2000)..............................................................................6

*In re AMF Bowling Sec. Litig.,*
   334 F. Supp. 2d 462 (S.D.N.Y. 2004)............................................................8, 15

*In re Am. Bank Note Holographics,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)..........................................................5, 6, 14

*In re Austrian & German Bank Holocaust Litig.,*
   80 F. Supp. 2d 164 (S.D.N.Y. 2000), *aff'd*, 236 F.3d 78 (2d Cir. 2001) .....................12

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................19, 22, 23

*In re EVCI Career Colleges Holdings Corp. Sec. Litig.*,
No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007).......................5

*In re Elan Sec. Litig.*,
385 F. Supp. 2d 363 (S.D.N.Y. 2005)...........................................................8

*In re Global Crossing Sec. & Erisa Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................... passim

*In re IPO Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) ...............................................................8

*In re Ikon Office Solutions Inc., Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)................................................................14

*In re Interpublic Sec. Litig.*,
No. 02 Civ. 6527 (DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)................9, 14

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*,
838 F. Supp. 729 (S.D.N.Y. 1993) ............................................................7

*In re Paine Webber Ltd. P'ships Litig.*,
147 F.3d 132 (2d Cir. 1998)...................................................................5

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)...............................................................10, 19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................18

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ........................................................9, 19, 23

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989).........................................................6, 15

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004).....................7

*Klein ex rel. IRA v. PDG Remediation, Inc.*,
No. 95 Civ. 4954 (DAB), 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999)........................10

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002).................................................................5, 7, 10

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)......................................................................................19

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) .................................................................................18

*McManus v. Fleetwood Enters.*,
    320 F.3d 545 (5th Cir. 2003) .....................................................................................19

*Meijer, Inc. v. 3M*, ,
    Civ. No. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ................................15

*Officers for Justice v. Civil Serv. Comm'n of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ......................................................................................5

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)......................................................................................19

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001).....................................................................................19

*San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996).......................................................................................13

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ...................................................................................7

*Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)......................................................................................6, 7

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982).....................................................................................7, 18

## STATUTES

Fed. R. Civ. P. 23(b)(3)........................................................................................18, 21, 22

18319v3

## PRELIMINARY STATEMENT

Lead Plaintiff Policemen's Annuity and Benefit Fund for the City of Chicago ("Lead Plaintiff") and Plaintiff Ramesh K. Mehan, RML Limited, Ramesh K. Mehan Irrevocable Children's Trust, Joel K. Mehan Irrevocable Trust, Sheila G. Mehan Irrevocable Trust, Renee Mehan Family Trust, Neal D. Mehan Irrevocable Trust, Rahul D. Mehan and Ramesh K. Mehan Family Trust (collectively, "Plaintiffs"), through Lead Counsel for Plaintiffs and the Class,[1] Bernstein Liebhard & Lifshitz, LLP, respectfully submit this memorandum of points and authorities in support of their motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the Settlement of this action as set forth in the Stipulation.[2]  This class action has been settled for $5 million in cash (the "Settlement Fund") due to Plaintiffs' efforts in prosecuting this litigation, and in the hard fought, arm's-length settlement negotiations conducted directly between the parties, as well as through the mediation conducted by the Hon. Daniel Weinstein (Ret.).

---

[1]  By Order (the "Preliminary Order") dated May 7, 2008, this Court certified a class, for settlement purposes (the "Class" or "Settlement Class"), consisting of all Persons who purchased the common stock of Telik, Inc. during the period February 19, 2004 through and including June 4, 2007. Excluded from the Class are the Underwriter Defendants (with respect to their own accounts, but not with respect to accounts held for the benefit of others) and the Telik Defendants, any entity in which Defendants or any excluded person has or had a controlling ownership interest, the officers and directors of Telik, members of their immediate families, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party. The Settlement Class shall also exclude those Persons who timely and validly request exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action to be sent to the class.  Stipulation of Settlement dated April 16, 2008, ¶1.23.

[2]  All capitalized terms not otherwise defined have the definitions set forth in the Stipulation.

18319v1

The core allegation in the Complaint is that the Telik Defendants[3] received data about Phase 3 clinical tests on Telik's leading new drug candidate, TELCYTA, on a "rolling basis" from the "interim looks" that Defendants Wick and Buttita stated were built into the study. Plaintiffs alleged that, based on their receipt of negative interim data concerning the TELCYTA Phase 3 trials, the Telik Defendants knew that their contemporaneous positive statements concerning the Phase 2 and 3 trial results were materially misleading. In addition, Plaintiffs alleged the Telik Defendants knew that an increasing number of participants in the lung cancer arm of the tests, eventually totaling 25% of the enrolled patients, were prematurely withdrawn from the study, compromising the data and rendering it unusable for FDA purposes.

However, as discussed at length in the accompanying Declaration of Timothy MacFall, dated August 29, 2008 (the "MacFall Declaration"), Lead Counsel learned during the settlement discussions and mediation, and later confirmed through discovery, that the Telik Defendants were actually blinded to all substantive data during the conduct of the Phase 3 trials. The "interim looks" referenced by Defendants Wick and Buttita were, in fact, periodic reports to the independent Data Monitoring Committees overseeing those tests – not Telik. *See* MacFall Declaration ¶¶3, 28-29. Lead Counsel reviewed thousands of pages of documents, including the FDA-approved Protocols governing the tests and the charters of the independent DMCs overseeing each of the tests, which demonstrated that the Telik Defendants were, in fact, blinded to all substantive data from the Phase 3 tests. This was further corroborated by the testimony of Defendant Telik CFO Cynthia Buttita and Telik Chief Medical Officer Dr. Gail Brown.

---

[3] Telik, Inc. ("Telik") and Telik officers Michael M. Wick and Cynthia M. Butitta are referred to as the "Telik Defendants". "Defendants" refers to the Telik Defendants, as well as UBS Securities LLC, Lehman Brothers Inc., and J.P. Morgan Securities Inc. (the latter are referred to as the "Underwriter Defendants").

Plaintiffs believe that they could have successfully amended their claims, based on the foregoing, to allege that the Telik Defendants' statements concerning the interim looks were, themselves, materially false and misleading because the Phase 3 tests were blinded. Plaintiffs, however, were mindful that even such amended claims might be susceptible to substantial defenses with respect to scienter and loss causation. Accordingly, Plaintiffs submit that the Settlement presents an excellent result for the investor Class.

Plaintiffs estimate that the Settlement represents recovery of approximately 25% of the recoverable damages that Plaintiffs could have proved in this Action went to trial. While Plaintiffs' damages expert estimated the aggregate loss of market value subsequent to relevant disclosures about TELCYTA, at $449 million, he opined that much of this market loss is attributable to market forces. Specifically, most of the market loss represents investors' reaction to the fact that the Company's primary new drug candidate, TELCYTA, failed FDA testing, as opposed to the disclosure of any fraud.[4]

To assess the extent to which the loss in market value was attributable to market forces as opposed to fraud, Lead Counsel analyzed 10 comparable biotechnology companies. These companies were selected because each had a primary drug candidate that failed Phase 3 FDA testing, *no* allegations of fraud were made, and *no* securities fraud litigation was filed, in connection with such failure. *See* MacFall Declaration, ¶33 and Ex. C thereto.[5] These

---

[4]  The Company's only other new drug candidate, Telintra, was still undergoing Phase 2 testing at the time of the final disclosure alleged in the Complaint, in June 2007. *See* Telik, Inc. Quarterly Report for the Period ended June 30, 2007, at 12, *available at* http://www.sec.gov/Archives/edgar/data/1109196/000119312507175687/d10q.htm. Accordingly, FDA approval and the subsequent commercial development of Telintra was very far off.

[5]  MacFall Declaration, Exhibit C is a chart listing ten biotechnology companies and the percentages, and amounts, of drop in stock value after disclosing that their primary new drug candidates had failed in Phase III trials). These companies, all part of the NASDAQ

companies lost between 40% and 87.83% of their market value, for an average loss of 67.21% of market value, upon disclosure of the Phase 3 test failures. Here, Telik lost 71.77% of its market value on the corrective disclosures on December 26, 2006 and June 3 and 4, 2007.[6] Thus, assuming that Plaintiffs believe that they could establish that the maximum recoverable damages in this litigation are approximately $20.47 million, or 4.56% of Telik's aggregate market value loss, the $5 million cash recovery provided by the proposed Settlement represents approximately 25% of the maximum recoverable damages that Lead Plaintiff believes it could establish at trial. This is well above average for securities class action settlements and, in light of all the circumstances, is an outstanding result.[7]

Further confirming the fairness of the Settlement is the overwhelmingly favorable reaction of the Class to the Settlement. Pursuant to the Preliminary Order, copies of the Court-approved Notice of Pendency and Proposed Settlement of Class Action ("Notice") were sent to over 54,000 Class members, and a Summary Notice was published n the national edition of *The Wall Street Journal* on June 20, 2008. In the Notice, Class members were advised that the deadline for objections was August 8, 2008. *See* Keough Aff. (attached as Ex. D to MacFall Decl.) ¶¶7,8.

---

Biotechnology Index, were selected based on the fact that their primary lead drug candidate failed Phase 3 FDA trials within the last two years, and no securities fraud litigations were filed in connection with such failures.

[6] The price of Telik common stock fell from a close of $16.26 per share on December 22, 2006 (the last trading day before alleged partial disclosure of December 26, 2006), to a close of $4.77 per share on December 26, 2006. The stock fell from a close of $5.81 to a close of $4.59 per share on June 4, 2007.

[7] *See infra* at 14 n.10.

To date, only two Class members have objected to the Settlement and three Class members have opted to excluded themselves from the Settlement – a powerful endorsement. MacFall Decl. ¶7. Indeed, the percentage of objecting Class members is below .004%.

Lead Counsel, who are very experienced in prosecuting securities class action litigation, have concluded that the Settlement is in the best interests of the Class. Therefore, Plaintiffs respectfully submit that the Court should approve the Settlement.[8]

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs respectfully refer the Court to the MacFall Declaration for a recitation of the facts and the procedural background of the Litigation.

## ARGUMENT

### I.    STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS

There is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re Paine Webber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998). "Settlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement." *In re EVCI Career Colleges Holdings Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *3 (S.D.N.Y. July 27, 2007) (McMahon, J.) (citation omitted); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 361 (S.D.N.Y. 2002) (McMahon, J.); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 424 (S.D.N.Y. 2001) (McMahon, J.). As this Court has stated: "In its exercise of that discretion, the Court must engage in a careful balancing act: 'The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it

---

[8] In reviewing the settlement under Rule 23 of the Federal Rules of Civil Procedure, the Court is not to substitute its business judgment for that of counsel. The Court is not permitted to "'substitute [its] notions of fairness for those of the . . . parties to the agreement.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (quoting *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 626 (9th Cir. 1982).

would undertake if it were actually trying the case." *Am. Bank*, 127 F. Supp. 2d at 424 (citing *City of*

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974).

The courts determine the fairness of a settlement by looking both at the terms of the

settlement and the negotiation process leading up to it. *See Wal-Mart Stores, Inc., v. Visa U.S.A.,*

*Inc.*, 396 F.3d 96 at 116 (2d Cir. 2005) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.

2001)). With respect to process, a class action settlement enjoys a "presumption of correctness"

where it is the product of arm's-length negotiations conducted by experienced, capable counsel. *In*

*re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989)

(Brieant, J.) (citing *Wellman v. Dickinson*, 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 647 F.2d

163 (2d Cir. 1981)); *see also In re Global Crossing Sec. & Erisa Litig.*, 225 F.R.D. 436, 461,

(S.D.N.Y. 2004).

With respect to the substantive terms of a settlement, the standards governing approval are

well-established. Courts in this Circuit examine the fairness, adequacy and reasonableness of a class

action settlement according to the "*Grinnell* factors":

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund in light of all
> the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463, *abrogated on other grounds,*

*Goldberger v. Integrated Res.*, Inc., 209 F. 3d 43, 48 (2d Cir. 2000)).

In finding that a settlement is fair, reasonable, and adequate, not every factor must weigh in

favor of the settlement, but "'rather the court should consider the totality of these factors in light of

the particular circumstances.'" *Global Crossing*, 225 F.R.D. at 456 (quoting *Thompson v. Metro.*

*Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). Moreover, in applying these factors, the court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" of the merits of the action. *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004). As such, the court should assess the settlement as presented, without modifying its terms, and without substituting its "'business judgment for that of counsel, absent evidence of fraud or overreaching.'" *Global Crossing*, 225 F.R.D. at 455 (quoting *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 737 (S.D.N.Y. 1993)).

Plaintiffs submit that the proposed Settlement is fair, reasonable and adequate when measured under the relevant criteria and the particular circumstances of this action. All parties have thoroughly weighed the strengths and weaknesses of the claims and defenses and, after extensive negotiations, have reached an informed and carefully crafted compromise.

## II.    THE PROPOSED SETTLEMENT IS PROCEDURALLY AND SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE

### A.    The Settlement Is Entitled to a Strong Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations Among Experienced Counsel

As noted above, a strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel. *See Wal-Mart*, 396 F.3d at 116. Moreover, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley*, 186 F. Supp. 2d at 366 (citation omitted).

A presumption of fairness is appropriate here. The Settlement was reached by the parties in good faith, at arm's-length, and without collusion. Lead Plaintiff filed its Complaint on October 23, 2007. MacFall Decl. ¶14. The parties first met in a face-to-face meeting soon thereafter on October 27, 2007 to discuss the possibility of settlement. While no resolution was reached at that time, the parties agreed to continue discussions. After numerous telephone conferences, the parties agreed to

mediate the Action. MacFall Decl. ¶16. Thereafter, the parties, as well as representatives of

Defendants' insurers, met with the Hon. Daniel Weinstein (Ret.) of JAMS and his assistant, Jed

Melnick, Esq., to mediate the case on November 27, 2007. *Id.* The parties negotiated well into the

night without success. However, over the next six weeks, the parties engaged in numerous telephone

conferences and extensive negotiations, with substantial concessions made by both sides. *Id.* The

parties finally reached an agreement-in principle to settle this action, signing a Memorandum of

Understanding on January 15, 2008. *Id.* Judge Weinstein's role in the settlement negotiations

strongly supports a finding that they were conducted at arm's-length and without collusion. *See In

re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004) ("The participation of Judge

Sweet and retired Judge Politan in the settlement process gives me confidence that they were

conducted in an arms-length, non-collusive manner"); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363,

369 (S.D.N.Y. 2005) ("[T]he Court has no reason to question that the Settlement was the product of

extended 'arm's length' negotiations, including, among other things, the two-day settlement

conference before Judge Politan"); *In re IPO Sec. Litig.*, 226 F.R.D. 186, 194 & n.42 (S.D.N.Y.

2005) (where negotiations were facilitated by Judge Politan, settlement was "clearly the result of

arm's-length bargaining"). Plaintiffs further submit that the fact that all parties were represented

throughout the Settlement negotiations by able counsel experienced in class action and securities

litigation also strongly militates in favor of approving the Settlement. *See Global Crossing*, 225

F.R.D. at 461 ("Both sides have been represented well . . . . Counsel for plaintiffs, the Settling

Defendants, and STB possessed the requisite expertise to negotiate a fair settlement.").

   In sum, the Settlement was negotiated at arm's-length by sophisticated counsel before an

experienced mediator. These facts establish that the process leading to the Settlement was fair to

absent Class Members.[9]  *See In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL

2397190, at *7 (S.D.N.Y. Oct. 26, 2004) (negotiations were arm's-length where, among other things,

parties met with magistrate judge).  The Court should therefore accord a strong presumption of

fairness to the Settlement in considering the substantive *Grinnell* factors discussed below.

> **B.**    **The Settlement Is Substantively Fair, Adequate and Reasonable Under
> *Grinnell***
>
> >   **1.**    **Continued Litigation Would Be Complex and
> >    Consume Substantial Judicial and Private Resources**

Without a settlement, the anticipated complexity, cost, and duration of continued litigation in

this action would be considerable.  This action is complex.  Plaintiffs assert claims under the

Securities Exchange Act of 1934 (the "Exchange Act") and Securities Act of 1933 based upon

alleged misstatements and omissions concerning Phases 2 and 3 of Telik's testing of its chief new

drug candidate, TELCYTA.  These claims involve sharply disputed legal issues.  *See In re Sumitomo

Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) ("In evaluating the settlement of a securities

class action, federal courts, including this Court, 'have long recognized that such litigation is notably

difficult and notoriously uncertain'") (citation omitted); *Global Crossing*, 225 F.R.D. at 456

(complexity of securities class action was "manifest").

Further, the costs and duration of litigating a motion dismiss, conducting merits and class

discovery, conducting expert discovery, litigating a motion for summary judgment, trial preparation,

the trial itself, post-trial motions, and any appeals would vastly exceed the substantial time and

money already spent.  *See In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148

F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long,

arduous process requiring great expenditures of time and money on behalf of both the parties and the

---

[9]  Significantly, the parties agreed to conduct, and Plaintiffs completed, discovery to confirm
certain factual assertions made by Defendants prior to submitting the proposed Settlement to the
Court for Preliminary Approval.  *Id.*

court"). While denying liability, Defendants considered their risks and options and agreed to settle now, thereby avoiding further litigation and a trial that might (like many class actions) culminate nonetheless in a settlement prior to final judgment.

Given the uncertain prospects of success at trial – particularly so here because Plaintiffs would have to amend the Complaint to allege viable claims – the Settlement is highly beneficial to the Class. The $5 million cash Settlement will provide tangible and certain relief to the Class now, and "without subjecting them to the risks, complexity, duration, and expense of continuing litigation." *Global Crossing*, 225 F.R.D. at 456-57; *see Maley*, 186 F. Supp. 2d at 362 ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement"); *Klein ex rel. IRA v. PDG Remediation, Inc.*, No. 95 Civ. 4954 (DAB), 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (complexity, expense and duration of litigation favored settlement that "offer[ed] Class members the benefit of immediate recovery as opposed to an uncertain award several years from now.").

### 2. The Reaction of the Class has Been Overwhelmingly Positive With Only Two Objections Filed Against the Settlement

The reaction of the Class to the Settlement strongly supports final approval. As noted above, the Notice and Proof of Claim form has been mailed to more than 54,000 potential Class Members. The Summary Notice was also published in the national edition of *The Wall Street Journal*.

The time for filing objections to the Settlement, Plan of Allocation or application for attorney's fees and expenses expired on August 8, 2008. As of that date (and the date hereof), Lead Counsel has received only *two* objections to the Settlement from any Class member, by Andrew May and Lloyd Sampson.

Mr. May's objection is groundless. As discussed at length in the MacFall Declaration, Mr. May makes numerous baseless accusations about the Settlement, *e.g.*, that the Telik Defendants were

not blinded to the underlying data and that TELCYTA was killing people at "alarming rates". MacFall Decl. ¶¶44-46. In confirmatory discovery, the Telik Defendants demonstrated that they had, in fact, been blinded to the underlying data, which went only to the DMCs. Likewise, Mr. May's claim that the Telik Defendants knew TELCYTA was killing people is simply not true. *Id.*, ¶45. First, the survival rates for the TELCYTA-treated patients in the ASSIST-1 trial were in line with Company expectations, but the control group, treated with Doxil, survived longer than anticipated based on the scientific literature and test results over the past 15 years. *Id.* ¶43. Thus, while TELCYTA failed to reach its primary endpoint in ASSIST-1, namely increased survivability compared to the control arm, that was due to the aberrationally long survival time for the control group. *Id.*

Further, the Telik Defendants also demonstrated in confirmatory discovery that it took months to analyze the data concerning the ASSIST-1 results, because the Company had only received top-line, or summary, data in December 2006. In light of the aberrational results for the control group, such analysis was necessary to assess the accuracy of the test results. MacFall Decl. ¶43. Mr. May also made other accusations concerning the factual underpinnings of the Settlement that are without merit. They are addressed at length in both the MacFall Declaration and the Declaration of Joseph R. Seidman, dated August 29, 2008 (the "Seidman Declaration"). *See* MacFall Decl. ¶¶39-52; Seidman Decl. ¶¶2-9.

The other objector, Lloyd Sampson, objects not on grounds pertaining to the merits of the Settlement but on the grounds of his mistaken belief that the Settlement proceeds are coming from the Company and thus, as a current shareholder, from his pocket. The proceeds of the Settlement are coming from D&O insurance. *See* MacFall Decl. ¶52.

### 3.    When the Parties Agreed to Settle, Plaintiffs' Case Had Changed Considerably

As discussed in the MacFall Declaration, Plaintiffs' case changed dramatically during settlement negotiations. *See* MacFall Decl. ¶27. As a result, Plaintiffs and Lead Counsel were able to realistically evaluate the strengths and weaknesses of the claims and the risks of continued litigation, and accordingly to enter into the Settlement on a fully informed basis. Indeed, the Telik Defendants' factual assertion that they were blinded to all substantive Phase 3 trial data was corroborated by evidence adduced in discovery. *See* MacFall Decl. ¶28; *see also Global Crossing*, 225 F.R.D. at 458 (plaintiffs "had the requisite information to make informed decisions about the relative benefits of litigating or settling" where documents were produced concurrently with settlement discussions); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 338 (S.D.N.Y. 2005) (plaintiffs had "a clear view of the strengths and weaknesses of their cases" where they received documents prior to settlement) (citation omitted).

### 4.    Establishing Liability Involves Significant Risks

In assessing the risks Plaintiffs would face in establishing liability, the Court need not "decide the merits of the case or resolve unsettled legal questions," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981), or "foresee with absolute certainty the outcome of the case." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd*, 236 F.3d 78 (2d Cir. 2001). Rather, the Court need only assess the risks of litigation against the certainty of recovery offered by the Settlement. *See Denney*, 230 F.R.D. at 337.

Establishing liability here was, at best, uncertain. As discussed above, Plaintiffs believe it would have been necessary to amend the Complaint to allege that the Telik Defendants' statements concerning "interim looks" were materially misleading because Defendants were, in fact, blinded to the Phase 3 test results. *See* MacFall Decl. ¶30. Plaintiffs, however, faced substantial hurdles in

establishing liability under this theory because some analysts appeared to have understood that the interim looks related to the DMCs which, in turn, provided periodic recommendations to Telik as to whether to continue, discontinue, or modify those tests. MacFall Decl. ¶¶30-31. While other analysts did not appear to understand this distinction, Plaintiffs, nonetheless, anticipate that they would have had to overcome a "truth-on-the-market" defense in connection with any amended claims.

Scienter would also have been difficult to establish. Indeed, proving a defendant's state of mind is notoriously hard. Defendants could seek to undermine any inference of *scienter* by observing that no Individual Defendants sold Telik shares during the Class Period – in fact, Defendant Buttita bought Telik shares during the Class Period. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (sales of stock by only one officer/defendant did not give rise to strong inference of intent). Likewise, since the only actionable misstatements Plaintiffs were left with were about the interim looks themselves – which some analysts apparently understood as meaning that the Telik Defendants were, in fact, blinded, to the underlying data, it would been especially hard to prove an intent to deceive or severe recklessness.

Likewise, proving loss causation was also far from certain here. Plaintiffs would have had to show that the drop in the price of the stock was due, in part, to the disclosure that the Telik Defendants were not receiving data about the Phase 3 tests on a rolling basis, as opposed to the failure of TELCYTA to reach the primary endpoint in the Phase 3 tests. While Plaintiffs believe that they could have established that causal connection, they understand that they faced significant hurdles to doing so. *See Dura Pharm., Inc. v. Broudo.*, 544 U.S. 336, 341-43 (2005). Further, had Plaintiffs established loss causation, there was no guarantee that a jury would have

agreed with Plaintiffs' calculation of damages. "Calculation of damages is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's true value absent the alleged fraud." *Global Crossing*, 225 F.R.D. at 459. *See also Am. Bank*, 127 F. Supp. 2d at 427 ("In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad non-actionable factors such as general market conditions."). Weighing the foregoing factors against the immediate and substantial benefit conferred by the Settlement also strongly supports Plaintiffs' motion for final approval.

### 5.    The Settlement Amount Is Reasonable in View of the Best Possible Recovery and the Myriad Risks of Litigation

Plaintiffs respectfully submit that the $5 million Settlement amount is well "within the range of reasonableness" in light of the best possible recovery and all of the risks of litigation. *Interpublic*, 2004 WL 2397190, at *8. As noted above, Plaintiffs have estimated recoverable damages, assuming liability is proven for the entire Class Period, at approximately $20 million. The $5 million Settlement amount represents approximately 25% of this figure, a percentage well above that in most securities class actions.[10] *See also In re Ikon Office Solutions Inc., Sec. Litig.*, 194 F.R.D. 166, 183-

---

[10] *See* Laura E. Simmons & Ellen M. Ryan, Post-Reform Act Securities Settlements, 2005 Review and Analysis, at 5 (Cornerstone Research 2006) (post-Private Securities Litigation Reform Act ("PSLRA") securities class action settlement in 2005 recovered 3.0% of plaintiffs' estimated damages). Lead Plaintiff also notes that settlements in cases where there was no litigation release or administrative proceeding by the SEC, as is the situation here, have recovered 3.4% of estimated damages from 1997 to 2005. *Id.* at 12. Furthermore, the Cornerstone Research Study states that issuers that filed for bankruptcy are associated with significantly lower settlement amounts. In fact, from 1997-2005, the median settlement value was $4.8 million. *Id.* at 14.; Keith L. Johnson & Richard H. Koppes, Cellstar and Cal Micro Cases Provide New Model for Securities Fraud Litigation, SE39 ALI-ABA 537, 539 (1999) (citing Denise N. Martin, et al., National Economic Research Associates, What Explains Filings and Settlements in Shareholder Class Actions?, at 10, 133 (1996)).

84 (E.D. Pa. 2000) (approving settlement amounting to 5.2% of damages for common stock holders); *see also Union Carbide*, 718 F. Supp. at 1103 ("The Court of Appeals has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought. The essence of settlement is compromise") (Brieant, J.) (citations omitted); *Global Crossing*, 225 F.R.D. at 461 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved") (quoting *Grinnell*, 495 F.2d at 455).

### 6.    Defendants' Ability to Withstand a Greater Judgment

This factor had little bearing on settlement negotiations in light of the fact that the landscape was radically altered during negotiations. However, this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied. *See Meijer, Inc. v. 3M*, Civ. No. 04-5871, 2006 WL 2382718 at *15 (E.D. Pa. Aug. 14, 2006); *Deutsche Bank*, 236 F.3d at 86. The Telik Defendants are apparently covered by D&O liability insurance in excess of the Settlement amount. Ultimately, however, this factor is "of little significance in light of all other factors." *AMF Bowling*, 334 F. Supp. 2d at 467. *See also* MacFall Decl. ¶¶27-33.

### III.   THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND IS FAIR AND REASONABLE

"When formulated by competent and experienced counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis." *Global Crossing*, 225 F.R.D. at 462 (citation omitted). A reasonable plan may consider the relative strength and values of different categories of claims. *Id.*

The Net Settlement Fund will be distributed to Authorized Claimants, i.e., members of the Class who submit timely and valid Proofs of Claim, in accordance with the Plan of Allocation

described in the Notice. The Plan treats all Class Members in a similar manner: everyone who submits a valid and timely claim, and does not exclude himself or herself from the Class, receives a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's Recognized Claim bears to the total of all Recognized Claims. The "Recognized Claim," as used in the Plan, is not market loss. Rather, it is a calculation used to arrive at a weighted loss figure for purpose of calculating an Authorized Claimant's *pro rata* participation in the Net Settlement Fund.

The Plan reflects Plaintiffs' allegations that the truth concerning TELCYTA was partially disclosed on December 26, 2006, when the Telik Defendants disclosed that TELCYTA failed all three Phase 3 clinical trials in December 2006. However, Plaintiffs further alleged that they failed to disclose that TELCYTA had performed substantially worse than the competitors' drugs that were used in the control arms of ASSIST-1 and ASSIST-2. ¶¶67-68. From December 2006 until June 2007, the Telik Defendants continued to make positive statements about the purported efficacy of TELCYTA based on various studies and interim data from the Phase 2 clinical trials. ¶72.

Plaintiffs also alleged that it was not until June 3, 2007 (a Sunday, which is not a trading day) that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil® or Hycamtin® (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months – there was no statistical significance to the difference – for the control group that was treated with Iressa® (gefitinib). ¶¶73-74.

The following day, June 4, 2007, in an aftermarket release, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which stopped new patient enrollment in TELCYTA clinical trials, and prevented the Company from administering additional doses of the drug to those patients already enrolled in the trials. ¶76. Following the Company's disclosure and the FDA announcement, shares of the Company's stock declined an additional 41% to close on June 5, 2007 at $3.42 per share, on unusually heavy trading volume. ¶77.

As such, the Plan draws several important distinctions among Class Members who sold Telik stock before the end of the Class Period, bought after one of the partial disclosures, or held Telik stock as of the end of the Class Period.

Accordingly, the Plan ensures an equitable *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants based solely on if and when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during certain segments of the Class Period. "*Pro-rata* distribution of settlement funds based on investment loss is clearly a reasonable approach." *Global Crossing*, 225 F.R.D. at 462. Plaintiffs submit that the Plan is fair and reasonable and should be approved.

The only objection to the Plan is by Mr. May. Mr. May's objection to the Plan is not clear. May claims that the settlement is unfair to a "segment" of the class. *See* MacFall Decl. ¶49. Mr. May could be referring to the fact that Class members who bought and sold Telik stock before the partial disclosure of December 26, 2006 do not stand to recover. The Supreme Court's decision in *Dura v. Broudo* compels that conclusion because the Court held there that losses suffered before a corrective disclosure were found to generally not be compensable under Section 10(b).

## IV. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23

Pursuant to the Stipulation, Lead Plaintiff seeks final certification of the Class for settlement purposes pursuant to Rule 23(a) and (b)(3).[11] Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 205 (S.D.N.Y. 1995). Further, the Second Circuit has recognized that "[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes." *Weinberger,* 698 F.2d at 72. The proposed Class should be certified as it satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a)(1)-(4) and the predominance and superiority requirements of Rule 23(b)(3).

### A. The Numerosity Requirement is Satisfied

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *See Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 54 (S.D.N.Y. 1993). Here, throughout the Class Period, there were millions of Telik shares outstanding. Beneficial holders of the shares are believed to number in the thousands and are geographically located throughout the United States, making joinder impracticable. Thus, Rule 23(a)(1) is satisfied.

### B. Plaintiffs and the Proposed Class Share Common Questions of Law And Fact

The commonality requirement of Rule 23(a) (2) and typicality requirement of Rule 23 (a)(3) are discussed herein together because courts treat them as closely linked and evaluate them on much the same basis. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d at 311 ("The concepts of commonality and typicality are broadly defined and tend to

---

[11] As noted above, the Class is defined for settlement purposes as all persons who acquired Telik, Inc. common stock between February 19, 2004 and June 4, 2007, inclusive.

merge") (citation omitted). The threshold for satisfying these two requirements is not high.

*McManus v. Fleetwood Enters.*, 320 F.3d 545, 548 n.2 (5th Cir. 2003). The commonality

inquiry "asks if the named plaintiffs' 'grievances share a common question of law or of fact'

with those of the proposed class...." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y.

2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). Typicality is satisfied

if "each class member's claim arises from the same course of events, and each class member

makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North*

*Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also In re Blech Sec. Litig.*, 187

F.R.D. 97, 104 (S.D.N.Y. 1999) (plaintiff alleging a common course of conduct arising out of a

single set of operative facts satisfies the commonality requirement). *Cf. Robidoux v. Celani*, 987

F.2d 931, 936-37 (2d Cir. 1993).

The Complaint asserts the same claims on behalf of all Class Members. All Class

Members, as purchasers of Telik common stock during the Class Period, sustained injury due to

Defendants' alleged material misrepresentations throughout the Class Period. In addition, all

Class Members make the same legal claims under the federal securities laws. Plaintiffs have

alleged common issues of fact and law that affect all Class Members, satisfying the commonality

requirement of Rule 23(a)(2). *See, e.g., Sumitomo Copper Litig.*, 189 F.R.D. at 279

(commonality satisfied "[b]ecause a single, continuous conspiratorial artifice is alleged, the

relevant proof will not vary among class members, and the case presents a fundamental

[important] question...to all class members").

### C.   Plaintiffs And Lead Counsel Will Adequately Represent the Proposed Class

The adequacy requirement of Rule 23(a)(4) involves the inquiry as to whether: (1)

plaintiff's interests are antagonistic to the interests of the other members of the Class; and (2)

plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Both elements are present in this case.

No conflicts exist between Plaintiffs and the members of the Class. Plaintiffs' interests are aligned with those of the Class as the factual and legal claims of Plaintiffs and the Class arise from the same nexus of operative facts and course of conduct by Defendants. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citation omitted). Plaintiffs, like all Class Members, purchased Telik common stock at artificially inflated prices during the Class Period as a result of Defendants' alleged materially false and misleading statements and were damaged thereby.

Plaintiffs retained counsel who have successfully prosecuted numerous securities and other complex class actions in courts throughout the United States. *See* Firm resumes of Bernstein Liebhard and Brower Piven, P.C., who is counsel to additional named plaintiff Mehan Group, attached to the MacFall Declaration as Exhibits A and B, respectively.

Thus, Plaintiffs are adequate representatives of the Class, and their counsel are qualified, experienced, and capable of prosecuting the Action, in satisfaction of Rule 23(a)(4).

**D.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

In addition to the four requirements of Rule 23(a), a class must also satisfy one of the three subparts of Rule 23(b). Plaintiffs seek class certification under Rule 23(b), which requires that:

> the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

18319v1                                   20

Fed. R. Civ. P. 23(b)(3). This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

### E.    Common Questions of Law and Fact Predominate

The Rule 23(b)(3) inquiry normally focuses "'on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Cromer*, 205 F.R.D. at 127 (quoting *Amchem*, 521 U.S. at 623). (Alteration in original). "Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem*, 521 U.S. at 625.

Because the issue of liability in this case is common to all members of the Class, the predominance requirement of Rule 23(b)(3) is satisfied. Plaintiffs allege that Defendants engaged in a common course of fraudulent conduct to artificially inflate the price of Telik common stock. Proof of that common course of conduct relates to Defendants' liability as to all Class Members. Because the central and predominant focus of the Action is Defendants' alleged fraudulent conduct, each Class Member is similarly situated and common questions predominate over individual questions. *See Cromer*, 205 F.R.D. at 127 (finding predominance because "[t]he proof for the claims of misrepresentation or omission, materiality, and . . . scienter are all based on a common nucleus of facts and a common course of conduct"); *Blech*, 187 F.R.D. at 107 ("as a result of the allegations relating to the common course of conduct alleged in this action, certain common questions of law and fact relating to liability exist as to all members of the Class and predominate over any questions affecting solely individual members").

In this case, common questions predominate over individual questions. The common
questions include: (1) whether the federal securities laws were violated by Defendants'
statements and omissions; (2) whether statements made by Defendants during the Class Period
misrepresented and/or omitted material facts about the business and operations of Telik; (3)
whether the market price of Telik common stock was artificially inflated during the Class Period
due to the material misrepresentations and omissions; and (4) to what extent the members of the
Class have sustained damages and the proper measure of damages.

### F.    A Class Action is Superior to Multiple Individual Actions

Rule 23(b)(3) also requires that the class action be "superior to other available methods
for fair and efficient adjudication of the litigation." Fed. R. Civ. P. 23(b)(3). Courts have found
that the superiority requirement is satisfied where:

> The potential class members are both significant in number and geographically
> dispersed. The interest of the class as a whole in litigating the many common
> questions substantially outweighs any interest by individual members in bringing
> and prosecuting separate actions.

*Cromer*, 205 F.R.D. at 133.

Here, the utility of presenting the claims asserted through the class action method is
substantial since the Class Members who have been injured number in the thousands, but most
have not been damaged to a degree that would induce them to institute litigation on their own
behalf. *See Blech*, 187 F.R.D. at 107 ("violations of the federal securities laws, such as those
alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed
persons such that the cost of pursuing individual litigation to seek recovery is often not
feasible"); *see also Sumitomo Copper Litig.*, 189 F.R.D. at 279.

Further, certification of the Class is the superior method to facilitate the resolution of
Plaintiffs' claims. Without the settlement class device, Defendants could not obtain a Class-wide

release, and therefore would have had little, if any, incentive to enter into the Settlement.

Moreover, certification of a Class for settlement purposes will enable Lead Counsel to handle the

administration of the Settlement in an organized and efficient manner. Resolution of Plaintiffs'

claims against Defendants through the proposed Class is superior to any other available method

of resolution.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue the proposed

Final Judgment approving the Settlement, finally certifying the Class for settlement purposes, and

approving the Plan of Allocation of the Net Settlement Fund.

Dated: New York, New York
       August 29, 2008

Respectfully submitted,

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

By: /s/ _____
    Stanley D. Bernstein (bernstein@bernlieb.com)
    Mel E. Lifshitz (lifshitz@bernlieb.com)
    Timothy J. MacFall (macfall@bernlieb.com)
    Joseph R. Seidman, Jr. (seidman@bernlieb.com)
    10 East 40th Street
    New York, New York  10016
    (212) 779-1414
    (212) 779-3218 (fax)

    *Attorneys for Lead Plaintiff and Proposed*
    *Settlement Class*

18319v1

23

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached was served upon the following counsel of record in the actions filed this Court, First Class Mail prepaid, this 29th day of August, 2008:

*Attorneys for Defendants:*

David W. Haller
Linda C. Goldstein
**Covington & Burling LLP**
620 Eighth Avenue
New York, NY  10018

Jamie Levitt
**Morrison & Foerster LLP**
755 Page Mill Road
Palo Alto, CA  94304

*Attorneys for Plaintiff Mehan Group:*

David A.P. Brower
**Brower Piven, P.C.**
488 Madison Avenue
Eighth Floor
New York, New York  10022

*Objectors* (by fedex):

Andrew May
10321 Beaumont St.
Fairfax, VA  22030

Lloyd Sampson
2849 27th St. S.
Fargo, ND  58103

/s/
_____
JOSEPH R. SEIDMAN, JR.

18319v1                                24