UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE TELIK, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 07-cv-04819 (CM)

**DECLARATION OF TIMOTHY J. MACFALL IN SUPPORT OF
FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PETITION
FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

TIMOTHY J. MACFALL hereby declares as follows:

## I.    INTRODUCTION

1.    I am a member of the law firm of Bernstein Liebhard & Lifshitz, LLP ("Bernstein Liebhard"), court-appointed Lead Counsel ("Counsel") for Lead Plaintiff Policemen's Annuity and Benefit Fund for the City of Chicago ("Lead Plaintiff" or "Plaintiff"), in the above-captioned consolidated securities class action (the "Action"). I submit this declaration in support of: (i) the final approval of proposed settlement (the "Settlement") of the Action pursuant to a Stipulation and Agreement of Settlement dated April 16, 2008 (the "Stipulation"), with Defendants Telik, Inc. ("Telik"), Michael M. Wick, Cynthia M. Butitta (the "Individual Defendants") (Telik and the Individual Defendants are referred to as the "Telik Defendants"), as well as UBS Securities LLC, Lehman Brothers Inc., and J.P. Morgan Securities Inc. (collectively, "Underwriter Defendants"); (ii) approval of the plan of allocation of the proceeds of the Settlement (the "Plan of Allocation"); (iii) final certification of the class for settlement purposes; and (iv) approval of

the application of Counsel for an award of attorneys' fees and reimbursement of litigation

expenses. I have actively participated in all aspects of the Action and I am familiar with the facts

set out in this declaration.[1]

2.     Lead Plaintiff and Lead Counsel believe that the $5 million cash settlement (the

"Settlement") is a very good result for the Class. Plaintiffs' Complaint alleged that Defendants

made materially false and misleading statements about the Phase 2 and 3 clinical trials of

TELCYTA, Telik's premier cancer drug. Specifically, Plaintiffs alleged that Defendants'

statements about the positive results of TELCYTA Phase 2 testing were materially misleading

because, while Defendants were issuing such statements, they were in receipt of undisclosed

adverse information about three separate TELCYTA Phase 3 clinical tests through the "interim

looks" built into those studies. As discussed more fully below, however, during settlement

negotiations, the mediation, and in materials produced, as well as depositions conducted, during

confirmatory discovery, the Telik Defendants demonstrated that they were "blinded" to all

substantive data concerning the Phase 3 clinical trials of TELCYTA until the conclusion of those

studies in December 2006.

3.     Indeed, the "interim looks" publicly cited by the Telik Defendants were, in fact,

summary status reports from the independent Data Monitoring Committees ("DMCs") formed to

oversee each of the three clinical trials that indicated only whether the trials should be

terminated, continued, modified, or whether Telik should seek accelerated approval from the

Food and Drug Administration (the "FDA"). While the DMCs reviewed the underlying data

from the trials on an on-going basis, their Charters expressly precluded them from disclosing any

substantive data concerning the Phase 3 clinical trials to the Company. Lead Plaintiff has

---

[1] All defined terms contained in this declaration shall have the same meanings as set forth in the
Stipulation.

uncovered no evidence to suggest that the DMCs breached these provisions of their Charters.

4.      In addition, while the Complaint alleged that Defendants failed to disclose that the patients receiving TELCYTA died more quickly than those in the control groups, the evidence adduced during confirmatory discovery shows that the survival rates for the patients in the control group for that trial were aberrationally higher than historical norms. The TELCYTA-treated patients did not die any faster than Defendants had anticipated, but instead, the patients in the control group lived longer than anticipated. Finally, Lead Plaintiff learned that the five month time period between the December 26, 2006 disclosure (when it was publicly disclosed that TELCYTA had failed all three Phase 3 tests) and the June 4, 2007 disclosure (when it was first disclosed that TELCYTA-treated patients did not live as long as those in the control group) was necessary to fully analyze and confirm the accuracy of all data, since Telik received only "top-line," or summary, data, in December 2006. Indeed, that analysis was somewhat complicated by the unanticipated and aberrational survival rates of the control group patients.

5.      Despite the foregoing, Lead Plaintiff believes that, with leave of the Court, it could have amended the Complaint to allege that the Telik Defendants' statements that the Phase 3 trials were designed to provide for "interim looks" were materially false and misleading. For example, during a February 19, 2004 conference call with analysts, Defendant Wick stated that Telik would apprise the market of any change in the Company's guidance regarding the Phase 3 trials based on interim data. Because the Telik Defendants did not, in fact, receive such interim data, Lead Plaintiff believes that the Defendant Wick's statements, and other Class Period statements, were actionable. Lead Plaintiff recognized, however, that there were substantial hurdles to establishing liability under this theory. For example, certain analysts following Telik apparently understood the term "interim looks" to refer only to the limited periodic data reported

to the DMCs, and not to the Telik Defendants. Presumably, such analysts understood that Defendants were blinded to any substantive data from the trials. Even assuming, however, that Lead Plaintiff could demonstrate that such statements were actionable, Lead Plaintiff recognized that it faced significant hurdles in establishing that Defendants made such statements with scienter and in establishing loss causation.

6.     In sum, Lead Counsel and Lead Plaintiff believe these profound uncertainties, compared to a concrete and immediate benefit for the Class, make this Settlement a very attractive one for the Class.

7.     The reaction of the Class to the Settlement confirms our conviction that the Settlement is a fair one for the Class – there has been only two objections and three exclusions – a powerful endorsement.

8.     Lead Counsel, in close consultation with Lead Plaintiff's financial damages expert, Michael Marek, CFA, of Financial Markets Analyses, devised the proposed Plan of Allocation, which is set forth in the Settlement Notice, beginning at page 9. The Plan of Allocation provides that Class Members who submit timely, valid Proofs of Claim will share in a *pro rata* distribution of the Net Settlement Fund based on the common stock they purchased during the Class Period, and the price declines the stock experienced as an alleged result of corrective disclosures on December 26, 2006, June 3, 2007, and June 4, 2007. It is respectfully submitted that the Plan of Allocation provides a fair and reasonable basis to allocate the Settlement's proceeds equitably among Class Members, and should be approved by the Court.

9.     As fully set forth in Plaintiffs' Memorandum In Support Of Final Approval Of Class Action Settlement, Plan Of Allocation, and Certification of the Settlement Class ("Settlement Memorandum"), measured by all the criteria for approval of class action

settlements, the Settlement satisfies the relevant legal standards and should be approved by the Court as fair, reasonable and adequate.

10.     Lead Plaintiff also requests that the Court award Plaintiffs' Counsel attorneys' fees in the amount of 25% of the Settlement Fund, plus reimbursement of expenses of $100,118.19.  As fully set forth in Plaintiffs' Memorandum In Support of Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Expenses (the "Fee Memorandum"), the percentage fee requested by Lead Plaintiff falls within the range of fees awarded in similar class actions.

11.     In view of the above, Lead Plaintiff respectfully submits that the Settlement is a very good result given the difficult circumstances in this Action, and is worthy of final approval by the Court; that the Court should approve the Plan of Allocation; and that the requested fee and expense award should be granted in full.  Legal support for approval of the Settlement and the fee request is set forth in the accompanying Settlement Memorandum and the Fee Memorandum.

## II.    LITIGATION BACKGROUND

12.     Beginning on June 6, 2007, putative class actions were filed in the United States District Court for the Southern District of New York (the "Court") on behalf of purchasers of Telik common stock during a defined period of time alleging violations of the federal securities laws and captioned as (i) *Andrew May v. Telik, Inc., et al.,* No. 07-CV-04819 and (ii) *O'Grady v. Telik, Inc. et al.,* No. 07-CV-07040.

13.     On October 12, 2007, the Court (i) consolidated the foregoing actions for all purposes under the caption *In Re Telik, Inc. Securities Litigation,* No. 07-CV-04819 (CM); (ii) appointed Policeman's Annuity and Benefit Fund of Chicago as Lead Plaintiff pursuant to Sections 27(a)(3)(B) of the Securities Act of 1933 ("Securities Act") and 21D(a)(3)(B) of the

Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities

Litigation Reform Act of 1995 ("PSLRA"); and (iii) approved Lead Plaintiff's selection of the

law firm of Bernstein Liebhard & Lifshitz, LLP as Lead Counsel.

14.     On October 23, 2007, Lead Plaintiff and plaintiffs Ramesh K. Mehan, RML

Limited, Ramesh K. Mehan Irrevocable Children's Trust, Joel K. Mehan Irrevocable Trust,

Sheila G. Mehan Irrevocable Trust, Renee Mehan Family Trust, Neal D. Mehan Irrevocable

Trust, Rahul D. Mehan and Ramesh K. Mehan Family Trust (the "Mehan Group") (Lead

Plaintiff and the Mehan Group are collectively referred to herein as "Plaintiffs") filed a

Corrected Amended Class Action Complaint (the "Complaint") in the Action. The Complaint

alleges violations of Sections 11, 12, and 15 of the Securities Act, violations of Sections 10(b)

and 20(a) of the Exchange Act, as amended, and Rule 10b-5 promulgated thereunder by the

Securities and Exchange Commission ("SEC") on behalf of a putative class of all those who

purchased Telik common stock during the period from February 19, 2004 to June 4, 2007,

inclusive (the "Class Period").

15.     The Action was brought as a putative class action alleging that the Telik

Defendants violated the federal securities laws by making material misrepresentations and/or

material omissions about, *inter alia*, the Phase 3 clinical trials of TELCYTA, Telik's primary

new drug candidate.  In addition, Plaintiffs alleged that Defendants issued, or caused the issuance

of, a materially false and misleading registration statement in connection with the Company's

January 2005 offering of 6.5 million shares of Telik common stock.

16.     The parties first met in a face-to-face meeting soon thereafter on October 27, 2007

to discuss the possibility of settlement.  While no resolution was reached at that time, the parties

agreed to continue discussions.  After numerous telephone conferences, the parties agreed to

mediate the Action. Thereafter, the parties, as well as representatives of Defendants' insurers, then met with the Hon. Daniel Weinstein (Ret.) of JAMS and his assistant, Jed Melnick, Esq., to mediate the case on November 27, 2007. The parties negotiated well into the night without success. However, over the next six weeks, the parties engaged in numerous telephone conferences and extensive negotiations, with substantial concessions made by both sides. The parties finally reached an agreement-in principle to settle this action, signing a Memorandum of Understanding on January 15, 2008. Significantly, the parties agreed to conduct, and Plaintiffs completed, discovery to confirm certain factual assertions made by Defendants prior to submitting the proposed Settlement to the Court for Preliminary Approval.

17.    Plaintiffs' Counsel reviewed and analyzed thousands of pages of documents produced by the Telik Defendants. Lead Counsel has also conducted confirmatory depositions of Defendant and Telik CFO Cynthia Buttita, as well as Telik's Chief Medical Officer, Dr. Gail Brown. The testimony elicited during these depositions is not only consistent with the information contained in the documents produced by the Telik Defendants, but supports the fairness and adequacy of the proposed Settlement. Counsel for Plaintiffs, who have extensive experience in securities litigation and are thoroughly familiar with the factual and legal issues in this action (as indicated in the firm resumes attached as part of Exhibits A and B hereto), were able to adequately assess the strengths and weaknesses of the parties' claims and defenses based on the evidence adduced during this process.

## III.    SUMMARY OF THE CLAIMS

18.    Telik is a biopharmaceutical company that works to develop innovative small molecule drugs to treat diseases. The Company's most advanced drug development candidate is

TELCYTA, a tumor-activated small molecule designed to be activated in cancer cells. ¶3.[2]
Throughout the Class Period, the Company conducted multiple clinical trials to evaluate the
effectiveness of TELCYTA. ¶30.[3]

19.    Telik initiated Phase 2 clinical trials of TELCYTA in ovarian and non-small cell
lung cancers in the first half of 2001, and continued these trials throughout the Class Period. In
March 2003, Telik initiated Phase 3 trials in connection with those same diseases. ¶5.[4]

20.    Plaintiffs alleged that, throughout the Class Period, the Telik Defendants stated
that they received interim data concerning both the Phase 2 and Phase 3 clinical trials. *See* ¶¶35-
36, 47-49. Indeed, at various oncological conferences, in press releases, and in analysts'
conference calls throughout the Class Period, the Telik Defendants repeatedly touted the interim
findings of the Phase 2 trials, stating that TELCYTA demonstrated significant anti-tumor activity
and had a favorable impact on survival. *Id.* As a consequence of these glowing reports, Telik
common stock reached a Class Period high of $29.04 per share. ¶7. In addition, in January

---

[2] "¶___," refers to paragraphs of the Complaint.

[3] Before a new drug can be marketed in the United States, it must be approved by the Food and
Drug Administration ("FDA") after a lengthy period of clinical trials which are divided into
several phases. ¶4. Phase 2 trials include about 100-300 participants and test for safety and
efficacy. Phase 3 trials test the drug, which utilizes a larger number of participants than Phase 2,
further tests the product's effectiveness, monitors side effects, and, in some cases, compares the
product's effects to a standard treatment, if one is already available. *Id.*

[4] The Phase 3 trials consisted of three separate testing arms called ASSIST (ASsessment of
Survival In Solid Tumors) 1, 2, and 3. ASSIST-1 was a 440 patient multinational, randomized
study designed to evaluate TELCYTA as compared to the active control agents liposomal
doxorubicin or topotecan in the third-line therapy of platinum resistant ovarian cancer. ASSIST-
2 was a 520 patient multinational, randomized study designed to evaluate TELCYTA as
compared to gefitinib in the third-line therapy of advanced non-small cell lung cancer. ASSIST-
3 was a 244 patient randomized trial conducted in the U.S. designed to demonstrate a statistically
significant improvement in overall tumor response to the combination of TELCYTA plus
carboplatin compared to liposomal doxorubicin in the second-line treatment of platinum resistant
ovarian cancer. The primary "endpoint," or goal, of ASSIST-1 and 2, was survivability. The
primary endpoint of ASSIST-3 was "objective response" to TELCYTA, *i.e.*, reduction in tumor
size, with a secondary endpoint of survivability. ¶6.

2005, Telik engaged in an offering of 8,050,000 shares of common stock, underwritten by the Underwriter Defendants, that was completed in February 2005. Net proceeds to Telik were about $140 million. *Id.*

21.    Even as they were issuing highly positive statements about the interim results of the Phase 2 clinical trials, however, Plaintiffs alleged that the Telik Defendants received, but failed to disclose, interim data from the ASSIST-1 and 2 Phase 3 clinical trials which showed that TELCYTA not only failed to improve survival rates, but that patients treated with TELCYTA actually died sooner than the control groups who did not receive the drug. ¶¶45-46, 50-51, 55-56, 65. Plaintiffs also alleged that the Telik Defendants failed to disclose that they had received interim reports that the ASSIST-3 Phase 3 clinical trial had been compromised by the premature withdrawal of 25% of the participants, rendering it useless for submission to the FDA. ¶¶57-58, 60-61, 63-65.

22.    Plaintiffs alleged that the truth was partially disclosed on December 26, 2006 when the Telik Defendants announced that TELCYTA had failed to reach the primary endpoint – "a statistically significant improvement in overall survival" – in two of its Phase 3 clinical trials. ¶65. Additionally, the Company disclosed that in the third Phase 3 clinical trial, ASSIST-3, approximately 25% of the patients were prematurely discontinued from the assigned study treatment, invalidating that trial. *Id.* After these partial disclosures, Telik common stock fell $11.49 per share, or over 70%, to close on December 26, 2006 at $4.77 per share, on very heavy trading volume. ¶66.

23.    Although the Telik Defendants had disclosed that TELCYTA failed all three Phase 3 clinical trials in December 2006, Plaintiffs alleged that they failed to disclose that TELCYTA had performed substantially worse than the competitors' drugs that were used in the

control arms of ASSIST-1 and ASSIST-2. ¶¶67-68. From December 2006 until June 2007, the Telik Defendants continued to make positive statements about the purported efficacy of TELCYTA based on various studies and interim data from the Phase 2 clinical trials. ¶72.

24. Plaintiffs alleged that it was not until June 3, 2007 that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil® or Hycamtin® (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months for the control group that was treated with Iressa® (gefitinib). ¶¶73-74.

25. The following day, June 4, 2007, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which stopped new patient enrollment in TELCYTA clinical trials, and prevented the Company from administering additional doses of the drug to those patients already enrolled in the trials. ¶76. Following the Company's disclosure and the FDA announcement, shares of the Company's stock declined an additional 41% to close on June 5, 2007 at $3.42 per share, on unusually heavy trading volume. ¶77.

26. After a full review of the data from the Phase 3 trials, the FDA lifted the clinical hold on October 15, 2007.

## IV.    REASONS FOR THE SETTLEMENT

27. The stature of Plaintiffs' case – and the risks of continued litigation – changed dramatically during settlement negotiations and mediation. The core allegation in the Complaint is that the Telik Defendants received data about the Phase 3 tests on a "rolling basis" from the

"interim looks" that Defendants Wick and Buttita stated were built into the study. Plaintiffs alleged that, based on their receipt of negative interim data concerning the TELCYTA Phase 3 trials, the Telik Defendants knew that their positive statements concerning the Phase 2 and 3 trial results were materially false and misleading. In addition, Plaintiffs alleged the Telik Defendants knew that 25% of the participants in the lung cancer arm of the tests were prematurely withdrawn from the study, compromising the data and rendering it unusable for FDA purposes.

28.     However, Lead Counsel learned during the settlement discussions and mediation, and later confirmed through discovery, that the Telik Defendants were actually blinded to all substantive data during the conduct of the Phase 3 trials. The "interim looks" referenced by Defendants Wick and Buttita were, in fact, periodic reports to the independent DMCs – not Telik. Moreover, under their respective Charters, the DMCs were precluded from disclosing any of this data, including the withdrawal rate for the TELCYTA-treated patients, to Telik until the Phase 3 trials were complete. Instead, the DMCs' communications with Telik were limited to recommending whether the trials should be continued, modified, terminated, or whether the Company should seek accelerated FDA approval, based on that data. Accordingly, the Telik Defendants were aware neither of TELCYTA's performance compared to the control arms, nor that 25% of the patients in the ASSIST-3 trial had been prematurely withdrawn until December 2006. This was confirmed through documentary evidence and through the testimony of Dr. Brown, Telik's Chief Medical Officer and primary liaison with the DMCs.

29.     In addition, while Plaintiffs alleged that the Telik Defendants delayed disclosing that certain patients treated with TELCYTA failed to survive as long as those in the control groups, Lead Counsel learned that the additional time was necessary to allow Telik to analyze the actual data underlying the top-line analysis that was un-blinded in December 2006.

Moreover, Lead Counsel has confirmed that the reason for the disparity in survival rates for the patients in the ASSIST-1 control group (specifically those treated with Doxil) was that these patients had aberrationally long survival times as compared to historical norms. In fact, TELCYTA had actually performed as well as the Company had anticipated in the ASSIST-1 trial. With respect to ASSIST-2, the difference in the survival rates for the TELCYTA-treated patients and the control group (4.6 months and 6.1 months, respectively) was not statistically significant. Once again, TELCYTA performed as had been expected, but the control group survived slightly longer than anticipated based on the literature and the results in prior studies. Indeed, post-Class Period events corroborate this. On June 4, 2007, the FDA issued a clinical hold suspending all trials involving TELCYTA based on the fact that TELCYTA-treated patients died earlier than those in the ASSIST-1 and 2 control groups. However, after reviewing the data from the Phase 3 trials, the FDA lifted that hold on October 15, 2007.

30.    As noted above, Plaintiffs believe that, with leave of the Court, they could have amended their claims to allege that the Telik Defendants' statements about the "interim looks" were actionable because the Telik Defendants did not actually receive such data. Plaintiffs believe these statements were materially false and misleading because they lead the market to believe that the Company received data on an on-going basis and, in the absence of the disclosure of any adverse information, that the trials were proceeding favorably. Plaintiffs believe they would face significant obstacles under this theory, however, because some (although not all) analysts apparently understood that "interim looks" referred to periodic reports to the DMCs, and that Telik received only limited information from those DMCs as to whether to continue, modify, stop the trials, or seek accelerated FDA approval. Defendants would likely argue that the statements were not materially false and misleading as the reference to "interim

looks" accurately pertained to the data received by the DMCs. Even if the statements were found to be materially false and misleading, however, Plaintiffs anticipate that Defendants would have mounted a substantial "truth-on-the-market" defense based on the understanding of those analysts who understood that the interim data was being provided to the DMCs and not the Company. In addition, Plaintiffs would have to establish that the Telik Defendants made these statements with the intent to defraud, or with severe recklessness. While Lead Plaintiff believes that it could have satisfied its burden of establishing the foregoing, it also recognizes that overcoming these obstacles was far from certain.[5]

31.    The strong defenses available to Defendants, as well as the substantial hurdles to recovery on any alternative theory of liability, and the risks of continued litigation militated strongly in favor of settling this Action. Indeed, the foregoing was discussed at length during the parties' joint sessions and in Plaintiffs' break-out sessions during the mediation process. Plaintiffs respectfully submit that these factors also constitute strong support for the final approval of the Settlement.

32.    Further, the recovery here is excellent. While Plaintiffs' damage expert estimated the aggregate loss of market value following the disclosures about the results of the Phase 3 tests and the survival rates is $449 million, Lead Plaintiff believes, based on consultation with its damages expert, that the overwhelming majority of this loss is attributable to market forces (*i.e.*, the fact that Telik's primary new drug candidate failed all three Phase 3 clinical trials).

33.    For example, Plaintiffs surveyed 10 similarly situated biotech companies with primary drug candidates that failed FDA Phase 3 testing – where *no* allegations of fraud were

_____

[5] Further, because of the language in the prospectus disseminated in connection with the Offering, Lead Plaintiff would face substantial hurdles in amending the Complaint to allege a Section 11 claim under a similar alternative theory of liability.

made, and *no* securities fraud litigation was filed, in connection with such testing failure – lost between 40% and 87.83% of their market value, for an average loss of 67.21% of market value upon disclosure of the adverse test results.[6] Here, Telik lost 71.77% of its market value on the corrective disclosures on December 26, 2006 and June 3 and 4, 2007.[7] Thus, even assuming that they could establish liability, Plaintiffs anticipate that they could establish that only 4.56% of Telik's loss in market value (the difference between the loss in market value for Telik (71.77%) and the average loss in value where there were no allegations of fraud (67.21%)), or approximately $20.47 million, are the maximum recoverable damages in this litigation. Accordingly, the $5 million cash recovery provided by the proposed Settlement represents approximately 25% of the maximum recoverable damages that Plaintiffs believe they could establish at trial – a very result that is well above average. *See* Settlement Memorandum at 14-15.

## V.    CERTIFICATION OF THE SETTLEMENT CLASS

34.    The Class readily meets the criteria for final certification for settlement purposes. *See* Settlement Memorandum at 18-23.  Further, Counsel and counsel for Defendants have agreed to class certification for settlement purposes.

## VI.    THE NOTICE PROGRAM

35.    Pursuant to the Court's Preliminary Approval Order, The Garden City Group, Inc.

---

[6]  *See* Exhibit C hereto (chart listing ten biotechnology companies and the percentages, and amounts, of drop in stock value after disclosing that their primary new drug candidates had failed in Phase III trials).  These companies, all part of the NASDAQ Biotechnology Index, were selected based on the fact that their primary lead drug candidate failed Phase 3 FDA trials within the last two years, and no securities fraud litigations were filed in connection with such failures.

[7]  The price of Telik common stock fell from a close of $16.26 per share on December 22, 2006 (the last trading day before the alleged partial disclosure of December 26, 2006), to a close of $4.77 per share on December 26, 2006.  The stock fell from a close of $5.81 to a close of $4.59 per share on June 4, 2007.

(the "Claims Administrator"), was directed to mail the Settlement Notice and Proof of Claim by first class mail to all Class members who could be reasonably identified. *See* Affidavit of Jennifer Keough attached hereto as Exhibit D at ¶¶7,8. In the aggregate, over 54,000 copies of the Settlement Notice and the Proof of Claim forms were disseminated to potential Class Members. Settlement Notices and Proofs of Claim were initially mailed to the names and addresses of record transferees of Telik common stock, and to banks, brokerage firms and other nominees known to trade in securities as nominees for beneficial purchasers. Those brokerage firms, banks, institutions and other nominees, then either (i) provided the Claims Administrator with lists of the names and addresses of their beneficiaries who are potential Class Members, or (ii) requested bulk sets of the Settlement Notice and Proof of Claim for the brokerage firms, banks, and institutions to mail to their beneficiaries. The Notice and Proof of Claim were sent to all these potential Class Members promptly. *Id.*

36.    In addition, copies of the Notice and the Proof of Claim were posted on the Claims Administrator's website, which allowed them to be downloaded by potential claimants. *Id.* ¶10. Counsel also caused the Summary Notice of Pendency of Class Action, Proposed Settlement Thereof And Fairness Hearing (the "Summary Notice") to be published in the national edition of *The Wall Street Journal* on June 20, 2008. *Id.* ¶8.

37.    The Claims Administrator established a toll-free Interactive Voice Response system to accommodate potential claimants. This system became operational on June 6, 2008. As of August 10, 2008, a total of 397 calls were received. *See id.* ¶9.

38.    The Claims Administrator has received only 3 requests for exclusion from the Class. *Id.* ¶11. Likewise, Counsel has received only two objections from Class members to the Settlement, one of which also objects to the fee request. Counsel respectfully submits that the

overwhelmingly positive reaction of the Class strongly supports approval of both the Settlement and the request for the award of attorneys' fees and expenses.

39.     The only objection attempting to articulate any reasons militating against approval of the Settlement was filed by Andrew May.  As detailed in a letter with numerous exhibits (the "May Letter") (the letter is attached hereto with its exhibits as Exhibit E), sent by Lead Counsel to Mr. May, with a copy to the Court, on July 2, 2008, we spoke to Mr. May before he filed his objection (as well as his modified objection).  *See* Ex. A to the May Letter.  As described in the May Letter, Joseph R. Seidman, Jr., a senior Bernstein Liebhard associate who worked on Telik since the inception of the Action, explained to Mr. May Plaintiffs' rationale for the Settlement.  *See id*; *see also* accompanying Seidman Declaration at ¶2.  Mr. Seidman also directed Mr. May to the papers in support of preliminary approval of the Settlement, which discussed those reasons in detail.  *Id*.  Mr. May indicated that he had seen the preliminary approval papers and, nonetheless claimed that they, together with the reasons provided by Mr. Seidman, were inadequate.  *Id*. at ¶3.

40.     Mr. May requested copies of the materials provided by Telik during confirmatory discovery, as well as the transcripts of the depositions of Dr. Brown and Ms. Buttita taken in connection with the Settlement.  Mr. Seidman informed Mr. May that such materials were confidential (they were provided subject to a stipulated confidentiality agreement with Defendants).  Mr. Seidman did, however, tell Mr. May that he would double-check with the partner on the case.  *Id*.

41.     On June 6, 2008, we received a second letter from Mr. May.  *See* Ex. B to the May Letter.  In that letter, Mr. May again requested all the confirmatory discovery material, wrote that Mr. Seidman had not contacted Mr. May's counsel, Marc Henzel, as purportedly

requested, and asked how much cash on hand Telik had at the time that the parties had agreed to

the terms of the Settlement. Seidman Decl. ¶5. That same day, Mr. Seidman contacted Mr.

Henzel by email, attaching Mr. May's second letter. *See* Ex. C to the May Letter. Mr. Henzel

was apprised that Mr. Seidman did not recall telling Mr. May that he would call Mr. Henzel. Mr.

Seidman further apprised Mr. Henzel that we could not honor Mr. May's request for the

confirmatory discovery materials because of the confidentiality agreement. *See id.* Finally, Mr.

Seidman informed Mr. Henzel that Mr. May also requested Telik's cash position at time the

terms of the Settlement were reached, which is public information readily available from the

Company's filings with the Securities and Exchange Commission ("SEC"). *Id.*

42. On June 19, 2008, we received Mr. May's initial objection in the mail. *See* Ex. D

to the May Letter. Mr. May claimed in his initial objection that "when management was asked

about the final results of assist 1-2-3 [*sic*] trials, management refused to give truthful answers

after being asked on a conference call even though the information was right in front of

management." *See id.*

43. This assertion is contrary to the evidence adduced by Plaintiffs through discovery.

While Telik had received data from the Phase 3 trials a few days prior to call referenced by Mr.

May, it was summary, top-line data and it took *months* for management to complete a detailed

analysis of the data. Indeed, that analysis confirmed that while the survivability rate for the

ASSIST-1 TELCYTA-treated patients was in line with Telik's original projections, the control

group treated with Doxil had survived longer than anticipated based on scientific literature of the

past 15 years (in which Doxil had shown survivability rates of approximately 6 months for

patients comparable to those in ASSIST-1). In ASSIST-2, there was no statistically significant

difference between the survival rates of the TELCYTA-treated patients and the control group,

treated with Iressa. However, because the primary endpoint of the test was *increased*

survivability, TELCYTA failed this test as well. In his objection, Mr. May also inaccurately

recounts the communications between he and Lead Counsel. Those inaccuracies are specifically

addressed in the Seidman Declaration.

44.    On July 18, 2008, Lead Counsel received a "Modified Objection" (the "MO")

from Mr. May. *See* Exhibit F attached hereto.[8] In the MO, Mr. May expands upon his initial

objection, and also asserted new grounds for his objection. As discussed more fully in the

accompanying Memorandum of Law in Support of Final Approval of the Settlement, Mr. May's

objection lacks merit and should be rejected. For example, Mr. May asserts that the Telik

Defendants knew, as of December 26, 2006, that TELCYTA had significantly underperformed

the control arm (Doxil) in Phase 3 ASSIST-1 trials, and caused women to die faster and at rates

that could not be attributed to "random chance." MO at 8. It is true that TELCYTA did not

perform as well as the control treatment, Doxil in the ASSIST-1 test. Mr. May's assertion,

however, ignores that the evidence adduced by Plaintiffs showed that TELCYTA actually

performed in line with Telik's original projections, but that the Doxil-treated control group lived

longer than anticipated based on the scientifically accepted literature and prior test results.

Likewise, the difference in survival times between patients treated with TELCYTA and the

ASSIST-2 control group treated with Iressa was not large enough to be statistically significant.

45.    Moreover, there is no credence to Mr. May's claim that TELCYTA caused these

patients to die at all, let alone to die faster and at rates unattributable to random chance. As

described in the Complaint, ASSIST-1 involved the treatment of patients suffering from ovarian

---

[8] Also attached as Exhibit F are the other letters, purportedly including additional evidence, written by Mr. May to Lead Counsel after he submitted his modified objection, as well as one response letter from Lead Counsel to Mr. May.

cancer, which "has the highest mortality rate of all gynecologic malignancies." ¶34. Moreover,

the patients in the ASSIST-1 test were individuals "whose disease has progressed following

platinum-based chemotherapy and one second-line treatment." *Id.* In other words, these were

patients with advanced ovarian cancer, which had not responded to traditional therapies.

Unfortunately, the issue was not one whether these patients were terminal or not, but whether

TELCYTA could increase their survival time by a statistically significant amount (as measured

in months). In sum, TELCYTA did not cause these patients to die.

46.    Likewise, Mr. May provides no basis for his assertion that the Telik Defendants

were not blinded to data during the pendency of the trials. MO at 9-10. As discussed above,

Lead Counsel reviewed thousands of pages of documents, including the FDA-approved

Protocols governing each test and the Charters of the various DMCs monitoring each test, and

these documents confirm Dr. Brown's testimony that the Company was blinded to any

substantive data concerning the Phase 3 tests until those tests were completed in December 2006.

47.    Mr. May's assertion that Defendants' statements were misleading because the

trials resulted in dirty data "riddled with inconsistencies" rendering it "suspect" and

"unacceptable to the FDA" (MO at 9, 22), refers to the ASSIST-3 trial which was rendered

unusable because 25% of its patients were prematurely withdrawn. Significantly, however, the

Telik Defendants demonstrated that they were blinded to this, as to other, data during the

pendency of the trial. Further, Lead Counsel adduced additional evidence that showed that while

25% of the patients were withdrawn from the test after various radiologists had determined that

the patients were experiencing no benefit from TELCYTA, a second group of independent

radiologists determined that many of these patients were actually experiencing some benefit from

TELCYTA and, therefore, had been improperly withdrawn from the study.

48.     Mr. May also apparently misapprehends the significance of the similarly situated drug companies cited by Plaintiffs in connection with the damages discussion. Mr. May states that the companies used as comparisons to Telik did not have "three trial's going [sic] on where patients died at alarming rates[]." MO at 23. Plaintiffs, however, referenced these companies only to demonstrate that even in the absence of any allegations of fraud, drug companies with a primary new drug candidate that fails Phase 3 testing will lose, on average, 67.21% of their market value. By means of these comparisons, Plaintiffs sought to assess only what portion of the loss in Telik's market value could be attributed to the failure of TELCYTA in the Phase 3 clinical trials irrespective of the allegations of fraud. For these limited purposes, the allegations against Telik are not relevant.

49.     To the extent that Mr. May opines that the settlement provides "no relief to a significant segment of the class," his objection has no merit. Although Mr. May does not explain the precise basis of this particular assertion, if his complaint is that "in-and-out" purchasers (*i.e.*, individuals who purchased and sold Telik shares prior to the December 2006 disclosure) should be included in the Class under the proposed Plan of Allocation, his argument is squarely at odds with the Supreme Court's decision in *Dura Pharm, Inc. v. Broudo*, 125 S. Ct. 1627 (2005), holding that investors who bought and sold prior to the curative disclosure have sustained no 10(b) damages because they bought *and* sold their stock at artificially inflated prices. *See* Settlement Memorandum at 17-18.

50.     Mr. May also claims that the settlement is shrouded in secrecy and "appears designed to dampen the ability of class members to detect the true nature of the deal" because the notice i) was sent to class members' "last known address" and ii) was disguised as a solicitation. These complaints have no merit because as counsel for the Court-appointed Lead Plaintiff, Lead

Counsel was authorized to engage in settlement negotiations and mediation with Defendants. As this Court is well aware, such negotiations and mediations are confidential so as to avoid prejudicing the parties' litigation positions if they are unsuccessful. Moreover, to the extent that defendants were required to disclose confidential, non-public information during the negotiations, mediation process, and in confirmatory discovery process, it is hardly surprising that they conditioned the disclosure of such information upon Plaintiffs' agreement to preserve the confidentiality of this information particularly because such information was provided voluntarily as part of the settlement process and not as part of ordinary discovery. Indeed, Plaintiffs could not yet have obtained such information from Defendants since the PSLRA discovery stay was still in effect. Mr. May's complaint about sending claim packets to class members' "last known address" is not only illogical (since Plaintiffs would have no other place to send such information), but contrary to the express terms of this Court's Preliminary Approval Order, dated May 7, 2008, which authorizes such mailing and publication notice as the best notice practicable. Likewise, since the Notice clearly bears the notation "This is not a solicitation" on the first page, this argument is simply baseless. *See* Exhibit A-1 to Stipulation at 1.

51.    Mr. May's remaining arguments are equally devoid of merit and provide no valid basis for this Court to decline final approval of this Settlement. While it is obvious that Mr. May does not like the Settlement, the Notice he received makes clear that he can opt-out and pursue his individual remedies against Defendants. Plaintiffs respectfully submit that he should not, however, be permitted to frustrate the tacit approval of this Settlement by the other members of the Class, who have voiced only one other objection to it.

52.    The other objector, Lloyd Sampson, objects not to the Settlement itself but to his

mistaken belief that the Settlement proceeds are coming from the Company and thus, as a current shareholder, from his pocket. In fact, the proceeds of the Settlement are coming from D&O insurance.[9]

## VI.    THE PLAN OF ALLOCATION

53.    The Plan of Allocation, formulated by Lead Counsel, working with financial damages expert Michael Marek of Financial Markets and Analyses is as follows:

1.    For shares of common stock purchased between February 19, 2004 and December 22, 2006:

    A.    For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

        (1) $11.49 per share; or
        (2) the difference between the purchase price per share and $3.17.[10]

    B.    For shares sold between February 19, 2004 and December 22, 2006, the Recognized Loss shall be zero.

    C.    For shares sold between December 26, 2006 and June 1, 2007, the Recognized Loss shall be the lesser of:

---

[9] Mr. Sampson filed a request for exclusion from the Settlement (all three requests for exclusions are attached hereto as Exhibit G) in which he also objected to the Settlement. Although a class member cannot exclude himself from the settlement and object to the settlement – because to have standing to object you must remain a class member – we nonetheless deal with Mr. Sampson's objection as such.

[10] Pursuant to Section 21(D)(e)(1) of the PSLRA, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." $3.17 was the mean (average) daily closing trading price of Telik, Inc. common stock during the 90-day period beginning on June 5, 2007 and ending on August 31, 2007.

(1) $9.39 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

D.     For shares sold on June 4, 2007, the Recognized Loss shall be the lesser of:

(1) $10.32 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

E.     For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:

(1) $11.49 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

2.     For shares of common stock purchased between December 26, 2006 and June 1, 2007:

A.     For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

(1) $2.10 per share; or
(2) the difference between the purchase price per share and $3.17.

B.     For shares sold between December 26, 2006 and June 1, 2007, the Recognized Loss shall be zero.

C.     For shares sold on June 4, 2007, the Recognized Loss shall be the lesser of:

(1) $0.93 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

D.     For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:

(1) $2.10 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

3.     For shares of common stock purchased on June 4, 2007:

A.     For shares retained at the end of trading on August 31, 2007, the Recognized Loss shall be the lesser of:

(1) $1.17 per share; or
(2) the difference between the purchase price per share and $3.17.

B.     For shares sold on June 4, the Recognized Loss shall be zero.

C.     For shares sold between June 5, 2007 and August 31, 2007, the Recognized Loss shall be the lesser of:

(1) $1.17 per share; or
(2) the difference between the purchase price per share and the sales price per share for each share sold.

54.     The Net Settlement Fund will be distributed to Authorized Claimants, *i.e.,* members of the Class who submit timely and valid Proofs of Claim, in accordance with the Plan of Allocation described in the Notice. The Plan treats all Class Members in a similar manner: everyone who submits a valid and timely claim, and does not exclude himself or herself from the Class, receives a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's Recognized Claim bears to the total of all Recognized Claims. The "Recognized Claim," as used in the Plan, is not market loss. Rather, it is a calculation used to arrive at a weighted loss figure for purpose of calculating an Authorized Claimant's *pro rata* participation in the Net Settlement Fund.

55.     The Plan reflects Lead Plaintiff's allegations that the truth concerning TELCYTA was partially disclosed on December 26, 2006, when the Telik Defendants disclosed that TELCYTA failed all three Phase 3 clinical trials in December 2006. However, Lead Plaintiff further alleged that they failed to disclose that TELCYTA had performed substantially worse than the competitors' drugs that were used in the control arms of ASSIST-1 and ASSIST-2. ¶¶67-68. From December 2006 until June 2007, the Telik Defendants continued to make positive statements about the purported efficacy of TELCYTA based on various studies and interim data from the Phase 2 clinical trials. ¶72.

56.    Lead Plaintiff also alleged that it was not until June 3, 2007 (a Sunday, which is not a trading day) that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil® or Hycamtin® (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months – there was no statistical significance to the difference – for the control group that was treated with Iressa® (gefitinib).  ¶¶73-74.

57.    The following day, June 4, 2007, in an aftermarket release, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which stopped new patient enrollment in TELCYTA clinical trials, and prevented the Company from administering additional doses of the drug to those patients already enrolled in the trials.  ¶76. Following the Company's disclosure and the FDA announcement, shares of the Company's stock declined an additional 41% to close on June 5, 2007 at $3.42 per share, on unusually heavy trading volume.  ¶77.

58.    As such, the Plan draws several important distinctions among Class Members who sold Telik stock before the end of the Class Period, bought after one of the partial disclosures, or held Telik stock as of the end of the Class Period.

59.    Accordingly, the Plan ensures an equitable *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants based solely on if and when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during certain segments of the Class Period.  "*Pro-rata* distribution of settlement funds based on investment loss is clearly a reasonable approach."  *In re Global Crossing Sec. & ERISA Litig.*,

225 F.R.D. 436, 462 (S.D.N.Y. 2004). Plaintiffs submit that the Plan is fair and reasonable and should be approved.

60.     The only objection to the Plan is by Mr. May. As noted above, Mr. May states only that the settlement is unfair to a "segment" of the class. *See infra* at ¶49. Because the precise basis for that objection is never articulated, it should be summarily rejected.

## VII.    ATTORNEYS' FEES AND EXPENSES

61.     As compensation for their services in obtaining the Gross Settlement Fund as a common fund recovery for the Class, Plaintiffs' Counsel seek attorneys' fees in the amount of 25% of the Gross Settlement Fund. As shown in the accompanying Fee Memorandum, the requested fee is well below the range of fees approved in the Second Circuit and consistent with the percentage of the common fund awarded to counsel in securities class actions in New York federal district courts in settlements of this kind and amount.[11]

62.     The Settlement Notice states that Plaintiffs' Counsel are moving the Court to award attorneys' fees of not greater than thirty percent (30%) of the Gross Settlement Fund, and for reimbursement of expenses incurred in connection with the prosecution of this Action in the

_____

[11] The reasonableness of Plaintiffs' Counsel's request is further demonstrated under a lodestar/ multiplier analysis. Counsel spent 1,423.85 hours prosecuting the Action for a total lodestar of $779,297.75. Accordingly, Counsel seek a multiplier of 1.6, which is below average. The Affidavits of Mel E. Lifshitz and David Brower, and Declaration of David Rosenfeld, detailing Plaintiffs' Counsel's time and expenses, are annexed hereto as Exhibits A,B, and G. David Brower is a member of Brower Piven, P.C., counsel for additional named plaintiff Mehan Group. David Rosenfeld is a member of Coughlin Stoia Geller Rudman & Robbins, LLP ("Coughlin"), who drafted the first complaint on behalf of Mr. May, but does not represent him with respect to his objection. Coughlin is also counsel for Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Local 103"), a lead plaintiff movant that had standing to assert Section 11 claims in connection with Telik's Class Period offering. This matter was resolved before Local 103 filed its motion to intervene on behalf of Section 11 plaintiffs with an eye to serving as a class representative for such plaintiffs later in the case.

approximate amount of $125,000. Pursuant to this Court's Preliminary Approval Order, all objections to the application for fees and reimbursement of expenses had to be served and filed no later than August 8, 2008. To date, only Mr. May has objected to the fee and expense request. Mr. May says that the Court should "hold compensation" for counsel until counsel provides shareholders with "relief". *See* Seidman Decl. Ex. H. For the reasons discussed above, that objection lacks merit.

63.    There were significant risks in pursuing this Action. This was not a case where any recovery was assured. Compounding the risk, Plaintiffs' Counsel have received no compensation during the time that this Action has been pending, their fees being totally contingent and dependent upon a successful result and an award by this Court. Plaintiffs' Counsel respectfully submit that the Settlement was the result of their hard work, persistence, and skill and they should be compensated for their services.

64.    Plaintiffs' Counsel also request reimbursement of the expenses incurred in connection with the prosecution of the Action. Those expenses are reflected in the books and records maintained by Plaintiffs' Counsel and are accurate recordings of the expenses incurred. In total, Plaintiffs' Counsel has incurred reimbursable expenses in the amount of $100,118.19, which they respectfully submit are reasonable and were necessarily incurred in connection with the prosecution of this Action.

## XI.    CONCLUSION

65.    For the reasons set forth above and in the accompanying Settlement Memorandum and Fee Memorandum, Plaintiffs respectfully submit that: (i) the Settlement is fair, reasonable, and adequate and should be approved; (ii) the Plan of Allocation represents a fair and reasonable method for the distribution of the Net Settlement Fund among Class

Members and should be approved; (iii) the Class should be finally certified for settlement purposes; and (iv) the application for attorneys' fees and reimbursement of expenses, should be granted.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of August, 2008, at New York, New York.

/s/

_____

TIMOTHY J. MACFALL

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached was served upon the following counsel of record in the actions filed this Court, First Class Mail prepaid, this 29th day of August, 2008:

*Attorneys for Defendants:*

David W. Haller
Linda C. Goldstein
**Covington & Burling LLP**
620 Eighth Avenue
New York, NY  10018

Jamie Levitt
**Morrison & Foerster LLP**
755 Page Mill Road
Palo Alto, CA  94304

*Attorneys for Plaintiff Mehan Group*:

David A.P. Brower
**Brower Piven, P.C.**
488 Madison Avenue
Eighth Floor
New York, New York  10022

*Objectors* (by fedex):

Andrew May
10321 Beaumont St.
Fairfax, VA  22030

Lloyd Sampson
2849 27th St. S.
Fargo, ND  58103

/s/
_____
JOSEPH R. SEIDMAN, JR.