EXHIBIT F

**Modified Objection**                          **July 16, 2008**

**In Telik,INC.**

**Securities Litigation**

**Civil Action No.07-cv-04819-CM**


**Mr. Andrew R. May**

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Re : **Timothy J. MacFall, Esq.**

     **Joseph R. Siedman, Jr.**

Bernstein Liebhard & Lifshitz, LLP

10 East 40th Street, 29th Floor

New York, New York 10016-0201


              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK


Formal Objections and Arguments of Andrew R. May

Andrew May = "Class Members"


1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Settlement Agreement is a particularly egregious illustration of the kind of class action settlement where the attorneys and the defendants benefit, but the class members receive almost nothing. The Settlement Agreement provides an extremely broad release of liability for Telik Inc, will likely produce a handsome fee for class counsel, and will provide remarkably little relief to class members. The Settlement Agreement is also surrounded with a veil of secrecy which is extraordinary for a class action, ensuring that class members and members of the public are deprived of critical information bearing on the fairness of the deal. Also class counsel has not adequately represented the class members. See exhibit 01. This Court should reject the settlement, and unravel the secrecy. To begin with, the Settlement Agreement provides no relief to a significant segment of the class. In return, Telik obtains a total release of liability for its misconduct with respect to all class members. This fact alone renders the Settlement Agreement unfair and unapprovable on its face.

As to those class members who a stay member will receive penny,s .06 cents on a share of stock. Thus, even those class members who are theoretically entitled to some relief from this

settlement will actually receive nothing. The result, for Telik, is a complete release of liability in exchange for minimal cash payout.

Making matters worse, the Settlement Agreement is designed to minimize opposition to its terms by concealing a host of information that bears directly on its substantive fairness.

First, the Settlement Agreement prohibits any public disclosure of its "total value," thereby permitting Telik to conceal the extent of its liability from class members and the general public. Second, the Settlement Agreement prohibits any public disclosure of the total amount of, thereby permitting class counsel to conceal the extent of it's liability from class members and the general public. Third, all the discovery in the case is under seal, thereby limiting access to information regarding the extent of class members' damages and Telik.s conduct. Finally, and perhaps most astonishing, the Settlement Agreement seeks to bar  class counsel  -- but not Telik -- from speaking out publicly about any aspect of this case. Not only do these provisions violate the public's right of access to the judicial process, but they appear designed to stifle opposition from the class itself -- a result that runs flatly contrary to the fairness inquiry imposed by Rule 23.

All these problems are exacerbated by the class notice, which also appears designed to dampen the ability of class members to detect the true nature of the deal. First, many class members undoubtedly did not receive any notice at all. The only notice provided was via direct mail to class members' last known addresses. Because the Settlement Agreement does not make any provision for notice by publication except for one article in the WSJ, any class members who have moved most likely are unaware of this settlement. Second, the notice itself was presented in such a way as to lead many class members to pay little attention to it, and to take it for a mere solicitation. Third, the notice is sketchy on important points, failing to provide crucial details relating to a host of misleading statements and similar matters. Taken together, the inadequacies in the notice make it even more likely that class members are deprived of important information relating to the Settlement Agreement.

For all these reasons, this settlement cannot be approved as fair, adequate, or reasonable. Not only is the class provided with remarkably little relief, but the settling parties have gone to great lengths to limit opposition to the deal by agreeing to secrecy provisions that are virtually unheard of in the class action context. The Court should reject this attempt

4

to use the class action device in this manner.

### STATEMENT OF FACTS

This action arises out of a pattern of misleading Telik shareholders committed by Telik covering up safety data. In essence , Telik sold stock knowing Telcyta was not safe.
The plaintiff brought this action on June 6 2007, pleading a nationwide class action. The Defendants were untruthful in the statements taken  in the depositions. See Exhibit 01.

### ARGUMENT

**I.THIS COURT SHOULD CLOSELY SCRUTINIZE THE PROPOSED SETTLEMENT.**

The statement of facts clearly show the defendants were not so truthful at all.

**II.THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT WILL PROVIDE NO COMPENSATION TO THE VAST MAJORITY OF CLASS MEMBERS, WHILE GIVING AN EXTRAORDINARILY BROAD RELEASE TO THE DEFENDANTS.**

On its face, the Settlement Agreement is an extremely poor deal for class members. In exchange for a very broad release of liability, the agreement provides unheard of relief  to class members.

**III.THE PROPOSED SETTLEMENT'S SECRECY PROVISIONS NOTICE VIOLATE THE CLASS MEMBERS' RIGHTS, AS WELL AS THE PUBLIC'S RIGHT TO**

**KNOW, AND MAKE IT IMPOSSIBLE TO LEARN OF OTHER POSSIBLE DEFECTS IN THE SETTLEMENT.**

While the information revealed by the settling parties makes clear -- as we have just shown -- that the settlement gives far too little to class members and far too much to defendants, the most disturbing and unprecedented feature of the proposed settlement is the extent to which it keeps key information secret. Unlike any class action settlement in reported legal history, the proposed settlement in this case places under seal  all discovery taken in the by Lead.

EXHIBIT 01

**UNDER THE FEDERAL RULES AND THE CONSTITUTION, THE SETTLEMENT AGREEMENT CANNOT BE APPROVED UNLESS THE CLASS REPRESENTATIVES AND CLASS COUNSEL ADEQUATELY REPRESENTED ALL OF CLASS MEMBERS.**

One of the essential requirements of due process in class actions is the requirement that the representative parties -- and their counsel -- must fairly and adequately represent the interests of the class. This requirement has not happened.

*(Exhibits taken from the pages 11-12-20-22-23 of depositions of the 1 of 33 pages).*

6

**Exhibit-A** :    *(Taken from the page 11 of depositions and statements).*

Lead Plaintiff alleged that it was not until June 3, 2007 that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil or Hycamtin (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months for the control group that was treated with Iressa (gefitinib).

Answer : Class member agrees ( Andrew May ).

\* \* \*

In conjunction  with its  Dec, 26  announcement,  Telik management held a conference call for investors. On the call, Telik Chief Medical Officer Gail Brown stated that, " Telcyta was generally well tolerated. Telcyta treatment was associated with mild to moderate nausea, vomiting and fatigue, mostly grade 1 or 2. There were few grade 3 or 4 toxicities observed among Telcyta patients, " according to a transcript of the conference

call.

**Class member's answer :**

These statements are false and misleading and contradict's the defendants prior statements of public record,

Brown, who is married to Telik CEO Michael Wick, who was on the conference call, did not mention that Telcyta patients died significantly faster than patients in the control arms.

Later in the conference call, Lehman Brothers analyst Jim Birchenough asked Brown if there was any evidence in the Telcyta studies to suggest that the drug was benefiting patients more than the control.

Brown responded, " I am not prepared to discuss that today. We have to do further analysis of all the trials".

Lazard analyst Joel Sendek then asked Brown, " Can you let us know if there was a trend toward the comparator (control) arm being statistically significantly better than Telcyta in any of the trials? Or can you at least tell us if that didn't happen?" " No, I do not think we can comment on that right now, Joel," replied Brown.

It turns out that Sendek's question was spot-on, since the data that Telik had in front of them during the call showed that Telcyta patients had fared far worse than control patients. The plaintiffs claim they are not getting truthful answers!

8

**Exhibit-B**  : *(Exhibit-B taken from the page 11 of depositions and statements.)*

Defendants demonstrated that they were " blinded " to all substantive data concerning the ASSIST-1, ASSIST-2, and ASSIST-3 Phase 3 clinical trials of TELCYTA until the conclusion of those studies in December 2006.

**Class member's answers :**

These statements are false and misleading and contradict's the defendants prior statements of public record because The Defendants also publicly stated throughout the Class Period that the Company's clinical trials were subject to the FDA's rigorous "adequate and well-controlled" clinical trial standards, but the Telcyta clinical trials then underway were anything but "adequate and well-controlled." Instead, they had been haphazardly designed and were being poorly administered resulting in "dirty" clinical data that would be unacceptable to the FDA. Defendants described the ongoing clinical trials as "robust and sophisticated" and "designed to support a successful New Drug.

This clearly shows lead counsel has been misled.

**Exhibit-C**  : (*Taken from the page 12 of deposition and statements.)*

Lead Plaintiff has uncovered no evidence to suggest that the DMCs breached these provisions of their Charters.

**Class Member's  answer  :**

These statements are false and misleading and contradict's the defendants prior statements of public record, because defendants stated the studies were " state-of-the-art," with all the "bells and whistles," defendants claimed they would be able to monitor the process of the studies and report any material changes in the timing of the studies, the number of participants, or any other material factors affecting the studies to the investment community.

However, defendants misled analysts, the investing public and even the FDA throughout the Class Period into believing that their novel cancer treatment drug, Telcyta, was safe and effective for public use, and that the Company had conducted sufficient clinical studies to prove it. Meanwhile, unbeknownst to the investing public, because defendants concealed it.

**Exhibit-D**  : (*Taken from the page 12 of deposition and statements.)*

Discovery shows that the survival rates for the patients in the control group in the ASSIST-1 trial were aberrationally

higher than historical norms, and there was no statistical
significance to survival rate differential between the control
group and the TELCYTA-treated group in ASSIST-2.

**Class member's answer  :**

These statements are false and misleading and contradict's
the defendants prior statements of public record, because The
median survival time for women with advanced ovarion cancer in
the Telcyta arm of ASSIST-1 was 8.5 months. The women in the
control  arm of the study  treated  with the  approved drugs
doxorubicine or topetecan reported a median survival time of
13.6 months, according to data presented at the ASCO meeting on
June3. This  negative  survival  effect  against  TELCYTA  was
statistically  significant  by  a  wide margin,  which  means
that,  statistically speaking,  it was  Telcyta and not random
chance that caused these women to die faster.

**Exhibit-D-1 :**

The negative survival effect "took my breath away," says
Sherry Salway Black, executive director of the Ovarian Cancer
national Alliance, a patient advocacy group.

Ovarian cancer is a very difficult disease to treat, so
Black says she is accustomed to seeing experimental drugs fail
to help patients when tested in clinical trials. But it's
unusual and surprising to see an experimental drug that appears

11

to cut short the lives of patients by a significant margin, she added.

In the aftermath of Telik's disclosure of the Telcyta patient deaths at the ASCO meeting last week, the FDA, ovarian cancer patients advocates such as Black and others want to know why the company didn't quickly make the information public in the interest of patient safety and ethics.

**Exhibit-D-2** : (Because these statements are Public Record) (Class member Andrew May tried to discuss these with Lead Counsel Mr. Siedman about patient population but Mr. Siedman refused to speak. )

### FDA  U.S. Food and Drug Administration

Patient Information Sheet

Gefitinib (marketed as Iressa)

This is a summary of the most important information about Iressa. For details, talk to your healthcare professional.

FDA ALERT [06/2005]: FDA has approved new labeling for Iressa that states the medicine should be used only in cancer patients who have already taken the medicine and whose doctor believes it is helping them. New patients should not be given Iressa because in a large study Iressa did not make people live longer. There are other medicines for non-small cell lung cancer (NSCLC) that have shown an ability to make people live longer.

This information reflects FDA's current analysis of all available data concerning this drug. FDA intends to update this sheet when additional information or analyses become available.

What Is Iressa?

Iressa is a medicine used to kill cancer cells (chemotherapy). It is used alone for the continued treatment of patients who are benefiting or have benefited from Iressa. Iressa is approved for patients with non-small cell lung cancer (NSCLC) that:

has progressed after treatment with platinum based and docetaxel chemotherapies, or

did not respond to treatment with platinum based or docetaxel chemotherapies.

**Exhibit-D-3** : (Because these statements are Public Record)

(Class member Andrew May tried to discuss these with Lead

Counsel Mr. Siedman about patient population but Mr. Siedman

refused to speak. )

Journal of Clinical Oncology, Vol 17, Issue 6 (June), 1999: 1794

© 1999 American Society for Clinical Oncology

Twenty Years of Phase III Trials for Patients With Extensive-Stage Small-Cell Lung Cancer: Perceptible Progress

John P. Chute, Timothy Chen, Ellen Feigal, Richard Simon, Bruce E. Johnson

From the Naval Medical Research Institute and Division of Hematology/Oncology, National Naval Medical Center; and the Biometric Research Branch, Clinical Investigations Branch, and Medicine Branch, National Cancer Institute, Bethesda, MD.

Address reprint requests to Bruce E. Johnson, MD, Lung Cancer Biology Section, Medicine Branch, National Cancer Institute, Building 8, Room 5101, National Naval Medical Center, Bethesda, MD 20889-5105; email bejohnson@partners.org.

### ABSTRACT

PURPOSE: All cooperative group studies performed in North America for patients with extensive-stage small-cell lung cancer (SCLC) were evaluated to determine the pattern of the clinical trials and the outcome of patients over the past 20 years.

PATIENTS AND METHODS: Phase III trials for patients with extensive-stage SCLC were identified through a search of the National Cancer Institute Cancer Therapy Evaluation Program database from 1972 to 1993. Patients with extensive-stage SCLC treated during a similar time interval listed in the Surveillance, Epidemiology, and End Results (SEER) database were also examined. Trends were tested in the number

13

of trials over time, the number and sex of patients entered onto the trials, and the survival time of patients treated over time.

RESULTS: Twenty-one phase III trials for patients with extensive-stage SCLC were initiated between 1972 and1990. The median of the median survival times of patients treated on the control arms of the phase III trials initiated between 1972 and 1981 was 7.0 months; for those patients enrolled onto control arms between 1982 and 1990, the median survival time was 8.9 months (P = .001). Analysis of the SEER database of patients with extensive-stage SCLC over the same time period shows a similar 2-month prolongation in median survival time.

CONCLUSION: Analysis of 21 phase III trials initiated in North America and the SEER database from 1972 to 1994 demonstrates that there has been a modest improvement in the survival time of patients with extensive-stage SCLC.

Because of the Facts in Exhibit D they clearly shown that patient population overtime place a role in survival of years testing patients. Also The FDA states Iressa shows no ability to make people longer however in the ASSIST-2 trial the patients using TELCYTA died much sooner than the control arm using IRESSA.

Some may believe TELCYTA killed patient prematurely !.

**Exhibit-E** : *(Taken from the page 21 of depositions and statements)*

Telik Defendants were actually blinded to all substantive data during the conduct of the Phase 3 trials. The "interim looks" referenced by Defendants Wick and Buttita were, in fact, periodic reports to the independent DMCs-not Telik. Moreover, under their respective Charters, the DMCs were precluded from disclosing any of this data, including the withdrawal rate for

14

the TELCYTA-treated patients, to Telik until the Phase 3 trials were complete. Instead, the DMCs' communications with Telik were limited to recommending whether the trials should be continued, modified, or terminated ( whether for safety reasons or to seek accelerated FDA approval ) based on that data. Accordingly, the Telik Defendants were aware neither of TELCYTA's performance compared to the control arms, nor that 25 % of the patients in the ASSIST-3 trial had been prematurely withdrawn until December 2006.

**Class member's answer :**

These statements are false and misleading and contradict's the defendants prior statements of public record, because Wick assured that the Phase III trials had been "designed with all the bells and whistles" and that they had "built in every opportunity to have success." Wick also stated that the Company would " communicate with Wall Street" if any issues arose with the trials as the moved along.

Now the shareholders are getting the picture of cover up and lies. Once again Lead Counsel did not do a very good job in these depositions.

Negligents on the part of Telik by hiring the independent DMCs " or we are getting a false reading".

15

**Exhibit-F** : *(Taken from the page 21 of depositions and statements)*

In addition , While Lead Plaintiff alleged that the Telik Defendants delayed disclosing that certain patients treated with TELCYTA failed to survive as long as those in the control groups, Lead Counsel has learned that the additional time was necessary to allow Telik to analyze the actual data underlying the top-line analysis un-blinded in December 2006. Moreover, Lead Counsel has confirmed that the reason for the disparity in survival rates for the patients in the ASSIST-1 control group ( specifically those treated with Doxil ) was that these patients had aberrationally long survival times as compared to historical norms. In fact, TELCYTA had actually performed as well as the Company had anticipated in the ASSIST-1 trial. With respect to ASSIST-2, the difference in the survival rates for the TELCYTA-treated patients and the control group (4.6 months and 6.1 months, respectively) was not statistically significant. Once again, TELCYTA performed as had been expected, but the control group survived slightly longer than anticipated based on prior studies.

**Class member's answer :**

These statements are false and misleading and contradict's the defendants prior statements of public record, ones again Lead Counsel clearly did not research in this area of medicine.

16

**Exhibit-F-1** : (Because these statements are Public Record)
(Class member Andrew May tried to discuss these with Lead
Counsel Mr. Siedman about patient population but Mr. Siedman
refused to speak. )

Journal of Clinical Oncology, Vol 19, Issue 6 (March), 2001: 1734-1742

© 2001 American Society for Clinical Oncology

Twenty-Two Years of Phase III Trials for Patients With Advanced Non–Small-Cell Lung Cancer: Sobering Results

By Oscar S. Breathnach, Boris Freidlin, Barbara Conley, Mark R. Green, David H. Johnson, David R. Gandara, Michael O'Connell, Frances A. Shepherd, Bruce E. Johnson

From the Lowe Center for Thoracic Oncology, Department of Adult Oncology, Dana-Farber Cancer Institute, and Departments of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, MA; Biometric Research Branch, Clinical Investigations Branch, Cancer Therapy Evaluation Program, Division of Cancer Treatment and Diagnosis, National Cancer Institute, Bethesda, MD; Cancer and Leukemia Group B, Chicago, IL; Eastern Cooperative Oncology Group, Pittsburgh, PA; Southwest Oncology Group, San Antonio, TX; North Central Cancer Treatment Group Philadelphia, PA; and National Cancer Institute of Canada Clinical Trials Group, Kingston, Ontario, Canada.

Address reprint requests to Oscar S. Breathnach, MD, Thoracic Oncology Program, Dana-Farber Cancer Institute, Ste 1234, 44 Binney St, Boston, MA 02115.

PURPOSE: To determine the changes in clinical trials and outcomes of patients with advanced-stage non–small-cell lung cancer (NSCLC) treated on phase III randomized trials initiated in North America from 1973 to 1994.

PATIENTS AND METHODS: Phase III trials for patients with advanced-stage NSCLC were identified through a search of the National Cancer Institute's Cancer Therapy Evaluation Program database from 1973 to 1994, contact with Cooperative Groups, and by literature search of MEDLINE. Patients with advanced NSCLC treated during a similar time interval were also examined in the SEER database. Trends were tested in the number of trials, in the number and sex of patients entered on the trials, and in survival over time.

RESULTS: Thirty-three phase III trials were initiated between 1973 and 1994. Twenty-four trials (73%) were initiated within the first half of this period (1973 to 1983) and accounted for 5,359 (64%) of the

8,434 eligible patients. The median number of patients treated per arm of the trials rose from 77 (1973 to 1983) to 121 (1984 to 1994) (P < .001). Five trials (15%) showed a statistically significant difference in survival between treatment arms, with a median prolongation of the median survival of 2 months (range, 0.7 to 2.7 months).

CONCLUSION: Analysis of past trials in North America shows that the prolongation in median survival between two arms of a randomized study was rarely in excess of 2 months. Techniques for improved use of patient resources and appropriate trial design for phase III randomized therapeutic trials with patients with advanced NSCLC need to be developed.

**Exhibit-F-2** : (Because these statements are Public Record)

(Class member Andrew May tried to discuss these with Lead

Counsel Mr. Siedman about patient population but Mr. Siedman

refused to speak. )

Journal of Clinical Oncology, Vol 17, Issue 6 (June), 1999: 1794

© 1999 American Society for Clinical Oncology

Twenty Years of Phase III Trials for Patients With Extensive-Stage Small-Cell Lung Cancer: Perceptible Progress

John P. Chute, Timothy Chen, Ellen Feigal, Richard Simon, Bruce E. Johnson

From the Naval Medical Research Institute and Division of Hematology/Oncology, National Naval Medical Center; and the Biometric Research Branch, Clinical Investigations Branch, and Medicine Branch, National Cancer Institute, Bethesda, MD.

Analysis of North American cooperative group phase III trials for patients with extensive-stage SCLC initiated between 1972 and 1990 demonstrated that there was no significant change in the number of trials instituted or the number of patients enrolled onto phase III trials over time. In addition, our review of the North American cooperative group trials for patients with extensive-stage SCLC revealed that only six phase III trials were initiated in North America between 1984 and 1990 and none between 1990 and 1993. These results may be consistent with a declining interest on the part of physicians in the enrollment of patients with extensive-stage SCLC onto phase III trials. It also may reflect a paucity of ideas regarding innovative treatments for patients with extensive-stage SCLC. The advent of etoposide and cisplatin as standard therapy in the early 1980s may also have caused a decline in the number of trials being initiated and the number of patients being referred for phase III trials. Since the combination of etoposide and cisplatin was introduced in the treatment of this disease, there has been a significant lack of new drugs to use until recently. In this study, a least squares regression analysis demonstrated that cisplatin-based chemotherapy and the year of treatment were significantly associated with

18

improved median survival time over the years (P = .04 and P = .002, respectively). The improvement in survival time was independently associated with both cisplatin-based therapy as well as the passage of time. Therefore, the increase in survival time observed with the passage of time was contributed to by factors other than the transition to etoposide and cisplatin therapy. We speculate that the other factor that most likely has contributed to the prolongation of patient survival over time is the improvement in the supportive care and general medical management of these patients. The association between cisplatin-based treatment and prolonged survival has also been observed in a recent meta-analysis of trials for patients with metastatic non-SCLC.30

Sixteen (76%) of the 21 phase III cooperative group therapeutic trials for patients with extensive-stage SCLC showed no difference in the survival time of patients between the experimental and standard arms regardless of the treatment regimens used. Three of the five studies13,18,27 that showed a significant difference between the experimental and control arms had median survival times in the control arms that were lower than the median survival time of patients in the SEER database treated during the same time period (7.0, 7.1, and 7.3 months in the phase III trials v 7.2, 7.3, and 7.9 months in the SEER database). The relatively poor outcome of patients in the control arm of these three phase III studies may have contributed to the significant differences in survival times that were observed in these trials.

Despite diverse treatment strategies, the longest median survival time achieved in any of the experimental arms of the cooperative group studies was 12.3 months, and only four (19%) of the 21 phase III trials that we reviewed demonstrated a median survival time in the experimental arm of greater than 11 months. These results demonstrate that experimental regimens that investigators believe are promising in pilot or phase II studies rarely show prolonged survival when these regimens are compared with standard treatments for patients with extensive-stage SCLC.

Although we observed a significant trend (P = .0001) toward a 2-month prolongation in patient median survival time over the 22 years of this analysis, there was no significant improvement in median survival time over the past 10 years (P = .27). The early phase III studies (between 1972 and 1981) had relatively short median survival times on the control arms, which included two studies that used single-agent cyclophosphamide as control treatment.9,11 The lack of change in patient survival time over the past 10 years contrasts with the conclusions presented recently by another investigator who reviewed selected aggressive chemotherapy regimens for patients with extensive-stage SCLC over the past 30 years and concluded that survival time of these patients was improving over the years.6 The lack of change in patient survival time that we observed over the past 10 years may reflect the consistent use of CAV or etoposide and cisplatin in the control arms of trials for patients with extensive-stage SCLC during that time period. These regimens have been shown in randomized studies to achieve similar survival times for patients with extensive-stage SCLC.24,31

In light of our observations that 22 years of clinical research has achieved only a 2-month improvement in the survival time of patients with extensive-stage SCLC, one must consider the economic impact and quality-of-life issues that surround the treatment of this disease. Studies of the quality of life of patients with extensive-stage SCLC have produced conflicting results. A study by Earl et al32 demonstrated that patients who received standard chemotherapy on schedule had a significantly improved quality of life

19

compared with patients who received chemotherapy only as symptoms dictated. Another study found that weekly dose-intensive chemotherapy was associated with a significant decline in patient quality of life, whereas patients receiving the same chemotherapy given every 3 weeks had significantly less change in their quality-of-life parameters.33 Similar studies of quality of life in patients with non-SCLC receiving chemotherapy indicate that most patients report improvements in quality-of-life parameters once treatment is initiated.34 Although we were unable to retrieve information on patient quality of life in this study, the limited changes we observed in patient survival time suggest that a greater effort to apply new, experimental agents is indicated for patients with this disease.

A comparison of the median survival time of patients with extensive-stage SCLC in the SEER database showed significantly prolonged median survival times of slightly less than 2 months in the group treated between 1993 and 1994 compared with the group treated between 1973 and 1974. The trend toward prolongation in survival has continued from 1977 to 1989 (Fig 2A). The SEER data corresponded with the modest trend for a prolongation of survival for patients with extensive-stage SCLC treated in cooperative group therapeutic trials over the past 20 years. This prolongation in the survival of patients with extensive-stage SCLC could have been caused by stage migration because of improved technology for imaging metastatic sites developed during the last 20 years, a phenomena referred to as the Will Rogers effect.35 If this were the case, we would expect there to be a prolongation in survival for each stage without an overall improvement. However, the SEER data suggest that there has been a prolongation in the survival of all patients with SCLC as well as those with extensive-stage SCLC over the 1973-to-1994 time period (Fig 2B).

Our analysis and the results of these other studies show that many of the phase III trials that have been completed over the past 25 years have been small (< 100 patients per arm) and have insufficient power to detect modest differences (> 2 months) in survival times between the patients treated with the different regimens being tested. In this analysis, only seven (33%) of the 21 phase III trials enrolled at least 100 patients with extensive-stage SCLC onto each treatment arm and two (29%) of these seven showed a significant difference between the control and experimental arm (Table 1). In contrast, 14 (67%) of the 21 studies had fewer than 100 patients on at least one study arm and only three (21%) of the 14 showed a significant difference in the treatment outcomes.

The differences in median survival times between patients with extensive-stage SCLC treated on experimental versus control arms have been small, even in the five studies that had a significant difference in survival times between the two arms. Only one of five trials had a difference of more than 2 months in median survival time between those patients treated with an experimental regimen and those treated with a control regimen.13 We believe that future trials designed for patients with extensive-stage SCLC should incorporate this information. Differences in median survival times in excess of 2 months are unlikely, so the trials should be sized appropriately. For example, for patients with extensive-stage SCLC, if one assumes a median survival time of 9 months in the control arm, a 2-month improvement is a 22% improvement. To detect a 22% improvement, the total sample size requirement is 840 patients for a power of 0.80.36

The new regimens brought forth in pilot and phase II studies have rarely led to significant prolongation in survival for patients with extensive-stage SCLC in phase III studies. We are currently developing a statistical model based on the results of the phase III trials for extensive-stage SCLC reported here that may assist investigators in deciding which pilot/phase II regimens are likely to prolong survival when tested in a phase III trial.37

You can clearly see the drug TELCYTA is doing just the opposite of what is in these reports and the control arms as doing as stated. Many may believe that TELCYTA once again prematurely shortened the lives of patients in the trials.

**Exhibit-G** : *(Taken from the page from 21 of deposition and statements.)*

Phase 3 trials, the FDA completely lifted that hold on October 15, 2007.

**Class member's answer :**

These statements are false and misleading and contradict's the defendants prior statements of public record, The FDA did in fact lifted the hold on TELCYTA October 15, 2007 but what Lead Counsel does not explain that all patients had to be informed that TELCYTA had been on hold and people died sooner then the control arm !.

**Exhibit-H** : *(Taken from the page 22 of deposition and statements.)*

Lead Counsel claims Telik received only limited information as to whether to continue, modify, or stop the trials. Also Lead

Counsel believes that the overwhelming majority of this loss is attributable to market forces and not fraud.

**Class member's answer :**

These statements are false and misleading and contradict's the defendants prior statements of public record, because application (NDA) filing with the FDA for **our** lead drug candidate, TELCYTA and claimed the Company was "monitor(ing) patient enrollment levels." Inexplicably, defendant never disclosed that in at least two arms of the final clinical trials, up to 25 % of the subjects were prematurely released from the study. Defendants would later admit the data being obtained in another arm of the clinical trial was riddled with inconsistencies rendering it suspect as well. However, defendants concealed until 6/4/07 the full extent of their knowledge of the drugs toxicity and the disastrous trials.

As a result of these false and misleading statements, the price of Telik's stock was artificially inflated during the Class Period. When the Company revealed on 12/26/06 that TELCYTA had failed in three arm of its final clinical testing-howing no efficacy in two of the three arms and impermissibly dirty clinical data in two of the three arms- the Company's stock plunged 70 % in a single trading session – falling from over \$ 16 per share to below \$ 5 per share on more than 33 x the

previous 30 days average daily trading volume and erasing more than $ 600 million in market value. The Company's stock price fell precipitously by another 20% on 6/4/07 when it disclosed on 6/3/07 just how badly the ovarian cancer arm of the TELCYTA trials had failed.

**Exhibit-I**    :    *(Taken from the page 23 of deposition and statements.)*

For example, 10 similarly situated biotech companies with primary drug candidates that failed FDA testing – where no allegations of fraud were made, and no securities fraud litigation was filed, in connection with such testing failure.

**Class member's answer** :

These statements are false and misleading and contradict's the defendants prior statements of public record, Lead Counsel does not exhibit that the 10 biotech companies that failed trials had three trial's going on where patients died at alarming rates!

Class member says this is false and misleading.

\* \* \*

The Settlement Agreement class in this case creates a clear conflict between class members and Lead Counsel.

**CONCLUSION**

On its face, this settlement provides unheard of compensation to class members. In fact, the settlement will provide little recovery to the class members. Not by coincidence, this settlement is also enshrouded in greater secrecy than any other class action settlement that most lawyers or its experts have ever seen. This court should reject the secrecy and reject the settlement as well.

Respectfully submitted,

Andrew R. May

*Andrew R. May*

CC :
     **The Honorable Colleen McMahon**

CC : Court: **Clerk of the Court**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

CC : Counsel for Defendants Telik,

Michael F. Wick and Cynthia M. Buttita

**Jamie A. Levitt, Esq.**

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050

CC : Counsel for the Underwriter Defendants

**David W. Haller, Esq.**

Covington & Burling, LLP
620 Eighth Avenue
New York, New York 10018-1405

**Updated Objection**                                      July 27, 2008
**To Be Added,**
**For Andrew R. May**
**New Evidence and Exhibits**

**(Please Add To The Objection Package Dated July 16, 2008)**


**In Telik,INC.**

**Securities Litigation**

**Civil Action No.07-cv-04819-CM**


**Mr. Andrew R. May**

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Re : **Timothy J. MacFall, Esq.**

      **Joseph R. Siedman, Jr.**

Bernstein Liebhard & Lifshitz, LLP

10 East 40th Street, 29th Floor

New York, New York 10016-0201




      Dear Mr. Siedman,

      After reviewing your letter again dated July 02, 2008 you
sent me, I found something that startled me but first I want to
remind you that in the same letter you mislead Mr. Henzel and

1

myself and The Judge by claiming in your "exhibit b-c" as following like this " I informed Mr. Henzel that I did not- and still do not- recall telling you that I would call him". As you have been informed before I never said those words in my letter dated June 18, 2008 and I am objecting to this misconduct " see my exhibit j". I believe you are stalling the case !

Mr. Siedman, You said you could not give me the confirmatory **deposition** in that same letter dated July 02, 2008 can you explain to me the where about of the **deposition** you took from CFO Cynthia Buttita ? after all you only took one deposition ! Please look at the Memorandum where Lead Counsel say's these **Depositions** support fairness. Mr. Siedman, you even told me you had taken only ONE DEPOSITION "from Dr. Gail Brown only" in fact this was a topic in an e-mail to Mr.Henzel. Mr. Siedman, I demand a full understanding of the Missing Testimony Deposition! Please detail every aspect of the missing deposition as it may be a violation of law.

**Exhibit-J  :**

Lead Counsel Mr. Siedman mislead  Mr. Henzel and Myself and The Judge in a letter dated July 2, 2008. How can Mr. Siedman use a exhibit of something that never happened ? What Mr. Siedman did say in our phone conversation was his boss would call Mr Henzel. I never stated in the letter  dated June 18, 2008  Mr. Siedman would call Marc Henzel. These are your words as follows "" I informed Mr. Henzel that I did not- and still do not- recall telling you that I would call him". Now read the letter in this package dated June 18, 2008 and also read my letter dated June 05, 2008 and Mr. Siedman see that my statement is consistent. Mr. Siedman it appears went through great lengths to hide the truth. Mr. Siedman just read the way you wrote the false statement.

**Class member's answers :**

Because Mr. Siedman stated that "I informed Mr. Henzel that I did not- and still do not- recall telling you that I would call him" he made a misleading and false statement. Andrew May never said those words in the letter dated June 18, 2008.

2

**Exhibit-K    :**

Mr. Siedman stated to Mr. Andrew R. May in that same **letter dated July 02 2008,** after asking him for factual information to support stipulation Mr. Siedman said "testimony provided as part of confirmatory discovery, as well as the confirmatory **deposition** testimony take in connection.

**Class member's answers :**

Because this contradicts your letters and statements. Lead Counsel, Mr. Siedman mislead the shareholders and lawyers and the judge in his letter dated July 2, 2008 ( Mr. Siedman Called Exhibit a). Lead Counsel state's in the memorandum, Lead Counsel has also conducted confirmatory **DEPOSITIONS** of Defendant and Telik CFO Cynthia Buttita, as well as Telik's Chief Medical Officer, Dr. Gail Brown.

**Exhibit-L  :**

Lead Counsel wrote to Mr. Andrew R. May in a letter dated July 2, 2008 claiming factual errors where in Andrew R May's letter dated June 18, 2008.

**Class member's answers :**

Because of the many misleading and false statements made by Mr. Siedman I ask to the court to reject Mr. Siedman exhibits. Because a, b , c are proven fabricated and incorrect and one can clearly see exhibit d , e , f are hearsay and very confusing small talk e-mails that were a guessing game to everyone.


Respectfully submitted,

Andrew R. May

*Andrew R. May*


CC :

**The Honorable Colleen McMahon**

3

CC : **Marc S. Henzel, ESQ**

Law Offices Of Marc S. Henzel

273 Montgomary Ave. Suite 202

Balacynwyd, PA 19004


CC : Counsel for Defendants Telik,

Michael F. Wick and Cynthia M. Buttita

   **Jamie A. Levitt, Esq.**

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050


CC : Counsel for the Underwriter Defendants

   **David W. Haller, Esq.**

Covington & Burling, LLP
620 Eighth Avenue
New York, New York 10018-1405

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

ATTORNEYS AT LAW

10 EAST 40TH STREET

NEW YORK, NEW YORK 10016

*Please excuse my foot notes ARM*

(212) 779-1414

FAX: (212) 779-3218

www.bernlieb.com

July 2, 2008

**BY FEDEX**

Andrew R. May
10321 Beaumont Street
Fairfax, VA 22030

Re: **May v. Telik, Inc. (No. 07-4819 (CM))**

Dear Mr. May:

This letter responds to certain factual errors in your letter, dated June 18, 2008. To clarify, we first spoke on May 8, 2008, after I informed your counsel, Marc Henzel, that I would speak to you as he had requested in an email that same day. *See* Ex. A (correspondence with Mr. Henzel). During that conversation, you told me you thought the settlement was a bad one and we discussed, at length, the reasons for the proposed settlement. At that time, I also directed you to the memorandum in support of preliminary approval for further explication of the reasons for the settlement. Thereafter, you told me that you thought the reasons I gave to you, as well as the reasons set forth in the preliminary approval papers, were not good enough. You then asked me if you could see the documents provided by Telik as part of confirmatory discovery, as well as the confirmatory deposition testimony taken in connection with the settlement. I informed you that such materials were confidential as they were provided subject to a stipulated confidentiality agreement with defendants. I did, however, tell you that I would double-check with the partner on the case.

On June 6, 2008, I received a letter from you. *See* Ex. B. In the letter, you again requested all the confirmatory discovery material, wrote that I did not contact Mr. Henzel, and asked how much cash on hand Telik had at the time of settlement. *See id.* That same day, I wrote your counsel, Mr. Henzel, attaching your letter to the email. *See* Ex. C. I informed Mr. Henzel that I did not – and still do not – recall telling you that I would call him. I further apprised Mr. Henzel that we could not honor your request for the confirmatory discovery materials because of the confidentiality agreement. *See id.* Finally, I informed Mr. Henzel that you also requested Telik's cash position at time of settlement, which is public information readily available from the Company's Securities and Exchange Commission ("SEC") filings. *Id.*

17130v1

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Mr. Andrew May
Page # 2

_____

On June 19, 2008, I received your formal objection in the mail.  *See* Ex. D.  In your objection, you erroneously indicate that you were not provided with any information that supported the settlement, even though you and I reviewed the reasons for the settlement on the telephone on May 8, 2008 and I had directed you to the preliminary settlement papers.  I also wrote your counsel, Mr. Henzel, on June 19, 2008, informing him that I received your objection.  *See* Ex. E.  Mr. Henzel wrote me back saying that you "did not like [my] reasons for the settlement."  *See* Ex. F.

While you certainly have every right to object to the proposed settlement, I did want to clarify that you and I had, in fact, discussed the reasons that Lead Plaintiff and Lead Counsel believe that the settlement is fair, reasonable and adequate under all the circumstances of this case.  Indeed, that you apprised Mr. Henzel that you did not like the reasons for the settlement amply demonstrates that the rationale for the settlement was, in fact, discussed with you.  Further, Mr. Henzel emailed me later that day (June 19th) saying he had forwarded to you my June 6, 2008 email, which reiterated that the materials and testimony provided as part of confirmatory discovery was confidential, and directed you to Telik's SEC filings for its cash position at time of settlement.  We believe that even if there was any confusion as to the confidential nature of the documents and testimony provided as part of confirmatory discovery, Mr. Henzel's forward of my June 6, 2008 email clarified that issue.

We will, of course, formally respond to the merits of your objection in our papers in support of final approval of the settlement.

Very truly yours,

Joseph R. Seidman, Jr.

JRS/js

Enclosures

Cc: The Honorable Colleen McMahon (By hand)
    Marc Henzel, Esq. (By regular mail)

17130v1

2007. The Parties first met soon thereafter on October 27, 2007 to discuss the possibility of settlement. After numerous telephone conferences, the Parties, as well as representatives of Defendants' insurers, then met with Judge Weinstein and his assistant, Jed Melnick, Esq., to mediate the case on November 27, 2007. The Parties negotiated well into the night without success. However, over the next six weeks, the parties engaged in numerous telephone conferences and extensive negotiations, with substantial concessions made by both sides. The Parties finally reached an agreement-in-principle to settle this action, signing a Memorandum of Understanding on January 15, 2008. Judge Weinstein's role in the settlement negotiations strongly supports a finding that they were conducted at arm's-length and without collusion. *See In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004) ("The participation of Judge Sweet and retired Judge Politan in the settlement process gives me confidence that they were conducted in an arms-length, non-collusive manner.").

After mediation, Lead Counsel reviewed and analyzed thousands of pages of documents produced by the Telik Defendants. Lead Counsel has also conducted confirmatory depositions of Defendant and Telik CFO Cynthia Buttita, as well as Telik's Chief Medical Officer, Dr. Gail Brown. The testimony elicited during these depositions is not only consistent with the information contained in the documents produced by the Telik Defendants, but supports the fairness and adequacy of the proposed Settlement. Further, counsel for all Parties have extensive experience in securities litigation and are thoroughly familiar with the factual and legal issues in this action and the strengths and weaknesses of the parties' claims and defenses.

In sum, the Settlement is the product of serious, informed and non-collusive negotiations among experienced counsel, is supported by confirmatory discovery (as discussed below), and is deserving of preliminary approval.

In Re Telik, INC.                                              June 18, 2008

Securities Litigation

Civil Action No. 07-cv-04819 (CM)

Mr. Andrew R. May

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Dear  Judge Colleen McMahon ;

    I am a member of the plaintiffs' class and was the first  to file a lawsuit regarding the claims of this case. In response to the settlement papers I received, I contacted  Mr. Siedman, who is one of the lead counsel in the case and requested certain information from him. Mr. Siedman stated to me that he would have his boss contact Mr. Marc Henzel , who is my counsel on the complaint I filed. No one ever contacted Mr. Marc Henzel or myself and they did not provide either of us with any information that would support the settlement .

    It is my belief that Telik's management withheld important safety and results information from shareholders after they promised to keep the shareholders up to date, even way after the trials were  finished.  When  management  was  asked  about  the  final  results  of  assist  1 – 2 - 3   trials, management refused to give truthful answers after being asked on a conference call even though the information was right in front of management.  I also do not agree with the lead counseld claim that Telik's stock performance was caused by the market but rather that men and women using Telik's Telycyta died at alarming rates in the assist trials as compared to the control arms ….. trials that are going good have a way of leaking and these types of stocks can go up in a slower market. I would like to prove this too.  Telik stated over and over again how safe Telycyta is and that the assist trials were well managed but when the trials finished Telik said the trials were poorly managed, which was the opposite of their statements that the trials were being closely monitored.

    At this time, **I'm filing an objection to the settlement as presented** to the court and would like to be present at the hearing. The facts as I understand them to not support a settlement of only $ 5 million for  the shareholders.   The support for the settlement as described in the facts of the settlement documents seem to be incorrect and contradicted by public information.

    This proposed settlement of $ 5 million is completely inadequate considering the facts.

        Thank you for your kind attention in this matter.

            Very  truly  yours.

            Andrew R. May

CC : Mr. Joseph R. Seidman, Jr

In Re Telik , INC.                                                                     June 5, 2008

Securities Litigation

Civil Action No. 07-cv-04819 (CM)

Mr. Andrew R. May

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Re:  Joseph R. Seidman, Jr

Bernstein Liebhard & Lifshitz, LLp

10 E. 40th St

New York, New York 10016

(212) 779-1414


Dear Mr. Joseph R. Seidman, Jr ;

        As to our conversation on Thursday  May 8, 2008 I asked you to get me every bit of

Factual evidence supporting   lead  councels  stipulation regarding the Telik INC class action

Class Action Law Suit. At this time you mentioned you would have your boss call Marc Henzel

However  Marc's  office has never  heard from you or anyone in your office.  Please provide

Me with every document required by law that supports the stipulation including all depositions

All recorded or even better all transcripts of conversations on the talks between lead counsel

And lead plantiffs. Mr. Joe , I will need all  transcripts taken directly by the  DMC'c by

Questioning and highlights of all transcriptions.  Mr. Joe , its very important if you can supply

Me with Teliks cash at the time lead was appointed. Can you tell me how much coverage

Telik has   by Insurance Co. for this issue on ?.    Can you release the insurance policy ?.

Please try to provide this information at earliest convenience as I will need to prepare for the

Stipulation hearing .

        Thank you for your kind attention in this matter.

                        Very truly yours.

                        Andrew R. May


CC :  Honorable Colleen McMahon

***New Evidence***                                    Aug 03, 2008

**In Telik,INC.**

**Securities Litigation**

**Civil Action No.07-cv-04819-CM**


**Mr. Andrew R. May**

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Re : **Timothy J. MacFall, Esq.**

     **Joseph R. Siedman, Jr.**

Bernstein Liebhard & Lifshitz, LLP

10 East 40th Street, 29th Floor

New York, New York 10016-0201


Dear Mr.Siedman;

        Please read **my letter dated July 25, 2008** asking you for insurance coverage under rule 34.

        I am responding to **your letter dated July 29, 2008** about Telik's insurance coverage. You stated in your letter " we do not possess materials responsive to your request since copies of Telik's insurance agreements have never been produced to Lead Plaintiff ".

        Mr Siedman, please look at page # 4 in the Pendency Proposed Settlement Of Class Action, the one sent to

shareholders by mail. Now Mr. Siedman please read page **# 4** as following;

**"4. Why Is There A Settlement?**

**The Court did not decide in favor of Plaintiffs or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the cost of a trial, and eligible Settlement Class Members who submit valid claims will receive compensation. Plaintiffs and their attorneys believe the Settlement is best for all Settlement Class Members, considering the per share and the amount of available insurance coverage."**

At this time, Class Member Andrew R May is asking The Court to reject insurance as a settlement reason, because Lead Counsel mislead the Lawyers, shareholders and The Judge in this matter.

Also Mr.Siedman, under Rule 34, please provide me with all of Telik's insurance coverage by Law. Please get it for me.

Thank you for your kind attention in this matter.

Very truly yours.

Andrew R May

*Andrew R May*

CC : **The Honorable Colleen McMahon**

CC : Counsel for Defendants Telik,

Michael F. Wick and Cynthia M. Buttita

**Jamie A. Levitt, Esq.**

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050


CC :  Counsel for the Underwriter Defendants

**David W. Haller, Esq.**

Covington & Burling, LLP
620 Eighth Avenue
New York, New York 10018-1405


CC : **Marc S. Henzel, ESQ**

Law Offices Of Marc S. Henzel

273 Montgomary Ave. Suite 202

Balacynwyd, PA 19004


Attachment 1: Class Member Andrew R May's
              letter dated Jul 25,2008

July 25, 2008

Dear Mr. Siedman;

I asked you for Telik's insurance coverage in my letter to you, date June 5, 2008 for the Civil Action No : 07-cv-0419 cm. Can you cite Rule 34 to me why I can not review this information as I see in Telik's 10K they say insurance will pay for this case .

(iv)  for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Sincerely.


Andrew R. May

Andrew R. May

CC .  Honorable Collen McMahon

# BERNSTEIN LIEBHARD & LIFSHITZ, LLP

ATTORNEYS AT LAW

10 EAST 40TH STREET

NEW YORK, NEW YORK 10016

---

(212) 779-1414

FAX: (212) 779-3218

www.bernlieb.com

*INS URance*

July 29, 2008

**BY FEDEX**

Andrew R. May
10321 Beaumont Street
Fairfax, VA  22030

      Re:   **May v. Telik, Inc. (No. 07-4819 (CM))**

Dear Mr. May:

     I am responding to your letter of July 25, 2008, in which you request for review Telik's insurance agreement.  We do not possess materials responsive to your request since copies of Telik's insurance agreements have never been produced to Lead Plaintiff.

                    Very truly yours,

                    Joseph R. Seidman, Jr.

JRS/js

Cc: The Honorable Colleen McMahon (By hand)
     Marc Henzel, Esq. (By regular mail)

17925v1

This package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Southern District of New York, and the case is known as *In re Telik, Inc. Securities Litigation,* Master File No. 07-4819 (the "Action"). The people who sued are called the Plaintiffs; and the Company, several of its officers, as well as certain companies that acted as underwriters for an offering of Telik common stock, are called the Defendants. Specifically, the Defendants include: Telik, Michael F. Wick, Cynthia M. Buttita, UBS Securities LLC, Lehman Brothers Inc., and J.P. Morgan Securities Inc.

### 2.    What Is This Lawsuit About?

This case was brought as a putative class action alleging that Defendants violated the federal securities laws by making material misrepresentations and/or statements that omitted material information about, *inter alia*, Telik's chief drug, TELCYTA. Plaintiffs allege in the complaint that throughout the putative Class Period, Defendants misrepresented the status of the then-ongoing United States Food and Drug Administration ("FDA") Phase 3 clinical trials of TELCYTA.

Defendants have denied and continue to deny each and all of the claims and contentions alleged by Plaintiffs in the Action. Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action. Defendants also have denied and continue to deny, *inter alia*, the allegations that Plaintiffs or the putative Class have suffered damage, that the price of Telik common stock was artificially inflated by reasons of alleged misrepresentations, non-disclosures or otherwise, and that Plaintiffs or the other members of the Class were harmed by the conduct alleged in the Complaint.

### 3.    Why Is This a Class Action?

In a class action, one or more people (in this case the Court-appointed Lead Plaintiff, Policemen's Annuity and Benefit Fund of Chicago, and the other plaintiff, the Mehan Group), sue on behalf of people who have similar claims. Here, all these people are called a Settlement Class or Settlement Class Members. One court resolves the issues for all Settlement Class Members, except for those who exclude themselves from the Settlement Class. Judge Colleen McMahon is in charge of this class action.

### 4.    Why Is There a Settlement?

The Court did not decide in favor of Plaintiffs or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the cost of a trial, and eligible Settlement Class Members who submit valid claims will receive compensation. Plaintiffs and their attorneys believe the Settlement is best for all Settlement Class Members, considering the per share recovery and the amount of available insurance coverage.

## WHO IS IN THE SETTLEMENT

To see if you will receive money from the Settlement, you first have to determine if you are a Settlement Class Member.

**In Telik,INC.**                                          **August 13, 2008**

**Securities Litigation**

**Civil Action No.07-cv-04819-CM**

**Mr. Andrew R. May**

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818

Re : **Timothy J. MacFall, Esq.**

      **Joseph R. Siedman, Jr.**

Bernstein Liebhard & Lifshitz, LLP

10 East 40th Street, 29th Floor

New York, New York 10016-0201

Dear Mr. Seidman;

    I have been trying since May 8, 2008 for you to send me all factual documents to support the settlement. The first time was in a phone conversation and then in my letter to you dated June 5, 2008 asking you to provide me " with every documents required by law"  to support this settlement.

    Mr. Siedman , I also said " I will need all transcripts taken by The DMC's". I sent you a letter dated July 25, 2008 asking why I can not receive Telik's insurance coverage. Once again I asked you for Telik's insurance coverage in a letter dated August 03, 2008. To this day Aug. 13, 2008 I still never received one document from you at all that supports this settlement.

    Mr. Siedman, in my opinion and many others we believe in due process and the right to examine documents taken in a Settlement of Compromise. Lead Counsel has used Federal Rule 408 of The Federal Rules off Evidence. Andrew R. May class member believes that Lead Counsel has violated Federal Rule 408 and would like the to Court to review this Rule. Personally after reading Federal Rule 408 several times one must believe that documents taken by Lead Counsel is admissible. Also any information other than conduct or statements could

be admissible if the evidence is offered for purposes not prohibited by subdivision of (a) in Rule 408. For this reason and all the false and misleading statements Lead Counsel has made during discovery  I ask  The Court to hold all compensation until Lead Counsel can bring relief to the shareholders by being " fair and adequate and certainly dropping this poor settlement that has no value to the shareholders.

    Respectfully submitted,

Sincerely.

Andrew R. May

*Andrew R. May*

CC :
        **The Honorable Colleen McMahon**

CC : **Marc S. Henzel, ESQ**

Law Offices Of Marc S. Henzel

273 Montgomary Ave. Suite 202

Balacynwyd, PA 19004

CC : Counsel for Defendants Telik,

Michael F. Wick and Cynthia M. Buttita

        **Jamie A. Levitt, Esq.**

Morrison & Foerster LLP
1290 Avenue of the Americas

New York, New York 10104-0050

CC : Counsel for the Underwriter Defendants

**David W. Haller, Esq.**

Covington & Burling, LLP
620 Eighth Avenue
New York, New York 10018-1405

Attachments :

1. Stipulation and Agreement of Settlement

2. Federal Rules Of Evidence  ( Rule 408 )

3. Federal Rules Of Evidence   ( Rule 408 )

4. Federal Rules Of Evidence   ( Rule 408 )

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TELIK, INC.<br>SECURITIES LITIGATION | Civil Action No. 07-CV-04819 (CM) |

## STIPULATION AND AGREEMENT OF SETTLEMENT

This Stipulation and Agreement of Settlement dated as of April 16, 2008 (the

"Stipulation"), submitted pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and

Rule 408 of the Federal Rules of Evidence, is made and entered into by and among the following

Settling Parties[1] to the above-captioned action: (i) Plaintiffs, on behalf of themselves and each of

the Settlement Class Members, by and through their counsel of record in the Action (defined

below), and (ii) Defendants, by and through their counsel of record in the Action.  The

Stipulation is intended by the Settling Parties to fully, finally and forever resolve, discharge and

settle the Released Claims, upon and subject to the terms and conditions hereof.

## RECITALS

**The Litigation**

WHEREAS, beginning on June 6, 2007, putative class actions were filed in the United

States District Court for the Southern District of New York (the "Court") on behalf of purchasers

of Telik, Inc. ("Telik" or the "Company") common stock during a defined period of time

alleging violations of the federal securities laws and captioned as (i) *Andrew May v. Telik, Inc.,*

*et al.*, No. 07-CV-04819 and (ii) *O'Grady v. Telik, Inc. et al.*, No. 07-CV-07040.

---

[1] Capitalized terms shall have the meanings listed below in Section 1.

15791v1

### Rule 406. Habit; Routine Practice

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

### Rule 407. Subsequent Remedial Measures

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

(As amended Apr. 11, 1997, eff. Dec. 1, 1997.)

### Rule 408. Compromise and Offers to Compromise

(a) Prohibited uses.—Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses.—This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

(As amended Apr. 12, 2006, eff. Dec. 1, 2006.)

### Rule 409. Payment of Medical and Similar Expenses

Evidence of furnishing or offering or promising to pay medical, hospital, or similar expenses occasioned by an injury is not admissible to prove liability for the injury.

### Rule 410. Inadmissibility of Pleas, Plea Discussions, and Related Statements

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) a plea of guilty which was later withdrawn;

ELECTRONIC GUIDE TO FEDERAL PROCUREMENT ADR

**Compromise and Offers to Compromise.**

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

GO TO TOP OF PAGE

Three States which had adopted rules of evidence patterned after the proposed rules prescribed by the Supreme Court opted for versions of rule 408 identical with the Supreme Court draft with respect to the inadmissibility of conduct or statements made in compromise negotiations. [Nev. Rev. Stats. § 48.105; N. Mex. Stats. Anno. (1973 Supp.) § 20-4-408; West's Wis. Stats. Anno. (1973 Supp.) § 904.08].

For these reasons, the committee has deleted the House amendment and restored the rule to the version submitted by the Supreme Court with one additional amendment. This amendment adds a sentence to insure that evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation.

# BERNSTEIN LIEBHARD & LIFSHITZ, LLP

ATTORNEYS AT LAW

10 EAST 40TH STREET

NEW YORK, NEW YORK 10016

———

(212) 779-1414

FAX: (212) 779-3218

www.bernlieb.com

August 14, 2008

**BY FEDEX**

Andrew R. May
10321 Beaumont Street
Fairfax, VA  22030

Re:    **May v. Telik, Inc. (No. 07-4819 (CM))**

Dear Mr. May:

      I am in receipt of your letters dated August 3 and 13, 2008.  We have already answered the questions raised in these letters.  We will respond to any future letters in the final papers in support of the settlement, which are to be filed on August 29, 2008.  I will send to you by federal express a copy of these papers on August 29th.

Very truly yours,

Joseph R. Seidman, Jr.

JRS/js

Cc: The Honorable Colleen McMahon (By hand)
     Marc Henzel, Esq.
     Jamie A. Levitt, Esq.
     David W. Haller, Esq. (all by fax)

18226v1

August 15, 2008

**In Telik,INC.**

**Securities Litigation**

**Civil Action No.07-cv-04819-CM**


**Mr. Andrew R. May**

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


Re : **Timothy J. MacFall, Esq.**

     **Joseph R. Siedman, Jr.**

Bernstein Liebhard & Lifshitz, LLP

10 East 40th Street, 29th Floor

New York, New York 10016-0201


Dear  Mr. Siedman;

     I am responding to your letter dated Aug 14, 2008 at this time I want to inform you that you stated " we will respond to any future letters in the final papers in support of settlement" which will be filed on August 29,2008. You  are  required to answer all my letters in a timely matter because you  have not answered all my questions.

     And you still did not answer my letter to you dated July 27, 2008 asking for the missing deposition of CFO Cynthia Buttia. I also asked you to " please provide every aspect of the missing deposition as it may be violation of law". Mr. Siedman, can you answer these questions I have been waiting for the truth !

*In my letter dated to you Aug 13, 2008 I mentioned that I believe Lead Counsel violated The Federal Rules Of Evidence Rule 408 by not sharing transcripts on documents that could be discoverable under Federal Rule 408.*

*Mr. Siedman, it's my understanding that Telik has in the excess of $ 80 million in assets and also insurance so with all facts in My Formal Objection and Arguments Letter to prove this settlement is not fair and adequate why don't you try to help the shareholders and modify this settle that brings no relief to shareholders and only benefits Lead Counsel and Defendants.*

*Mr. Siedman, in my Aug 3, 2008 letter I stated to you I wanted to see Telik's insurance coverage. I beginning to take it that you only verbally told The Lead Plaintiffs about insurance coverage. It is my believe that most lawyers would try to obtain these documents for the Lead Plaintiff. Mr. Siedman can you at least tell my how many insurance companies Telik has in this law suit to provide coverage. And in fact if you shared the documents to the Lead Plaintiff please let me know.*

*Very truly yours,*

*Andrew R. May*

CC :
**The Honorable Colleen McMahon**


CC : **Marc S. Henzel, ESQ**

Law Offices Of Marc S. Henzel

273 Montgomary Ave. Suite 202

Balacynwyd, PA 19004

CC : Counsel for Defendants Telik,

Michael F. Wick and Cynthia M. Buttita

**Jamie A. Levitt, Esq.**

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050


CC : Counsel for the Underwriter Defendants

**David W. Haller, Esq.**

Covington & Burling, LLP
620 Eighth Avenue
New York, New York 10018-1405


Attachment  1. Federal Rule Of Evidence Rule 408

Case 1:07-cv-04819-CM    Document 72-7    Filed 08/29/2008    Page 53 of 55

Three States which had adopted rules of evidence patterned after the proposed rules prescribed by the Supreme Court opted for versions of rule 408 identical with the Supreme Court draft with respect to the inadmissibility of conduct or statements made in compromise negotiations. [Nev. Rev. Stats. § 48.105; N. Mex. Stats. Anno. (1973 Supp.) § 20-4-408; West's Wis. Stats. Anno. (1973 Supp.) § 904.08].

For these reasons, the committee has deleted the House amendment and restored the rule to the version submitted by the Supreme Court with one additional amendment. This amendment adds a sentence to insure that evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation.

### BERNSTEIN LIEBHARD & LIFSHITZ, LLP
ATTORNEYS AT LAW
10 EAST 40TH STREET
NEW YORK, NEW YORK 10016

———

(212) 779-1414
FAX: (212) 779-3218
www.bernlieb.com

August 14, 2008

**BY FEDEX**

Andrew R. May
10321 Beaumont Street
Fairfax, VA 22030

  Re: <u>**May v. Telik, Inc. (No. 07-4819 (CM))**</u>

Dear Mr. May:

  I am in receipt of your letters dated August 3 and 13, 2008. We have already answered the questions raised in these letters. We will respond to any future letters in the final papers in support of the settlement, which are to be filed on August 29, 2008. I will send to you by federal express a copy of these papers on August 29th.

       Very truly yours,

       Joseph R. Seidman, Jr.

JRS/js

Cc: The Honorable Colleen McMahon (By hand)
  Marc Henzel, Esq.
  Jamie A. Levitt, Esq.
  David W. Haller, Esq. (all by fax)

18226v1



In Telik,INC.                                    August 23, 2008

Securities Litigation

Civil Action No.07-cv-04819-CM

Mr. Andrew R. May

10321 Beaumont Street

Fairfax, VA 22030

(703) 473-3818


*Dear Judge Colleen McMahon;*

*After asking Lead Counsel for supporting documents to support the stipulated settlement they have refused to provide me with any documents to date. Lead Counsel has not answered all of my questions about the settlement either and the only answers Lead gave were incomplete, misleading or vague. This misconduct violates a class members rights under The Federal Rules of Evidence and Rule 23 for sure. I have hinted to Lead Counsel to try to repair this settlement that has no value to class members and only benefits Lead Counsel and the Defendants. I'm open to a modified settlement to help matters but only through my Counsel because this way he can review the insurances coverage and all documents that are under seal.*

*At this time I would ask The Court to reject this settlement and hold payment to Lead Counsel until Lead Counsel complies with the Federal Rules of Evidence and Rule 23.*

                                    Very truly yours,
                                    Andrew R. May


Cc :    Marc S. Henzel, Esq.

        Timothy J. MacFall, Esq.

        Joseph R. Siedman, Jr. Esq.

        Jamie A. Levitt, Esq.

        David W. Haller, Esq.