```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____          │
│ DATE FILED: __9|10|08__     │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

IN RE TELIK, INC.
SECURITIES LITIGATION                          07 Civ. 4819 (CM)


-----------------------------------------------------------x


DECISION AND ORDER APPROVING THE SETTLEMENT, CERTIFYING THE CLASS
FOR SETTLEMENT PURPOSES, APPROVING THE PLAN OF ALLOCATION OF
THE NET SETTLEMENT FUND, DISALLOWING THE OBJECTIONS, AND
AWARDING ATTORNEYS' FEES

McMahon, J.:

**PRELIMINARY STATEMENT**

The core allegation in the Complaint is that the Telik Defendants[1] received data about

Phase 3 clinical tests on Telik's leading new drug candidate, TELCYTA, on a "rolling basis"

from the "interim looks" that Defendants Wick and Buttita stated were built into the study.

Plaintiffs alleged that, based on their receipt of negative interim data concerning the TELCYTA

Phase 3 trials, the Telik Defendants knew that their contemporaneous positive statements

concerning the Phase 2 and 3 trial results were materially misleading. In addition, Plaintiffs

alleged the Telik Defendants knew that an increasing number of participants in the lung cancer

arm of the tests, eventually totaling 25% of the enrolled patients, were prematurely withdrawn

---

[1] Telik, Inc. ("Telik") and Telik officers Michael M. Wick and Cynthia M. Buttita are
referred to as the "Telik Defendants." "Defendants" refers to the Telik Defendants, as well as
UBS Securities LLC, Lehman Brothers Inc., and J.P. Morgan Securities Inc. (the latter are
referred to as the "Underwriter Defendants").

from the study, compromising the data and rendering it unusable for FDA purposes.

However, Lead Counsel learned during the settlement discussions and mediation, and later confirmed through discovery, that the Telik Defendants were actually blinded to all substantive data during the conduct of the Phase 3 trials. The "interim looks" referenced by Defendants Wick and Buttita were, in fact, periodic reports to the independent Data Monitoring Committees overseeing those tests – not to Telik. (*See* Dkt. #72, 8/29/2008 MacFall Decl. ¶¶3, 28-29.) Lead Counsel reviewed thousands of pages of documents, including the FDA-approved Protocols governing the tests and the charters of the independent DMCs overseeing each of the tests, which demonstrated that the Telik Defendants were, in fact, blinded to all substantive data from the Phase 3 tests. This was further corroborated by the testimony of Defendant Telik CFO Cynthia Buttita and Telik Chief Medical Officer Dr. Gail Brown.

Plaintiffs believe that they could have successfully amended their claims, based on the foregoing, to allege that the Telik Defendants' statements concerning the interim looks were, themselves, materially false and misleading because the Phase 3 tests were blinded. Plaintiffs, however, were mindful that even such amended claims might be susceptible to substantial defenses with respect to scienter and loss causation. The Settlement presents an excellent result for the investor Class.

Plaintiffs estimate that the Settlement represents recovery of approximately 25% of the recoverable damages that Plaintiffs could have proved if this action went to trial. While Plaintiffs' damages expert estimated the aggregate loss of market value subsequent to relevant disclosures about TELCYTA at $449 million, he opined that much of this market loss is attributable to market forces. Specifically, most of the market loss represents investors' reaction

2

to the fact that the Company's primary new drug candidate, TELCYTA, failed FDA testing, as opposed to the disclosure of any fraud.[2] This should come as little or no surprise to anyone.

To assess the extent to which the loss in market value was attributable to market forces as opposed to fraud, Lead Counsel analyzed 10 comparable biotechnology companies. These companies were selected because each had a primary drug candidate that failed Phase 3 FDA testing, *no* allegations of fraud were made, and *no* securities fraud litigation was filed, in connection with such failure. (*See* MacFall Declaration ¶33 and Ex. C.[3]) These companies lost between 40% and 87.83% of their market value, for an average loss of 67.21% of market value, upon disclosure of the Phase 3 test failures.

Here, Telik lost 71.77% of its market value upon the corrective disclosures of December 26, 2006, and June 3 and 4, 2007.[4] Thus, assuming that Plaintiffs believe that they could establish that the maximum recoverable damages in this litigation are approximately $20.47

---

[2] The Company's only other new drug candidate, Telintra, was still undergoing Phase 2 testing at the time of the final disclosure alleged in the Complaint, in June 2007. *See* Telik, Inc. Quarterly Report for the Period ended June 30, 2007, at 12, *available at* http://www.sec.gov/Archives/edgar/data/1109196/000119312507175687/d10q.htm. Accordingly, FDA approval and the subsequent commercial development of Telintra were very far off.

[3] Exhibit C to the MacFall Declaration is a chart listing ten biotechnology companies and the percentages, and amounts, of drop in stock value after disclosing that their primary new drug candidates had failed in Phase III trials. These companies, all part of the NASDAQ Biotechnology Index, were selected based on the fact that their primary lead drug candidate failed Phase 3 FDA trials within the last two years, and no securities fraud litigations were filed in connection with such failures.

[4] The price of Telik common stock fell from a close of $16.26 per share on December 22, 2006 (the last trading day before the alleged partial disclosure of December 26, 2006), to a close of $4.77 per share on December 26, 2006. The stock fell from a close of $5.81 to a close of $4.59 per share on June 4, 2007.

3

million, or 4.56% of Telik's aggregate market value loss, the $5 million cash recovery provided by the proposed Settlement represents approximately 25% of the maximum recoverable damages that Lead Plaintiff believes it could establish at trial.

Pursuant to the Preliminary Order, copies of the Court-approved Notice of Pendency and Proposed Settlement of Class Action ("Notice") were sent to over 54,000 Class members, and a Summary Notice was published in the national edition of *The Wall Street Journal* on June 20, 2008. In the Notice, Class members were advised that the deadline for objections was August 8, 2008. (*See* Keough Aff., MacFall Decl. Ex. D, ¶¶ 7, 8.)

To date, only three Class members have objected to the Settlement and three Class members have opted to exclude themselves from the Settlement. The percentage of objecting Class members is below .006%.

Lead Counsel, who are very experienced in prosecuting securities class action litigation, have concluded that the Settlement is in the best interests of the Class.

## I.    STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS

There is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re Paine Webber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998). "Settlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'" *In re EVCI Career Colleges Holdings Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *3 (S.D.N.Y. July 27, 2007) (citation omitted); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 361 (S.D.N.Y. 2002); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 424 (S.D.N.Y. 2001). As this Court has stated:

4

"In its exercise of that discretion, the Court must engage in a careful balancing act: 'The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Am. Bank*, 127 F. Supp. 2d at 424 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)).

Courts determine the fairness of a settlement by looking both at the terms of the settlement and the negotiation process leading up to it. *See Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96 at 116 (2d Cir. 2005) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)). With respect to process, a class action settlement enjoys a "presumption of correctness" where it is the product of arm's-length negotiations conducted by experienced, capable counsel. *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (Brieant, J.) (citing *Wellman v. Dickinson*, 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 647 F.2d 163 (2d Cir. 1981)); *see also In re Global Crossing Sec. & Erisa Litig.*, 225 F.R.D. 436, 461, (S.D.N.Y. 2004).

With respect to the substantive terms of a settlement, the standards governing approval are well established. Courts in this Circuit examine the fairness, adequacy and reasonableness of a class action settlement according to the "*Grinnell* factors:"

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

5

*Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463, *abrogated on other grounds*, *Goldberger v. Integrated Res.*, Inc., 209 F. 3d 43, 48 (2d Cir. 2000)).

In finding that a settlement is fair, reasonable and adequate, not every factor must weigh in favor of the settlement, but "'rather the court should consider the totality of these factors in light of the particular circumstances.'" *Global Crossing*, 225 F.R.D. at 456 (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). Moreover, in applying these factors, the court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" of the merits of the action. *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004). As such, the court should assess the settlement as presented, without modifying its terms, and without substituting its "'business judgment for that of counsel, absent evidence of fraud or overreaching.'" *Global Crossing*, 225 F.R.D. at 455 (quoting *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 737 (S.D.N.Y. 1993)).

## II.     THE PROPOSED SETTLEMENT IS PROCEDURALLY AND SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE

### A.     The Settlement Is Entitled to a Strong Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations Among Experienced Counsel

As noted above, a strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel. *See Wal-Mart*, 396 F.3d at 116. Moreover, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley*, 186 F. Supp. 2d at 366 (citation omitted).

A presumption of fairness is appropriate here. The Settlement was reached by the parties

in good faith, at arm's-length, and without collusion.  Lead Plaintiff filed its Complaint on

October 23, 2007.  (MacFall Decl. ¶14.)  The parties first met in a face-to-face meeting soon

thereafter on October 27, 2007 to discuss the possibility of settlement.  While no resolution was

reached at that time, the parties agreed to continue discussions.  After numerous telephone

conferences, the parties agreed to mediate the action.  (MacFall Decl. ¶16.)  Thereafter, the

parties, as well as representatives of Defendants' insurers, met with the Hon. Daniel Weinstein

(Ret.) of JAMS and his assistant, Jed Melnick, Esq., to mediate the case on November 27, 2007.

(*Id.*)  The parties negotiated well into the night without success.  However, over the next six

weeks, the parties engaged in numerous telephone conferences and extensive negotiations, with

substantial concessions made by both sides.  (*Id.*)

The parties finally reached an agreement-in-principle to settle this action, signing a

Memorandum of Understanding on January 15, 2008.  (*Id.*)  Judge Weinstein's role in the

settlement negotiations strongly supports a finding that they were conducted at arm's-length and

without collusion.  *See In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004)

("The participation of Judge Sweet and retired Judge Politan in the settlement process gives me

confidence that they were conducted in an arms-length, non-collusive manner."); *In re Elan Sec.*

*Litig.*, 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005) ("[T]he Court has no reason to question that the

Settlement was the product of extended 'arm's length' negotiations, including, among other

things, the two-day settlement conference before Judge Politan."); *In re IPO Sec. Litig.*, 226

F.R.D. 186, 194 & n.42 (S.D.N.Y. 2005) (where negotiations were facilitated by Judge Politan,

settlement was "clearly the result of arm's-length bargaining").

All parties were represented throughout the Settlement negotiations by able counsel

experienced in class action and securities litigation also strongly militates in favor of approving the Settlement. *See Global Crossing*, 225 F.R.D. at 461 ("Both sides have been represented well.... Counsel for plaintiffs, the Settling Defendants, and STB possessed the requisite expertise to negotiate a fair settlement.").

In sum, the Settlement was negotiated at arm's length by sophisticated counsel before an experienced mediator. Significantly, the parties agreed to conduct, and Plaintiffs completed, discovery to confirm certain factual assertions made by Defendants prior to submitting the proposed Settlement to the Court for Preliminary Approval. These facts establish that the process leading to the Settlement was fair to absent Class Members. *See In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *7 (S.D.N.Y. Oct. 26, 2004) (negotiations were arm's length where, among other things, parties met with magistrate judge).

## B. The Settlement Is Substantively Fair, Adequate and Reasonable Under *Grinnell*

### 1. Continued Litigation Would Be Complex and Would Consume Substantial Judicial and Private Resources

Plaintiffs assert claims under the Securities Exchange Act of 1934 (the "Exchange Act") and Securities Act of 1933 based upon alleged misstatements and omissions concerning Phases 2 and 3 of Telik's testing of its chief new drug candidate, TELCYTA. The costs and duration of litigating a motion dismiss, conducting merits and class discovery, conducting expert discovery, litigating a motion for summary judgment, preparing for trial, conducting the trial itself, filing post-trial motions, and pursuing any appeals would vastly exceed the substantial time and money already spent. *See In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long,

8

arduous process requiring great expenditures of time and money on behalf of both the parties and the court"). While denying liability – and Plaintiffs themselves admit that there is no liability under their original theory of the case – Defendants agreed to settle now, thereby avoiding further litigation with its attendant costs.

Given the uncertain prospects of success at trial – particularly where, as here, the claims asserted in the existing Complaint are admittedly without any merit whatever – the Settlement is highly beneficial to the Class. The $5 million cash Settlement will provide tangible and certain relief to the Class now, and "without subjecting them to the risks, complexity, duration, and expense of continuing litigation." *Global Crossing*, 225 F.R.D. at 456-57; *see Maley*, 186 F. Supp. 2d at 362 ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement.").

The reaction of the Class to the Settlement strongly supports final approval. As noted above, the Notice and Proof of Claim form has been mailed to more than 54,000 potential Class Members. The Summary Notice was also published in the national edition of *The Wall Street Journal.* The time for filing objections to the Settlement, Plan of Allocation or application for attorney's fees and expenses expired on August 8, 2008. As of that date (and the date hereof), the Court is aware of only *three* objections to the Settlement from any Class member: by Andrew May, Lloyd Sampson, and James Keller.

Mr. May's objection is groundless. As discussed at length in the MacFall Declaration, Mr. May makes numerous baseless accusations about the Settlement, *e.g.*, that the Telik Defendants were not blinded to the underlying data and that TELCYTA was killing people at

9

"alarming rates." (MacFall Decl. ¶¶ 44-46.) In confirmatory discovery, the Telik Defendants

demonstrated that they had, in fact, been blinded to the underlying data, which went only to the

DMCs. Likewise, Mr. May's claim that the Telik Defendants knew TELCYTA was "killing

people" is simply not true. (*Id.* ¶45.) The survival rates for the TELCYTA-treated patients in the

ASSIST-1 trial were in line with Company expectations. The problem for TELCYTA and the

company testing it was that the control group, treated with Doxil, survived longer than

anticipated based on the scientific literature and test results over the past 15 years. (*Id.* ¶43.)

That the drug failed to increase patients' life spans does not mean that it was "killing" them.

Further, the Telik Defendants also demonstrated in confirmatory discovery that it took

months to analyze the data concerning the ASSIST-1 results, because the Company had only

received top-line, or summary, data in December 2006. In light of the aberrational results for the

control group, such analysis was necessary to assess the accuracy of the test results. (MacFall

Decl. ¶43.) Mr. May also made other accusations concerning the factual underpinnings of the

Settlement that are without merit. They are rebutted at length in both the MacFall Declaration

and the Declaration of Joseph R. Seidman, dated August 29, 2008 (the "Seidman Declaration").

(*See* MacFall Decl. ¶¶39-52; Seidman Decl. ¶¶2-9.) I need not repeat that here.

Another objector, Lloyd Sampson, objects not on grounds pertaining to the merits of the

Settlement, but because of his mistaken belief that the proceeds being used to settle what is

admittedly a meritless claim are coming from the Company; thus, as a current shareholder, the

proceeds are coming from his pocket. The proceeds of the Settlement are coming from D&O

insurance, and so will not directly impact the shareholders. (*See* MacFall Decl. ¶52.)

James Keller's objection was postmarked August 5, 2008, and was received by the *Pro Se*

10

Office on August 11. Mr. Keller provides no particularized basis for his objection to the Settlement. His handwritten objection simply states that, "after watching a segment on a Fox News investment program," he was "tricked into purchasing Telik stock." (The following sentence reads: "The spokesman for the company was the actor from the 'Mash' sitcom.") Mr. Keller also lists the number of shares he purchased and the purchase price, as well as the value of his investment as of June 27, 2008.

### 2. When the Parties Agreed to Settle, Plaintiffs' Prospects for Success Had Lessened Considerably

As discussed in the MacFall Declaration, Plaintiffs' case changed dramatically during settlement negotiations. (*See* MacFall Decl. ¶27.) Actually, Plaintiffs' case did not "change" – it turned out to have no merit as a matter of fact. After considerable discovery, Plaintiffs and Lead Counsel were able to realistically evaluate the strengths and weaknesses of the claims and the risks of continued litigation. Once the Telik Defendants' factual assertion that they were blinded to all substantive Phase 3 trial data was corroborated by evidence adduced in discovery, Lead Counsel settled the case for a fraction of the relief originally thought. *See* MacFall Decl. ¶28; *see also Global Crossing*, 225 F.R.D. at 458 (plaintiffs "had the requisite information to make informed decisions about the relative benefits of litigating or settling" where documents were produced concurrently with settlement discussions); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 338 (S.D.N.Y. 2005) (plaintiffs had "a clear view of the strengths and weaknesses of their cases" where they received documents prior to settlement) (citation omitted).

### 3. Establishing Liability Involves Significant Risks

In assessing the settlement, this Court does not need to decide the merits of the case,

11

*Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981), or "foresee with absolute certainty the outcome of the case." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd,* 236 F.3d 78 (2d Cir. 2001). Rather, the Court need only assess the risks of litigation against the certainty of recovery offered by the Settlement. *See Denney*, 230 F.R.D. at 337.

Here, of course, it is difficult not to assess the merits of the case. To say that establishing liability here was, at best, uncertain is to understate the problems facing plaintiffs by a considerable degree. As discussed above, it would have been necessary to amend the Complaint to allege that the Telik Defendants' statements concerning "interim looks" were materially misleading because Defendants were, in fact, blinded to the Phase 3 test results. (*See* MacFall Decl. ¶30.) Plaintiffs faced substantial hurdles in establishing liability under their alternative theory, because some analysts appear to have understood that the interim looks related to the DMCs, which, in turn, provided periodic recommendations to Telik as to whether to continue, discontinue, or modify those tests. (MacFall Decl. ¶¶ 30-31.) While other analysts did not appear to understand this distinction, Plaintiffs anticipate that they would have had to overcome a "truth-on-the-market" defense in connection with any amended claims. Such a defense at least appears, on the facts presented to the Court, to have merit.

Scienter would also have been difficult to establish. Proving a defendant's state of mind is hard in any circumstances. Objector May pointed out that one of the Individual Defendants, Cynthia Buttita, sold Telik shares in 2004— very early during the Class Period. Defendant Buttita also bought Telik shares during the Class Period. This evidence is far from what is necessary to prove scienter. *See San Leandro Emergency Med. Group Profit Sharing Plan v.*

12

*Phillip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (sales of stock by only one officer/defendant did not give rise to strong inference of intent). Likewise, since the only actionable misstatements Plaintiffs were left with concerned the interim looks themselves – which some analysts apparently understood as meaning that the Telik Defendants were, in fact, blinded to the underlying data – it would been especially hard to prove an intent to deceive, or to prove severe recklessness.

Proving loss causation was also far from certain here. Plaintiffs would have had to show that the drop in the price of the stock was due, in part, to the disclosure that the Telik Defendants were not receiving data about the Phase 3 tests on a rolling basis, as opposed to the failure of TELCYTA to reach the primary endpoint in the Phase 3 tests. While Plaintiffs believe that they could have established that causal connection, they understand that they faced significant hurdles in doing so. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-43 (2005). Further, had Plaintiffs established loss causation, there was no guarantee that a jury would have agreed with Plaintiffs' calculation of damages. "Calculation of damages is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's true value absent the alleged fraud." *Global Crossing*, 225 F.R.D. at 459. *See also Am. Bank*, 127 F. Supp. 2d at 427 ("In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad non-actionable factors such as general market conditions.").

Judge Weinstein, who supervised the settlement negotiations, referred to this case as "troubled." I am constrained to agree. Weighing the foregoing factors against the immediate and

13

substantial benefit conferred by the Settlement strongly supports Plaintiffs' motion for final approval.

### 4.    The Settlement Amount Is Reasonable in View of the Best Possible Recovery and the Myriad Risks of Litigation

The $5 million Settlement amount is well "within the range of reasonableness" in light of the best possible recovery and all of the risks of litigation. *Interpublic,* 2004 WL 2397190, at *8. Frankly, given the problems with the case, almost any amount could be deemed reasonable. Here, Plaintiffs estimate recoverable damages (assuming liability is proven for the entire Class Period) at approximately $20 million. The $5 million Settlement amount represents approximately 25% of this figure, a percentage well above that in most securities class actions. *See also In re Ikon Office Solutions Inc., Sec. Litig.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (approving settlement amounting to 5.2% of damages for common stock holders); *see also Union Carbide*, 718 F. Supp. at 1103 ("The Court of Appeals has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought. The essence of settlement is compromise.") (citations omitted); *Global Crossing*, 225 F.R.D. at 461 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (quoting *Grinnell*, 495 F.2d at 455).

### 5.    Defendants' Ability to Withstand a Greater Judgment

This factor had little bearing on settlement negotiations in light of the fact that the landscape was radically altered during negotiations. However, this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied. *See*

14

*Meijer, Inc. v. 3M*, Civ. No. 04-5871, 2006 WL 2382718 at *15 (E.D. Pa. Aug. 14, 2006);

*Deutsche Bank*, 236 F.3d at 86. The Telik Defendants are apparently covered by D&O liability

insurance in excess of the Settlement amount. Ultimately, however, this factor is "of little

significance in light of all other factors." *AMF Bowling*, 334 F. Supp. 2d at 467. (*See also*

MacFall Decl. ¶¶27-33.)

### III.    THE PLAN OF ALLOCATION OF THE NETSETTLEMENT FUND IS FAIR AND REASONABLE

"When formulated by competent and experienced counsel," a plan for allocation of net

settlement proceeds "need have only a reasonable, rational basis." *Global Crossing*, 225 F.R.D.

at 462 (citation omitted). A reasonable plan may consider the relative strength and values of

different categories of claims. *Id.*

The Net Settlement Fund will be distributed to Authorized Claimants, *i.e.,* members of

the Class who submit timely and valid Proofs of Claim, in accordance with the Plan of

Allocation described in the Notice. The Plan treats all Class Members in a similar manner:

everyone who submits a valid and timely claim, and does not exclude himself or herself from the

Class, receives a pro rata share of the Net Settlement Fund in the proportion that the Authorized

Claimant's Recognized Claim bears to the total of all Recognized Claims. The "Recognized

Claim," as used in the Plan, is not market loss. Rather, it is a calculation used to arrive at a

weighted loss figure for purpose of calculating an Authorized Claimant's pro rata participation in

the Net Settlement Fund.

The Plan reflects Plaintiffs' allegations that the truth concerning TELCYTA was partially

disclosed on December 26, 2006, when the Telik Defendants disclosed that TELCYTA failed all

three Phase 3 clinical trials in December 2006. However, Plaintiffs further alleged that they failed to disclose that TELCYTA had performed substantially worse than the competitors' drugs that were used in the control arms of ASSIST-1 and ASSIST-2. (Am. Compl. ¶¶67-68.) From December 2006 until June 2007, the Telik Defendants continued to make positive statements about the purported efficacy of TELCYTA based on various studies and interim data from the Phase 2 clinical trials. (Id. ¶72.)

Plaintiffs also alleged that it was not until June 3, 2007 (a Sunday, which is not a trading day) that the Company revealed that participants in the ASSIST-1 Phase 3 clinical trial who received TELCYTA, actually died five months sooner, on average, than those in the control groups who were treated with either Doxil® or Hycamtin® (8.5 months compared to 13.6 months for the control groups); and that patients in the non-small cell lung cancer ASSIST-2 trial that had received TELCYTA had a median survival rate of 4.6 months compared to a median survival rate of 6.1 months (there was no statistical significance to the difference) for the control group that was treated with Iressa® (gefitinib). (Id. ¶¶73-74.)

The following day, June 4, 2007, in an aftermarket release, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which stopped new patient enrollment in TELCYTA clinical trials, and prevented the Company from administering additional doses of the drug to those patients already enrolled in the trials. (Id. ¶76.) Following the Company's disclosure and the FDA announcement, shares of the Company's stock declined an additional 41% to close on June 5, 2007 at $3.42 per share, on unusually heavy trading volume. (Id. ¶77.)

Accordingly, the Plan draws several important distinctions among Class Members who

16

sold Telik stock before the end of the Class Period, bought after one of the partial disclosures, or held Telik stock as of the end of the Class Period.

The Plan ensures an equitable *pro rata* distribution of the Net Settlement Fund among all Authorized Claimants based solely on if and when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during certain segments of the Class Period. "Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." *Global Crossing*, 225 F.R.D. at 462.

The only objection to the Plan is by Mr. May. Mr. May's objection to the Plan is not clear. May claims that the settlement is unfair to a "segment" of the class. (*See* MacFall Decl. ¶49.) Mr. May could be referring to the fact that Class members who bought and sold Telik stock before the partial disclosure of December 26, 2006 do not stand to recover. The Supreme Court's decision in *Dura v. Broudo* compels that conclusion because the Court held there that losses suffered before a corrective disclosure are generally not be compensable under Section 10(b).

## IV.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23

Pursuant to the Stipulation, Lead Plaintiff seeks final certification of the Class for settlement purposes pursuant to Rules 23(a) and 23(b)(3). The Class is defined for settlement purposes as all persons who acquired Telik, Inc. common stock between February 19, 2004 and June 4, 2007, inclusive.

Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y.

17

1995). Further, the Second Circuit has recognized that "[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes." *Weinberger*, 698 F.2d at 72. The proposed Class is certified because it satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3).

### A.    The Numerosity Requirement is Satisfied

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993). Here, throughout the Class Period, there were millions of Telik shares outstanding. Beneficial holders of the shares purportedly number in the thousands and are geographically located throughout the United States, making joinder impracticable. Thus, Rule 23(a)(1) is satisfied.

### B.    Plaintiffs and the Proposed Class Share Common Questions of Law and Fact

The commonality requirement of Rule 23(a)(2) and the typicality requirement of Rule 23 (a)(3) are discussed together because courts treat them as closely linked and often evaluate them together. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d at 311 ("The concepts of commonality and typicality are broadly defined and tend to merge.") (citation omitted). The threshold for satisfying these two requirements is not high. *See McManus v. Fleetwood Enters.*, 320 F.3d 545, 548 n.2 (5th Cir. 2003). The commonality inquiry "asks if the named plaintiffs' 'grievances share a common question of law or of fact' with those of the proposed class . . . ." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting

*Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). Typicality is satisfied if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) (plaintiff alleging a common course of conduct arising out of a single set of operative facts satisfies the commonality requirement). *Cf. Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

The Complaint asserts the same claims on behalf of all Class Members. All Class Members, as purchasers of Telik common stock during the Class Period, sustained injury due to Defendants' alleged material misrepresentations throughout the Class Period. In addition, all Class Members make the same legal claims under the federal securities laws. Plaintiffs have alleged common issues of fact and law that affect all Class Members, satisfying the commonality requirement of Rule 23(a)(2). *See, e.g., Sumitomo Copper Litig.*, 189 F.R.D. at 279 (commonality satisfied "[b]ecause a single, continuous conspiratorial artifice is alleged, the relevant proof will not vary among class members, and the case presents a fundamental [important] question . . . to all class members").

### C.    Plaintiffs and Lead Counsel Have Adequately Represented the Proposed Class

The adequacy requirement of Rule 23(a)(4) involves an inquiry as to whether: (1) the plaintiff's interests are antagonistic to the interests of the other members of the Class; and (2) plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). In this case, the

19

answers to these two questions are no and yes, respectively.

No conflicts exist between Plaintiffs and the other members of the Class. Plaintiffs' interests are aligned with those of the Class— the factual and legal claims of Plaintiffs and the Class arise from the same nexus of operative facts and course of conduct by Defendants. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citation omitted). Plaintiffs, like all Class Members, purchased Telik common stock at artificially inflated prices during the Class Period as a result of Defendants' alleged materially false and misleading statements and were damaged thereby.

Plaintiffs retained counsel who have successfully prosecuted numerous securities and other complex class actions in courts throughout the United States. (*See* MacFall Decl. Ex. A (firm resume of Bernstein Liebhard); *id.* Ex. B (firm resume of Brower Piven, P.C.).

Plaintiffs are adequate representatives of the Class, and their counsel are qualified, experienced, and capable of prosecuting the action, in satisfaction of Rule 23(a)(4).

### D.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

In addition to the four requirements of Rule 23(a), a class must also satisfy one of the three subparts of Rule 23(b). Plaintiffs seek class certification under Rule 23(b)(3), which requires that:

> the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

This rule is designed to "achieve economies of time, effort, and expense, and promote . . .

20

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

### E.    Common Questions of Law and Fact Predominate

The Rule 23(b)(3) inquiry normally focuses "'on the legal or factual questions that qualify

each class member's case as a genuine controversy . . . [and] tests whether the proposed classes

are sufficiently cohesive to warrant adjudication by representation.'" *Cromer*, 205 F.R.D. at 127

(quoting *Amchem*, 521 U.S. at 623) (alteration in original). "Predominance is a test readily met

in certain cases alleging consumer or securities fraud . . . ." *Amchem*, 521 U.S. at 625.

Because the issue of liability in this case is common to all members of the Class, the

predominance requirement of Rule 23(b)(3) is satisfied. Plaintiffs allege that Defendants

engaged in a common course of fraudulent conduct to artificially inflate the price of Telik

common stock. Proof of that common course of conduct relates to Defendants' liability as to all

Class Members. Because the central and predominant focus of the action is Defendants' alleged

fraudulent conduct, each Class Member is similarly situated, and common questions predominate

over individual questions. *See Cromer*, 205 F.R.D. at 127 (finding predominance because "[t]he

proof for the claims of misrepresentation or omission, materiality, and . . . scienter are all based

on a common nucleus of facts and a common course of conduct"); *Blech*, 187 F.R.D. at 107

("[A]s a result of the allegations relating to the common course of conduct alleged in this action,

certain common questions of law and fact relating to liability exist as to all members of the Class

and predominate over any questions affecting solely individual members.").

In this case, common questions predominate over individual questions. The common

21

questions include: (1) whether the federal securities laws were violated by Defendants'

statements and omissions; (2) whether statements made by Defendants during the Class Period

misrepresented and/or omitted material facts about the business and operations of Telik; (3)

whether the market price of Telik common stock was artificially inflated during the Class Period

due to the alleged material misrepresentations and omissions; and (4) to what extent the members

of the Class have sustained damages, and the proper measure of damages.

### F.    A Class Action Is Superior to Multiple Individual Actions

Rule 23(b)(3) also requires that the class action be "superior to other available methods

for fair and efficient adjudication of the litigation." Courts have found that the superiority

requirement is satisfied where:

> The potential class members are both significant in number and
> geographically dispersed. The interest of the class as a whole in
> litigating the many common questions substantially outweighs any
> interest by individual members in bringing and prosecuting
> separate actions.

*Cromer*, 205 F.R.D. at 133.

Here, the utility of presenting the claims asserted through the class action method is

substantial since the Class Members who have been injured number in the thousands, but most

have not been damaged to a degree that would induce them to institute litigation on their own

behalf. *See Blech*, 187 F.R.D. at 107 ("[V]iolations of the federal securities laws, such as those

alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed

persons such that the cost of pursuing individual litigation to seek recovery is often not

feasible."); *see also Sumitomo Copper Litig.*, 189 F.R.D. at 279.

Further, certification of the Class is the superior method to facilitate the resolution of

Plaintiffs' claims. Without the settlement class device, Defendants could not obtain a Class-wide release, and therefore would have had little, if any, incentive to enter into the Settlement. Moreover, certification of a Class for settlement purposes will enable Lead Counsel to handle the administration of the Settlement in an organized and efficient manner. Resolution of Plaintiffs' claims against Defendants through the proposed Class is superior to any other available method of resolution.

## V.    ATTORNEYS' FEES

### A.    The Percentage of Recovery Methodology Is the Most  Efficient and Logical Means for Calculating Counsel's Fees

Pursuant to the "'equitable' or 'common fund' doctrine established more than a century ago" in *Trustees v. Greenough*, 105 U.S. 527, 532-33 (1881), "attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work." *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *15 (S.D.N.Y. July 27, 2007) ("The Supreme Court has recognized that a lawyer who recovers a common fund for the benefit of persons other [than] his client is entitled to a reasonable attorney's fee from the fund as a whole.") (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). Fees and expenses are paid from the common fund so that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (the common fund doctrine "prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost"); *Am. Bank Note*, 127 F. Supp. 2d at 430 ("[T]he costs of litigation

should be spread among the fund's beneficiaries.").

Courts have also recognized that, in addition to providing just compensation, awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002). The Supreme Court has emphasized that private securities actions, such as this one, provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (citation omitted).

In *Goldberger*, the Second Circuit emphasized the need for fee awards to plaintiffs' counsel to be fair and reasonable, and described two forms of fee calculation methodologies—the first used as a check for reasonableness, and the latter serving as the preferred method. The first is the "lodestar" method, where "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Goldberger*, 209 F.3d at 47. Once the lodestar is calculated, the court "may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* (citation omitted).

The second method for calculating fees is the "percentage of recovery" method. *Id.* As the *Goldberger* court noted, "In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.* Because the percentage of recovery approach does not require courts to "exhaustively scrutinize[]" attorneys' time records, that methodology is "simpler" than the lodestar approach.

24

*Id.* at 50; *see also id.* at 48-49 (noting that the "primary source of dissatisfaction" with the lodestar methodology "was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits").

The advantages of the percentage of recovery methodology led the *Goldberger* court to reaffirm the Second Circuit's view that it is an accepted means for calculating attorneys' fees in class actions. *Id.* at 49 ("the percentage-of-the-fund method is a viable alternative") (quoting *Savoie v. Merch. Bank*, 166 F.3d 456, 460 (2d Cir. 1999)). Indeed, the court held that as long as utilizing the percentage of recovery methodology does not produce an "unwarranted windfall[]" to counsel, there is "no need to compel district courts to undertake the 'cumbersome, enervating, and often surrealistic process' of lodestar computation." *Goldberger*, 209 F.3d at 49-50 (quoting *Savoie*, 166 F.3d at 461 n.4). The court also decided: (a) not to prohibit district courts from calculating attorneys' fees utilizing a lodestar approach (as some Courts of Appeal had done); and (b) to "encourage" the analysis of counsel's lodestar "as a 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50 (citation omitted).

Both before and after the *Goldberger* opinion, the administrative problems associated with the lodestar method, and the advantages presented by the percentage of recovery approach,[5] led most district courts in this Circuit to adopt the percentage of recovery methodology.[6] That

---

[5] From a policy perspective, courts have continually recognized that the percentage of recovery approach "is attractive because it directly aligns the interests of the Class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *Am. Bank Note*, 127 F. Supp. 2d at 431-32.

[6] *See, e.g., Am. Bank Note*, 127 F. Supp. 2d at 431 ("[T]he trend of the district courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees."); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 85 (E.D.N.Y. 2002) ("The trend in the Second Circuit is to

trend is consistent with the national precedent concerning this issue.[7]  Moreover, the percentage

of recovery approach is consistent with the federal securities laws' requirement that attorneys'

fees in securities class actions not "exceed a reasonable *percentage* of the amount of any

damages and prejudgment interest actually paid to the class." *Am. Bank Note*, 127 F. Supp. 2d at

430 (citation omitted).  Indeed, the PSLRA expressly provides that class counsel are entitled to

attorneys' fees that represent "reasonable percentage" of the damages recovered by the class.  *See*

15 U.S.C. § 78u-4(a)(6).  Thus, Congress plainly contemplated that percentage-of-recovery

would be the primary measure of attorneys' fees awards in federal securities class actions.

　　　This Court recently confirmed that the percentage method continues to be the trend of

district courts in this Circuit and that it "has been expressly adopted in the vast majority of

circuits." *EVCI*, 2007 WL 2230177, at *16 n.3 (collecting cases).  This Court observed: "For

many years, courts within this Circuit recognized that 'Support for the lodestar/multiplier

approach in common fund cases had eroded, and there has been a groundswell of support for

*mandating* a percentage-of-the-fund approach in the common fund cases." *Id.* (quotation and

---

use the percentage method.") (citing *Am. Bank Note,* 127 F. Supp. 2d at 431); *In re Blech Sec.
Litig.*, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) ("This Court . . . continues to find that
the percentage of the fund method is more appropriate than the lodestar method for determining
attorney's fees in common fund cases."); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397
("Support for the lodestar/multiplier approach in common fund cases has eroded, and there has
been a 'ground swell of support for mandating a percentage-of-the-fund approach' in the
common fund cases.") (citation omitted); *Klein ex rel. Ira v. PDG Remediation, Inc.*, 1999 WL
38179, at *3 (S.D.N.Y. Jan. 28, 1999) ("The lodestar approach has been criticized, and courts
now favor awarding counsel in common fund cases . . . a percentage of the settlement fund.").

[7] *See, e.g., Maley*, 186 F. Supp. 2d at 370 (S.D.N.Y. 2002) ("[T]here is a strong consensus –
both in this Circuit and across the country – in favor of awarding attorneys' fees in common fund
cases as a percentage of the recovery."); *Am. Bank Note*, 127 F. Supp. 2d at 430 ("In recent years,
a majority of the Circuit courts have approved the percentage-of-the-fund method.").

citations omitted) (emphasis in original).

Accordingly, consistent with the approach adopted by the *Goldberger* court, the practice of most district courts in this Circuit, and the provisions of the federal securities laws, the percentage-of-recovery approach is the appropriate methodology for awarding attorneys' fees in this action.

Plaintiffs' Counsel request a fee award of 25% of the Gross Settlement Fund, plus interest. The requested fee is well within the range of fees approved by courts in this Circuit and elsewhere, under the percentage and the lodestar/multiplier approaches, especially for settlements near the size of the $5 million settlement achieved here.

### 1. The Requested Fees Are Reasonable Under the Percentage Method

On a percentage basis, the amount of attorneys'' fees requested is less than the attorneys' fees awards made by courts in this District and other courts within the Second Circuit.[8]

---

[8] *See, e.g., In re Crayfish Co. Sec. Litig.*, No. 00-6766 , slip op. at 7 (S.D.N.Y. July 28, 2004) (awarding 30% of $9 million settlement, plus expenses); *Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (awarding 30% of $10 million settlement, plus expenditures); *In re Plug Power, Inc. Sec. Litig.*, No. 00-5553, slip op. at 7 (E.D.N.Y. Apr. 29, 2005) (awarding 30% of $5 million settlement, plus expenses); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02-2133, slip op. at 8 (D. Conn. Jan. 21, 2005) (awarding 33 ⅓% of $16.5 million settlement, plus expenses); *In re Winstar Commc'ns Sec. Litig.*, No. 01-3014, slip op. at 2 (S.D.N.Y. Dec. 29, 2004) (awarding 30% of $12 million settlement, plus expenses); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL), 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003) (awarding 33 ⅓% of $975,000 settlement plus reimbursement of expenses); *Maley*, 186 F. Supp. 2d at 367-68 (awarding 33 ⅓% of $1.25 million settlement, plus $200,371.93 for costs and expenses); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 WL 1052004, at *1 (S.D.N.Y. Nov. 19, 1999) (awarding 33 ⅓% of $21 million settlement); *Adair v. Bristol Tech. Sys., Inc.*, No. 97 Civ. 5874 (RWS), 1999 WL 1037878, at *3 (S.D.N.Y. Nov. 16, 1999) (awarding requested counsel fee of 33% of the $975,000 settlement fund, and finding that "Courts in this District have previously awarded fees at or exceeding this level on numerous occasions").

The requested fee is also less than the fee awards in many cases such as this throughout the rest of the country. *See, e.g., In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *15 (E.D. Pa. Apr. 18, 2005) (awarding attorneys' fees of one-third of $7 million settlement); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 497 (E.D. Pa. 2003) ("[T]he 33 ⅓ % fee request in this complex case is within the reasonable range."); *Faircloth v. Certified Fin. Inc.*, 2001 WL 527487, at *12 (E.D. La. May 16, 2001) (awarding attorneys' fees of 35% of settlement plus interest and reimbursement of expenses); *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 439 (E.D. Pa. 2001) (awarding attorneys' fees of one-third of settlement as "fair and reasonable," plus reimbursement of expenses); *In re Eng'g Animation Sec. Litig.*, 203 F.R.D. 417, 423-24 (S.D. Iowa 2001) (awarding attorneys' fees of $2.5 million, or one third of common fund, plus expenses); *In re Neoware Sys., Inc. Sec. Litig.*, 2000 WL 1100871, at *3-4 (E.D. Pa. July 27, 2000) (awarding counsel fees of approximately one-third of each of two settlement funds, plus a proportionate share of interest accrued and reimbursement of expenses); *In re Unisys Corp. Sec. Litig.*, 2001 WL 1563721, at *3-4 (E.D. Pa. Dec. 6, 2001) (approving one-third fee sought by plaintiffs' counsel as fair and reasonable); *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 101-102 (D.N.J. 2001) (approving fee request of one-third of $4.5 million settlement); *Neuberger v. Shapiro*, 110 F. Supp. 2d 373, 386 (E.D. Pa. 2000) (approving one third of $4.325 million settlement fund); *Gaskill v. Gordon*, 942 F. Supp. 382, 387-88 (N.D. Ill. 1996) (awarding 38% of the settlement fund), *aff'd*, 160 F.3d 361 (7th Cir. 1998); *Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1380-81 (D. Minn. 1985) (awarding attorneys' fees of 35% of settlement recovery); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 500 (D.D.C. 1981) (awarding attorneys' fees of 45% of settlement recovery); *In re Pac. Enters. Sec. Litig.*, 47

28

F.3d 373, 379 (9th Cir. 1995) (awarding attorneys' fees of 33% of total recovery); *Kogan v.*

*AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 503 (E.D. Mich. 2000) (awarding attorneys' fees of

one-third of common fund).

### 2.    Lodestar Confirmation

The Second Circuit has "encourage[d]" an analysis of counsel's lodestar "as a 'cross

check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50 (citation

omitted); *accord, e.g., Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d

254, 263 (S.D.N.Y. 2003) (same).  Where the lodestar is "used as a mere cross-check, the hours

documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*,

209 F.3d at 50.

### a.    The Number of Hours Worked by Plaintiffs' Counsel in Connection with This Litigation Was Reasonable

The starting point for any lodestar analysis is the calculation of the lodestar – which is

"comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent

hourly billing rate of counsel." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410,

414 (S.D.N.Y. 1997).  Here, despite the early stage of the litigation in which the Settlement was

achieved, Lead Counsel performed a substantial amount of work on behalf of the Class.  (*See*

MacFall Declaration ¶¶ 12-33.)  For instance, Lead Counsel: reviewed and analyzed all of

Telik's publicly available filings and financial statements; researched the biotechnology field and

Food and  Drug Administration ("FDA") regulations governing the new drug approval process in

drafting a detailed amended complaint; worked with consultants concerning the FDA approval

process and in analyzing the Phase 3 test results announced by Telik at the end of the Class Period; worked with an expert with respect the loss of market value for Telik and the potential recoverable damages in the action; participated in hard-fought settlement negotiations and in mediation under the supervision of the Hon. Daniel Weinstein (Ret.); reviewed (with the assistance of Plaintiffs' Counsel) thousands of pages of documents produced by Telik to confirm the accuracy of certain factual representations that had been made throughout the settlement negotiations and mediation, as well as to confirm the adequacy of the proposed Settlement; conducted the depositions of Defendant and Telik CFO Cynthia Buttita, as well as Telik Chief Medical Officer Dr. Gail Brown; and prepared papers in support of the settlement.

In light of the complexity of the claims and defenses asserted by the parties, the significant amount of time litigating the action on behalf of the Class, and the complex nature of the negotiations that produced the Settlement, the total number of hours billed in connection with this action – 1423.85 – is reasonable.

Plaintiffs' Counsel are highly experienced in prosecuting securities law claims and shareholder class actions. (*See* MacFall Decl. Exs. A, B, H (firm resumes).) Thus, Plaintiffs' Counsel were presumably able to perform the various tasks necessary to advance Plaintiffs' and the Class's interests in a more efficient manner than would have counsel with a lesser degree of specialization in this field.[9]

The second step in the lodestar cross-check analysis is to test the reasonableness of the

---

[9] *See Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.,* No. 01 CV 11814 (MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) (noting that the skill and prior experience of counsel in the specialized field of shareholder securities litigation is relevant in determining fair compensation).

(empty)

current billing rates charged by Plaintiffs' Counsel.[10] In determining the propriety of the hourly rates charged by plaintiffs' counsel in class actions, courts have continually held that the standard is the rate charged in the community where the services were performed for the type of service performed by counsel.[11] Perhaps the best indicator of the "market rate" in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis. Viewed in light of that market barometer, Plaintiffs' Counsel's rates are entirely reasonable.

For example, a *National Law Journal* summary of billing rates at various law firms confirmed that New York firms that frequently represent defendants in securities class actions billed at rates comparable to or higher than those currently charged by the principal counsel who performed services for Plaintiffs in this action. *See Firm-by-Firm Sampling of Billing Rates Nationwide*, NAT'L L.J., Dec. 12, 2005, at S2. Specifically, that article revealed that certain Manhattan firms with substantial securities class action defense practices had the following

---

[10] The use of current rates to calculate the lodestar figure has been endorsed repeatedly by courts as a means of accounting for the delay in payment inherent in class actions and for inflation. *See, e.g., Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (endorsing "an appropriate adjustment for delay in payment" by applying "current" rate); *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (rates "should be 'current rather than historic'") (citation omitted); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (current rates "should be applied in order to compensate for the delay in payment").

[11] *See, e.g., Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115-16 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'") (quoting *Blum*, 465 U.S. at 896 n.11); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (appropriate rate in performing lodestar analysis is "the rate 'normally charged for similar work by attorneys of like skill in the area,' taking into account factors such as the experience of the attorney performing the work and the type of work performed") (citation omitted).

31

partnership level billing rates, several years ago, in 2005: Kramer Levin Naftalis & Frankel

($530-$775); Orrick, Herrington & Sutcliffe ($355-$715); and White & Case ($560-$830).

The current hourly rates of the partners litigating this action on behalf of the Class, who

performed the vast majority of the partner-level work on this matter, range from $700 to $750.

(*See* MacFall Decl. Exs. A, B, H.) Those rates fall within the norm of the rates charged by those

attorneys' common adversaries in the defense bar. Likewise, associate rates for the majority of

work charged by Plaintiffs' Counsel range from a low of $300 per hour to a high of $550 per

hour. (*See id.*) Those rates, too, are consistent with rates charged by the defense bar for similar

work.

Finally, courts in this District and around the country have repeatedly found rates charged

by plaintiffs' counsel in class actions that are comparable to those at issue here to be reasonable

given the nature of such work and the risks associated with financing class actions.[12] Thus, both

substantial precedent and a market check demonstrate that the rates utilized by Plaintiffs'

Counsel in calculating their lodestars are reasonable.

**b.    The Requested Multiplier Is Low**

Courts have continually recognized that, in instances where a lodestar analysis is

employed to calculate attorneys' fees or used as a "cross check" for a percentage of recovery

---

[12] *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *9 (S.D.N.Y. Sept. 29, 2003) (rates five years ago of $650/hour for a partner, and $300-$425/hour for associates, "were not extraordinary for a top flight New York City law firm"); *In re BankAmerica Corp. Sec. Litig.*, 228 F. Supp. 3d 1061, 1065 (E.D. Mo. 2002) ("[W]hile the hourly rates ranging up to $695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions.").

32

analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for the risk they assumed, the quality of their work and the result achieved for the class.[13]  Here, utilizing the number of hours and the hourly billing rates set forth in the affidavits attached to the MacFall Declaration, Plaintiffs' Counsel's lodestar is $779,297.75.  (*See* MacFall Decl. ¶61.) Thus, the fee requested is 1.6 times Plaintiffs' Counsel's lodestar.

In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court.  *See, e.g., Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within range awarded by courts in this Circuit and courts throughout the country"); *EVCI*, 2007 WL 2230177, at *17 (2.48 multiplier "is within the range found to be reasonable").  Accordingly, a 1.6x multiplier is well within the range of reasonableness.

## B.    The Requested Attorneys' Fees Are Reasonable Based on the Second Circuit Criteria

The *Goldberger* Court held that the appropriate percentage fee in a class action is a matter of judicial discretion that "should be assessed based on scrutiny of the unique circumstances of each case . . . ."  *Goldberger*, 209 F.3d at 53.  The Second Circuit did, however, set forth factors that should be considered by district courts in arriving at a suitable percentage.  Specifically, the court held:

---

[13]  *See, e.g., In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (multiplier used to "reflect the risks of nonpayment facing counsel, to serve as an incentive for counsel to undertake socially beneficial litigation, or as a reward to counsel for an extraordinary result"); *Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement.") (citation omitted); *Prudential*, 985 F. Supp. at 414 ("Because counsel who rendered services were not being compensated for their work as it was being performed and because of the significant risk that they might never receive any compensation if the action was unsuccessful, courts have, when warranted, applied a multiplier to the lodestar to arrive at a fair

> District courts should continue to be guided by the traditional
> criteria in determining a reasonable common fund fee, including:
> "(1) the time and labor expended by counsel; (2) the magnitude and
> complexities of the litigation; (3) the risk of the litigation . . . ;
> (4) the quality of representation; (5) the requested fee in relation to
> the settlement; and (6) public policy considerations."

*Id.* at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp.

160, 163 (S.D.N.Y. 1989)).

### 1.    The Significant Time and Labor Expended By Counsel to Produce a Settlement Supports the Fee Requested by Plaintiffs' Counsel

The first factor set forth in *Goldberger* for determining an appropriate attorneys' fee is the

time and labor expended by counsel. *Goldberger*, 209 F.3d at 50. As is detailed in the

Declaration, the Settlement was the result of the efforts of Plaintiffs' Counsel. (*See* MacFall

Decl. ¶¶1-11, 27-33.) In total, Plaintiffs' Counsel have spent over 1,400 hours litigating this

matter. (*Id.* ¶61.) Those efforts have included a great deal of sophisticated work related to

Plaintiffs' claims for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5

promulgated there under. (*Id.* at ¶¶13, 18-26.) Lead Counsel also conducted substantial factual

research concerning Telik and its business activities, as well as concerning the new drug approval

process and the pertinent FDA regulations. As is described in detail in the MacFall Declaration,

that investigation included a review of SEC filings, news reports, analyst reports, FDA

regulations, oncological literature and clinical trial testing procedures, as well as discussions with

consultants concerning the new drug approval process, specifically in connection with cancer-

treatment new drug candidates.

In addition, Lead Counsel spent a considerable amount of time negotiating the terms of

---

contingent fee.").

34

the Settlement, including the negotiation and drafting of the necessary settlement documents.
Lead Counsel met and conferred with Defendants' Counsel prior to engaging in mediation. On
November 27, 2007, both sides participated in a mediation under the supervision of the Hon.
Daniel Weinstein, retired Superior Court Judge of California, and his assistant, Jed Melnick,
Esq., negotiating well into the night, but the parties were unable to reach any agreement. (*See*
MacFall Decl. ¶16.) After six weeks of intense negotiating conducted through Judge Weinstein,
a Memorandum of Understanding was signed on January 15, 2008.

Thereafter, Plaintiffs' Counsel undertook the review of thousands of pages of documents
to confirm the adequacy and fairness of the Settlement, as well as to confirm various factual
assertions that had been made during the parties' negotiations. (MacFall Decl. ¶¶16-17.) Lead
Counsel also conducted the depositions of Telik's Chief Medical Officer, Dr. Gail Brown, and its
CFO, Defendant Cynthia Buttita, to confirm various facts concerning Plaintiffs' claims and the
fairness of the Settlement. (MacFall Decl. ¶17.) Numerous exchanges via e-mail and telephone
followed so that the settling parties could reach an agreement on the necessary settlement
documentation. The efforts of Lead Counsel and Defendants' Counsel resulted in the execution
of the Stipulation and Agreement of Settlement dated April 16, 2008.

Plaintiffs' Counsel expended significant time and labor in prosecuting Plaintiffs' claims.
Those concerted efforts were undertaken on a contingent fee basis despite the possibility that
Plaintiffs and the Class would not prevail in this litigation, and that Lead Counsel could
potentially receive nothing for their efforts. The "time and labor expended by counsel" in
producing the proposed Settlement with Defendants, therefore, supports the $1.25 million fee

requested by Plaintiffs' Counsel.[14]

### 2.    The Magnitude And Complexity Of This Litigation Support The Award Of The Fee Requested By Plaintiffs' Counsel

The second factor in determining the appropriate fee in class action settlements is the "magnitude and complexities of the litigation." There is no question that this litigation presented enormous challenges. As detailed in the MacFall Declaration, the stature of this case changed dramatically during settlement negotiations. (MacFall Decl. ¶27.) Nonetheless, Lead Counsel managed to recover something for the class. It may have been in the nature of a nuisance settlement, but it was $5 million.

### 3.    The Substantial Risks to Plaintiffs' Recovery Fully Support the Fee Requested by Lead Counsel

Courts have repeatedly recognized that "the risk of the litigation" is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions. *See, e.g.*, *Goldberger*, 209 F.3d at 50. Here, Plaintiffs' Counsel faced significant risks that they might be unsuccessful in obtaining any recovery for the Class and, therefore, that they would receive no payment for their efforts. (*See* MacFall Decl. ¶63.)

Plaintiffs' Counsel undertook their representation of Plaintiffs and the Class in this action on a contingent-fee basis, investing a substantial amount of time and money to prosecute this action in the expectation that if they were successful in obtaining a recovery for the Class, they would receive a percentage of that recovery. But there was no guarantee of compensation or

---

[14] *See, e.g.*, *Sumitomo*, 74 F. Supp. 2d at 399-400 (27.5% fee award, representing a multiplier of 2.5, was justified in action involving settlement in excess of $115 million because Plaintiffs' counsel "were required to expend substantial amounts of professional time and money away from other professional business in order to prosecute the action, with no certainty of recovery thereof

even the recovery of out-of-pocket expenses. Thus, counsel might have expended a substantial

amount of attorney time in pursuing this action, yet receive no compensation whatever if the

action proved ultimately unsuccessful. (MacFall Decl. ¶63.) Unlike counsel for Defendants,

who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead

Counsel have not been compensated for any time or expenses in their prosecution of this action

and would have received no compensation or reimbursement of expenses had this action not been

successful.

Attorneys' "risk of litigation" is an important factor to be considered in making an

appropriate fee award. In *Grinnell*, the Second Circuit explained:

> No one expects a lawyer whose compensation is contingent upon
> his success to charge, when successful, as little as he would charge
> a client who in advance had agreed to pay for his services,
> regardless of success. Nor, particularly in complicated cases
> producing large recoveries, is it just to make a fee depend solely on
> the reasonable amount of time expended.

(citing *Cherner v. Transitron Elec. Corp.*, 221 F. Supp. 55, 61 (D. Mass. 1963)).

Plaintiffs and their counsel acknowledge that they could not win the case as originally

brought, and that there were substantial risks in attempting to amend the complaint to assert a

viable claim. Thus, there were serious risks in proceeding with this litigation.   It was readily

apparent to Plaintiffs and their Counsel that there were substantial risks to achieving a recovery

had Plaintiffs not agreed to settle at this point in the proceedings.

### 4.     The Quality of Plaintiffs' Counsel's Representation of the Class Supports the Fee Requested

The fourth factor cited by the Second Circuit for determining the fee percentage awarded

from any source").

to class counsel is the "quality of representation" delivered in the litigation. *See Goldberger*, 209

F.3d at 50. Lead Counsel believes that they have provided excellent representation to the Class,

given the serious challenges that arose during litigation of the action. Since they admit that the

complaint that they originally filed lacks merit as a matter of fact, yet they extracted a $5 million

settlement from Defendants, I am constrained to agree with them.

The overwhelmingly positive reaction of the Class to the Settlement further demonstrates

that Plaintiffs' Counsel have generated an excellent result. Over 54,000 Notices have been

mailed to the Class. (*See* Keough Aff. (MacFall Decl. Ex. D) at ¶7.) To date, only three Class

Members have elected to opt out of the Settlement. (*See id.* ¶11; MacFall Decl. ¶7.) Likewise,

only one Class Member, Mr. May, has objected to the fee request. Mr. May, however, provides

no particularized basis for that objection, stating only that the Court should not compensate

counsel until counsel provides "relief" to shareholders. (*See* Seidman Decl. Ex. H.) His

objection is based, not on the fee requested, but on the underlying Settlement. However, Mr.

May's objections to the reasons for the Settlement are groundless and his objection to the fee

lacks weight.

### 5.    The Fee Requested Is Fair in Relation to the Settlement Amount

The fifth factor cited by the Second Circuit for determining the appropriate percentage fee

award in class actions is the "requested fee in relation to the settlement," *i.e.*, whether the fee

represents a fair percentage of the settlement achieved. *Goldberger*, 209 F.3d at 50.

Here, Plaintiffs' Counsel requests 25% of the Settlement. Given the significant risks at

stake in succeeding on a motion to dismiss, a motion for summary judgment, or at trial, 25% of

the Settlement is reasonable.

### 6. Public Policy Considerations Fully Support the Fee Requested

The sixth factor in determining the fee awarded to plaintiffs' counsel in class actions is "public policy considerations." *Goldberger*, 209 F.3d at 50. "A strong public policy concern exists for rewarding firms for bringing successful securities litigation." *In re Ashanti Goldfields Sec. Litig.*, No. Civ. 00-717 (DGT), 2005 WL 3050284, at *5 (E.D.N.Y. Nov. 15, 2005); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 236 (S.D.N.Y. 2005) ("[P]ublic policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC."). This is the only factor that augurs against a fee award, because – as has been noted over and over again – the complaint lacks merit as a matter of fact and the plaintiffs and their counsel admit as much. One could argue that attorneys ought not be rewarded for cluttering the courts with meritless lawsuits. However, Defendants have not made that argument. Instead, knowing that they were almost certain to prevail (even on an amended complaint), Defendants have made a business decision to settle. It is not the province of this Court to gainsay their hard-headed business decision.

### C. Only One Class Member Has Objected to the Requested Fee

Over 54,000 copies of the Notice have been disseminated to potential members of the Class. The Notice informs the Class that Plaintiffs' Counsel intends to apply for an award of attorneys' fees not to exceed thirty percent (30%) of the Gross Settlement Fund, and for reimbursement of their expenses in the approximate amount of $125,000, plus interest on such fees and expenses at the same rate as earned by the Settlement Fund. Members of the Class,

which would include sophisticated institutional investors, were informed that they could object to the amount of attorneys' fees or expenses requested. The deadline for filing such objections has passed, and only one Class Member has come forward to object to the fee request. (*See* MacFall Decl. ¶62.) That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable. *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F. Supp. 97, 103 (S.D.N.Y. 1996) (determining that an "isolated expression of opinion" should be considered "in the context of thousands of class members who have not expressed themselves similarly"); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 327 (E.D.N.Y. 1993) (lack of objections to requested fee supported its reasonableness); *Ressler*, 149 F.R.D. at 656 (lack of objections is "strong evidence of the propriety and acceptability" of fee request).

Moreover, as noted above, the one objection to the fee request is utterly groundless. The objector, Mr. May, claims – without any rational grounds for his belief – that the settlement does not warrant approval because, *inter alia*, it represents a tiny fraction of Telik's market loss. But, as discussed at length in the MacFall Declaration, Lead Counsel's analysis shows that the vast majority of Telik's collapse in market capitalization was *unrelated* to the allegations in this case, but rather due to the failure of their leading new drug candidate.

## VI.    THE REQUEST FOR REIMBURSEMENT OF EXPENSES IS DENIED

It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class. *See, e.g., Teachers' Ret. Sys.*, 2004 WL 1087261, at *6; *Am. Bank Note*, 127 F. Supp. 2d at 430. Moreover, courts have awarded such expenses so long as counsel's documentation of them is "adequate." *NASDAQ Market-Makers*,

40

187 F.R.D. at 489.

In the MacFall Declaration and the accompanying exhibits, Plaintiffs' Counsel detail and document the $100,118.19 in expenses incurred in connection with prosecution of the action. (*See* MacFall Decl., Exs. A, B, and H.) These expenses are of the type that law firms typically bill to their clients and include such things as expenses for expert witness fees, document review and management, and depositions.[15] Plaintiffs' Counsel expended $12,890.98 for their damages expert and incurred $1,530.75 in costs for duplicating and imaging services. These costs were necessary to litigate this action and to conduct the confirmatory depositions, which took place in California. Plaintiffs' Counsel also expended $44,167.44 in costs for electronic research, including Westlaw and Lexis.

However, the Court declines to award these costs, in an exercise of discretion. I have said it before and I will say it again— Plaintiffs and their attorneys admit that the claims as alleged lack merit as a matter of fact. The facts did not "change" during the course of the litigation; rather, Plaintiffs' lead counsel learned that the truth was not on their side. They managed to settle before having to take the risk that they would not be permitted to amend their pleading, and they are entitled to compensation for bringing a benefit to the members of the Class. They will take home more than $1 million for commencing and prosecuting what they admit is a meritless lawsuit, knowing that, if the claims asserted had gone forward, they would have recovered nothing. In the circumstances, they can pay their own expenses out of their fee award.

---

[15] *See, e.g., LeBlanc-Sternberg*, 143 F.3d at 763; *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992).

CONCLUSION

The Settlement and Plan of Allocation are approved, as is the payment of 25% of the Settlement in attorneys' fees (without interest). Plaintiffs shall pay for all expenses out of their fee award; the Court declines to reimburse expenses. The objections are disallowed. The Clerk of the Court is directed to close the file as soon as the parties submit a form of judgment conforming to this decision.

Dated: September 10, 2008

_____
U.S.D.J.